United States District Court
District of Maine

| | |
|---|---|
| John Doe, | ) |
| | ) |
|     Plaintiff, | ) |
| v. | )    No. 2:23-cv-00423-JAW |
| | ) |
| Sara Smith, | ) |
| | ) |
|     Defendant. | ) |

**Defendant's Opposition to Plaintiff's Motion for Sanctions**

Plaintiff John Doe has filed a motion for sanctions under Fed. R. Civ. P. 11, ECF 75 (Plt. Motion), claiming that Defendant Sara Smith's motion for sanctions (ECF 31) (Def. Motion) was unfounded, had an (unspecified) legal theory with no reasonable chance of success, and was filed for an improper purpose. Defendant submits this opposition to that motion.

In brief, Defendant supported her motion for sanctions with a declaration from *Plaintiff's own father*, ECF 31-1 (Dad Decl.), who flatly contradicted Plaintiff's story of the core facts contained in his unverified complaint, and a declaration from Defendant, ECF 31-2 (Def. Decl.), who squarely contradicted Plaintiff's other key allegations concerning conversations that didn't involve Plaintiff. Remarkably, as part of his sanctions motion, Plaintiff submits a sworn declaration that *confirms* Defendant's central defense in this case, namely, that Plaintiff, *not* Defendant, told Plaintiff's father about his billion-dollar lottery winnings. ECF 75-1, ¶ 19 (Plt. Decl.). The final nails in the coffin come from the enclosed supplemental declarations from *Plaintiff's own father* (Dad Supp. Decl.), who explains under oath that Plaintiff told his father much more about his lottery winnings and then cut off all contact with him when his father wouldn't sever all ties with Defendant (the good mother to his young granddaughter), and from Defendant (Def. Supp. Decl.), who explains under oath more about the bullying, threatening, and

terrorizing by Plaintiff, Plaintiff's counsel, and his "security team." Sanctions—against Plaintiff and Plaintiff's counsel—are warranted.

## Background

The heart of Plaintiff's publicly-filed complaint is paragraph 17, which alleges: "*Upon information and belief*, Defendant has disclosed Protected Subject Matter in one or more telephone communications with John Doe's father and stepmother." ECF 1 (Complaint ¶ 17) (emphasis added). Defendant's counsel informed Plaintiff's counsel that that allegation was false, and that Plaintiff's father had provided a sworn declaration squarely contradicting this claim. ECF 31-3. Plaintiff persisted, and Defendant filed her sanctions motion. ECF 31. Plaintiff's father swore that the key allegation in paragraph 17 of the complaint was false, that *Plaintiff* had informed him and his wife about Plaintiff's lottery winnings, and that *Plaintiff's father* then had told Plaintiff's sister about the winnings. Dad Decl. ¶¶ 4–6.

The other critical allegation in Plaintiff's publicly-filed complaint is paragraph 18, which alleges: "*Upon information and belief*, and as a result of Defendant's unauthorized disclosure of Protected Subject Matter to John Doe's father and stepmother, other third parties are now in possession of John Doe's Protected Subject Matter, including his sister." Complaint ¶ 18 (emphasis added). For good measure, Defendant also submitted with her sanctions motion her own sworn declaration that the allegations in both paragraphs 17 and 18 were false, and that she had not told Plaintiff's father, stepmother, or sister about his lottery winnings. Def. Decl. ¶¶ 17–19. In short, Plaintiff made allegations on "information and belief" about conversations that he did not hear, and the parties to those conversations unequivocally denied under oath Plaintiff's assertions.

Plaintiff filed his original sanctions motion under seal, which was stricken by the Court. ECF 66. In his refiled sanctions motion, Plaintiff now admits: "I made the mistake of telling my

2

father that I had won the lottery without having him sign a confidentiality agreement." Plt. Decl. ¶ 19. Game, set, match. Plaintiff's own father further explains that Plaintiff told him a lot more than the naked fact he had won the lottery, including the fact that he had won over a billion dollars (reduced after taxes to about $500 million), what he planned on doing with the money, and all the things he said he would do for his father (which he never did). Dad Supp. Decl. ¶¶ 3–12. Defendant was entitled to believe what she was told contemporaneously about what Plaintiff had disclosed to his father (as opposed to the carefully curated Plaintiff declaration submitted now in conjunction with his sanctions motion). *See* Def. Supp. Decl. ¶¶ 39–43. In brief, Plaintiff's own sworn declaration knocks the struts out from under his complaint, and then his own father shatters the remaining shards of this suit.

Defendant's original declaration explains in detail why she also believes this lawsuit was brought for an improper purpose, namely, to use Plaintiff's limitless resources to bully and intimidate her to make concessions in the on-going family matter concerning their daughter. Def. Decl. ¶¶ 13–29. This lawsuit came on the heels of Defendant refusing Plaintiff's request to get back together, Plaintiff's offer to buy custody of her daughter, and a court granting Defendant's emergency motion for return of her daughter after Plaintiff had taken the daughter to points-unknown and cut off contact with her. *Id*. ¶¶ 24–26.

Although Plaintiff repeatedly smears Defendant in his declaration, Defendant does not descend into the gutter to respond. *See* Def. Supp. Decl. ¶¶ 4–13. Instead, Defendant's supplemental declaration provides more color to Plaintiff's improper actions relevant to *this* case. *See id*. ¶¶ 14–20 (describing kidnapping). Also, Plaintiff's counsel had her summoned from the emergency room where she was nursing a patient to serve her with the complaint; then Plaintiff's counsel sent a text message to her personal cell phone telling her that she was parked illegally at

the hospital; and Plaintiff's counsel sent her another text message later telling her that he could see she now was home and that she needed a lawyer to defend her in this case, all of which she found terrifying, invasive, intimidating, and downright creepy. *Id*. ¶¶ 21–33. Finally, Defendant finds being constantly followed by Plaintiff's "security team" even when her daughter is not with her, having her and her visitors' every move tracked, and perhaps even having her electronic devices monitored, to be part and parcel of a pattern of harassment and intimidation. *Id*. ¶¶ 34–38.

## Argument

Plaintiff argues that Defendant is subject to sanctions under Fed. R. Civ. P. 11 "when a party files a motion that has no reasonable factual basis." Plt. Motion 6 (citing *Marcello v. Maine,* 2006 WL 8459163, *1 (D. Me. Oct. 13, 2006)). Not to put too fine a point on it, sworn declarations from the only participants in telephone conversations provide a "reasonable factual basis" for stating that Plaintiff's characterizations of such conversations in the complaint on "information and belief" are fabrications.

Plaintiff's complaints about Defendant causing him bad press coverage are misdirected. The torrent of worldwide press was generated instead by Plaintiff's ill-advised filing of his public complaint suing the mother of his child because he wanted to hide his lottery winnings from his family. These articles appeared in November 2023 *before* Defendant retained counsel and answered the complaint in December 2023. *See* ECF 28 (Plt. Motion to File First Amended Complaint (FAC) Under Seal 6 (complaining about news articles from Nov. 17–22, 2023, *e.g.*, People Magazine, *$1.35B Mega Millions Winner Sues His Daughter's Mom for Telling His Family*). Plaintiff's alleged problems stem not from Defendant telling anyone about his lottery winnings, but from Plaintiff filing this self-owning lawsuit.

4

Plaintiff attempts to avoid the consequence of sworn declarations eviscerating the central allegations in the complaint by arguing the non-disclosure agreement (NDA) extended far beyond disclosure of Plaintiff's identity and the amount of the jackpot because it included other "Protected Subject Matter." *See* Plt. Motion 6–7. Conspicuously, Plaintiff does not provide the NDA's definition of Protected Subject Matter in his sanctions motion, much less explain which prong of that definition is even theoretically applicable here. Protected Subject Matter is defined:

> Information indicating that [John Doe] was the winner of the Maine lottery in January of 2023, the amount or existence of any assets of [John Doe], the amount of any assets being conveyed to the Daughter by [John Doe], the existence of children, family members, friends, and business associates, identity of the physical location or assets of [John Doe], or other information which [Defendant] reasonably knows not to disclose to protect [John Doe's] privacy.

Complaint ¶ 10 (quoting NDA ¶ 1(b)). The sworn declarations from Plaintiff, Plaintiff's father, and Defendant flatly contradict the claim that Defendant disclosed Plaintiff's identity or the jackpot to Plaintiff's father, stepmother, or sister. The complaint does not even make unfounded claims about the other Protected Subject Matter prongs, and presumably Plaintiff's father did not need any disclosure from Defendant to learn about the existence of his granddaughter or the identity and location of his son. Once Plaintiff's father swore that Plaintiff, not Defendant, told him about Plaintiff's big lottery win, that is the end of the matter. Plaintiff's complaint is built on a falsehood, and that is sufficient for Defendant to seek sanctions under Rule 11.

Plaintiff next argues that Defendant is subject to sanctions for characterizing Plaintiff's actions as "kidnapping." *See* Plt. Motion 7–9. To recount the basic facts, Plaintiff took their young daughter to an undisclosed location, cut off contact with their daughter, unilaterally withdrew their daughter from school, offered to buy custody of their daughter, and only returned the daughter to her mother when a court ordered him to do so. *See* Def. Decl. ¶¶ 13–29; Def. Supp. Decl. ¶¶ 14–20. Plaintiff's fragile ego is hurt by truthfully characterizing these facts as "kidnapping."

5

Plaintiff claims that he had the legal right to take the daughter away from her mother, her school, and her friends, and thus this cannot be characterized as kidnapping. Plt. Motion 7–9. Setting aside the fact that he is wrong (as demonstrated by the emergency family court order requiring him to return the child), which is an issue for another tribunal, Plaintiff ignores the fact that there are literally thousands of cases on Westlaw in which *judges* describe a parent taking a child as "kidnapping." Some are criminal cases. Some are not. Although Plaintiff might not consider his actions kidnapping, a concerned mother, a family court, and others might beg to differ. As the Third Circuit explained long ago, "Strictly speaking, a parent who seizes his or her child in violation of a custody decree is not guilty of 'kidnapping' as defined by the criminal law of most states. Nevertheless, the literature on parental abduction frequently refers to this conduct as 'kidnapping' or 'abduction.'" *Flood v. Braaten*, 727 F.2d 303, 304 n.1 (3d Cir. 1984); *see also* Appendix (collecting additional examples). If *judges* call such behavior kidnapping, Plaintiff can scarcely seek sanctions for Defendant likewise describing such behavior as kidnapping.

Plaintiff next argues that Defendant's sanctions motion was filed for an improper purpose because it was filed publicly and not under seal. *See* Plt. Motion 9. Plaintiff apparently has not heeded the Court's admonition when it struck his original sanctions motion filed under seal:

> The Plaintiff appears to be under the misimpression that this case will be conducted entirely under seal. I fail to see why this motion for sanctions needs to be sealed and, furthermore, the Plaintiff did not receive the Court's permission to file it under seal as required by Local Rule 7A. Accordingly, the motion is STRICKEN.

ECF 66. As this Court recently made crystalline, "even though a district court must weigh the presumptive right of public access against competing interests, the First Circuit cautioned that 'only the most compelling reasons can justify non-disclosure of judicial records that come within the scope of the common-law right of access.'" ECF 71 at 11 (quoting *United States v. Kravetz*, 706 F.3d 47, 52 (1st Cir. 2013)) (other citations omitted).

6

As Gertrude Stein said, there is no there there. "Mindful that the law recognizes a presumption 'of public access to judicial proceedings and records,'" *Brown v. Prudential Life Ins. Co. of Am.*, 2023 WL 2413992, \*1 (D. Me. Feb. 7, 2023) (quoting *United States v. Kravetz*, 706 at 52 ), Defendant filed her sanctions motion publicly. The press report submitted by Plaintiff about that public filing confirms that Defendant did *not* identify key information about the parties. *See* ECF 75-2 (news article attached to Plaintiff's motion for sanctions). "The lawsuit confirmed he lives in Maine, but does not specify where, and neither party is identified by their real name." *Id*. at 1. "Their custody case remains active, but it's unclear in which state they're litigating." *Id.* at 3. *Cf. Gladu v. Me. Dep't of Corrections*, 2022 WL 17832711, \*1 (D. Me. Dec. 22, 2022) ("While the Court understands that most parties would prefer to limit the personal information that is available on the public docket, to the extent the information is relevant to the Court's assessment of an issue, claim, or defense, the public interest is of 'paramount' significance.") (quoting *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987)).

Plaintiff repeatedly attacks Defendant for including "false-but-salacious tidbits in an *unsealed* Motion for Sanctions and subsequent filings." Plt. Motion 9 (emphasis in original and footnote omitted). Reality does not match Plaintiff's rhetoric. Plaintiff's declaration sidesteps important evidence that establishes motive for this baseless litigation. Plaintiff's declaration simply ignores Defendant's sworn statement that he tried to buy off Defendant for custody of their daughter. Def. Decl. ¶ 25. Although Plaintiff's counsel dismisses in his *brief* as "absurd" that "Plaintiff asked Defendant to 'get back together with him' and was 'rebuffed,'" Plt. Motion 3 n.1, Plaintiff wisely chose not to deny under oath in his *declaration* Defendant's sworn description of that rejected offer. Def. Decl. ¶ 6. Plaintiff's bruised ego certainly provides motive for his subsequent threatening and terrorizing tactics.

Although Plaintiff *claims* that he is not using baseless, expensive, federal litigation to extract concessions in the family court in order to exact revenge on a former lover, Defendant and a factfinder certainly could conclude otherwise. More importantly for present purposes, because Defendant believes it, and because there are good grounds to believe Defendant is right, there is nothing improper about asserting Plaintiff filed this lawsuit for the improper purpose of using his unlimited resources to crush Defendant, an emergency room nurse, in federal litigation and thus coerce her to make concessions concerning her daughter in an on-going family matter.

Plaintiff also argues that Defendant is subject to sanctions because Defendant filed her motion in bad faith for an improper purpose, namely, to identify Plaintiff and their daughter in the press. Plt. Motion 9. Not so.

*First*, Plaintiff complains that Defendant's sanctions motion discloses her occupation (which, of course, is not even arguably covered by the NDA). Plt. Motion 10. This is less identifying than *Plaintiff's* complaint, which states Defendant "resides at in [*sic*] Dracut, Massachusetts." Complaint ¶ 2. *Compare* Zippia, *Emergency Dep't Registered Nurse Demographics and Statistics in U.S.* ("There are over 1,175,598 emergency department registered nurses currently employed in the United States."), available at https://www.zippia.com/emergency-department-registered-nurse-jobs/demographics/ *with* U.S. Census, *Quick Facts, Dracut, Middlesex County, Massachusetts* (16,071 adult females in Dracut), available at https://www.census.gov/quickfacts/dracuttownmiddlesexcountymassachusetts.

*Second*, Plaintiff complains that the sanctions motion states the daughter's age. Plt. Motion 10. The motion, which describes the daughter as nine years old, *see* Def. Motion 2, is even less specific than *Plaintiff's* complaint, which alleges that the NDA "shall remain in effect through June 1, 2032, representing the date of majority for the Daughter." Complaint ¶ 15. Even more

8

alarming, Plaintiff's proposed amended complaint repeatedly identifies the daughter by name. *See generally* ECF 28-1. Once again, Plaintiff believes that he can disclose whatever facts he thinks will further his false narrative, but it is sanctionable for Defendant to defend herself.

*Third*, Plaintiff complains that the motion mentioned the parties' on-going family law dispute. Plt. Motion 10. As the press report about the sanctions motion submitted by Plaintiff noted, "it's unclear in which state they're litigating." ECF 75-2 at 3. Once again, *Plaintiff's* proposed amended complaint provides even more detail about Defendant's family court action, including the name of her counsel (thus likely narrowing the location of the family court matter), and details about various filings in that matter. *See* ECF 28-1. More importantly, the point of Defendant's Rule 11 sanctions motion is that Plaintiff is trying to leverage his wealth in this expensive, but bootless, federal lawsuit to extract concessions in the Lawsuit-That-Cannot-Be Named.

If Plaintiff is concerned about his privacy and his daughter's safety, he certainly has taken an odd approach to protect such privacy and safety by publicly filing a complaint in federal court that contains sufficient detail to allow internet sleuths "to discover Plaintiff's identity from the pseudonymous court filings" and to "deride his attempt to remain anonymous." ECF 28 (Plt. Motion to File FAC Under Seal 6). It should be evident that Defendant—not Plaintiff—has scrupulously complied with the requirements to use pseudonyms and not disclose personally identifiable information in accordance with Fed. R. Civ. P. 5.2.

Suffice it to say, there is nothing irregular or suspect about publicly filing a substantive motion in federal court. The notion that Plaintiff can file his fictitious narrative publicly, including whatever details and breadcrumbs he wants, but that Defendant cannot call out those allegations as pure inventions submitted for an improper purpose, without incurring sanctions, is perverse.

Plaintiff may be embarrassed—and should be embarrassed—that the public will learn that his own father effectively has called him a liar, that he filed this lawsuit because he didn't want his own family to know that he won the lottery, that he was motivated to punish the mother of his child after she rejected him notwithstanding his billion-dollar lottery winnings, that he tried to buy custody of his daughter from Defendant, and having failed on that score, then used his wealth to try to overwhelm Defendant in this Stalingrad litigation and thus extort concessions in the on-going family dispute concerning their daughter. While we understand why Plaintiff would want to hide these facts from the public, the public is entitled to know why Plaintiff's complaint is baseless and was filed for an improper purpose.

## Conclusion

Defendant respectfully requests that Plaintiff's motion for sanctions be denied.

Dated: May 10, 2024

Respectfully submitted,

/s/Peter J. Brann
Daniel A. Nuzzi
Peter J. Brann
Hannah L. Wurgaft
Brann & Isaacson
113 Lisbon St., P.O. Box 3070
Lewiston, ME 04243-3070
(207) 786-3566
dnuzzi@brannlaw.com
pbrann@brannlaw.com
hwurgaft@brannlaw.com

*Attorneys for Defendant*

**Appendix – Examples of Courts Using "Kidnapping" in Vernacular**

*Anderson v. Cramlet*, 789 F.2d 840, 844 (10th Cir. 1986) (affirming summary judgment for Defendant in defamation action because alleged defamatory statements were substantially true) ("[I]n the popular sense of the word, Ms. Cramlet's letter truthfully and accurately described Mr. Anderson's conduct as 'kidnapping.'").

*Brokaw v. Mercer County*, 235 F.3d 1000, 1012 (7th Cir. 2000) (lower court dismissal reversed and remanded, in part, because Plaintiff may succeed on Fourth Amendment and Due Process claims) (Deputy Sheriff and Probation Officer, who removed Plaintiff from his home, "acted like kidnappers rather than law enforcement officers.").

*Colombrito v. Kelly*, 764 F.2d 122, 127 (2d Cir. 1985) (Defendants not entitled to attorneys' fees) ("[Plaintiff] acknowledged that he believed that his parents had acted out of love and concern for him … and that he had acted pursuant to their wishes in going with them to Kingston, where he was kidnapped.").

*Harrison v. Chicago Sun-Times, Inc.*, 793 N.E.2d 760, 766 (Ill. App. Ct. 2003) (defamation suit against newspaper; appellate court opined the use of the word "kidnapped" in news headline was substantially true) ("the use of the word 'kidnapped' does not necessarily denote a criminal offense, but is also used in custody contexts to describe a wrongful taking of a child.").

*In re Lewin*, 149 S.W.3d 727, 740 (Tex. App. 2004) (finding trial court lacked subject-matter jurisdiction to enter temporary custody order and abused its discretion in failing to enforce order under Hague Convention) ("Courts simply do not permit parents to kidnap children.").

*Lieberman v. Tabachnik*, 625 F. Supp. 2d 1109, 1114 (D. Colo. 2008) (ordering children returned to Mexico under the Hague Convention and Intl. Child Abduction Remedies Act) ("[Respondent] alleged that Petitioner had kidnapped the children in the past, had not fed them, and had exposed them to verbal and other forms of abuse while they resided in Mexico. Petitioner countered by explaining the circumstance of the divorce, professed love for his children, denied that he had abused the children and described the kidnaping incident from his perspective.").

*Matter of C.A.*, 2010 WL 11647364, *7 (S.D. Fla. Dec. 23, 2010) (recommending children remain in mother's custody after father failed to establish a *prima facie* case of wrongful removal and/or retention) ("Respondent and her daughters left said address, under cover of night, with a police escort in November 2009 – around Thanksgiving – because of fear that Petitioner might kidnap the children or 'do something horrible.'").