UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 2:23-cv-00423-JAW |
| | ) |
| SARA SMITH, | ) |
| | ) |
| Defendant. | ) |

**Defendant's Supplemental Declaration**

Pursuant to 28 U.S.C. § 1746, ▮▮▮▮▮▮▮ declares as follows:

1. I am over the age of eighteen and competent to make this declaration. I make this declaration based on personal knowledge, and on information and belief, and to the extent it is based on information and belief, I believe it to be true.

2. I am the Defendant in *John Doe v. Sara Smith*, 2:23-cv-00423-JAW, and have previously submitted a declaration in this matter. It was signed by me on January 10, 2024, and filed on February 7, 2024.

3. I submit this supplemental declaration to address a number of false and misleading statements in Plaintiff's declaration dated April 4, 2024.

4. I read with interest and surprise the Plaintiff's characterization of our relationship over the years and my working to provide for the family. Because I understand that many of his erroneous statements may be more of an issue for the family court, and because I do not want to descend into the gutter to respond, I'll just address the major mischaracterizations that may be relevant to this case.

5. Plaintiff claims that around July of 2021, I abandoned him and our daughter by taking a traveling nurse assignment in Florida. He further alleges that I made the decision "not to co-parent" and that he was raising our daughter "alone." This could not be further from the truth.

6. As he admits in his declaration, Plaintiff was "terminated" from his job during the pandemic. Given the needs of our family, we agreed that I would apply for traveling nurse assignments, which had higher wages than the positions within driving distance of our home.

7. Plaintiff wanted me to take the out-of-state assignments because it was beneficial to our family and enabled us to pay our mortgage. He was also excited about visiting me in the states where I would be working.

8. My first traveling nurse assignment was in Wyoming in 2020. Our daughter was homeschooled at the time. Plaintiff and our daughter flew out to stay with me for a week at the end of my assignment, and we all flew home together.

9. My next traveling nurse assignment was in Florida in 2021. Plaintiff and our daughter visited for two weeks. Plaintiff also brought his two dogs. We visited the beach, the aquarium, local museums, and went out for dinner as a family.

10. During these assignments, Plaintiff and I shared a joint bank account. I was the only source of income for our family. I also gave Plaintiff money to start a new business because he remained unemployed.

11. In between my out-of-state nursing assignments, I was home with Plaintiff and our daughter. Even though I had the best earning potential out-of-state, I primarily took on assignments within driving distance from our home so that I could be home every night to help care for our daughter.

12. After the Plaintiff and I broke up, I moved to ▇▇▇▇▇▇. Plaintiff claims that during this time I "rarely made the trip" to visit our daughter. That is not true. Plaintiff only took care of our daughter on the weekends, and I cared for her the rest of the week. Sometimes I made the trip to ▇▇▇, other times he made the trip to ▇▇▇▇▇▇, or we met halfway in ▇▇▇▇▇▇▇▇▇▇▇▇.

13. When our daughter went back to public school in August 2022, Plaintiff only cared for her every other weekend, and I cared for her the rest of the time.

14. I see that Plaintiff believes that my prior statement that he "kidnapped" our daughter in 2023 is inaccurate. I stand fully by my prior declaration, and believe that declaration understates the trauma and fear caused by his actions.

15. While I initially and reluctantly agreed that Plaintiff could take our daughter on a temporary trip to an undisclosed location beginning on February 18, 2023, I was assured I could speak to our daughter at any time and that she would wear a GPS watch so I would know her whereabouts at all times.

16. Shortly into the trip there were a number of red flags that made it clear to me that something was wrong.

17. As previously noted, the GPS watch was turned off and mailed back to me. On February 22, 2024, Plaintiff emailed me stating:

----- Forwarded Message -----
**From:** ▇▇▇▇▇▇▇▇▇▇
**To:** ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
**Sent:** Wednesday, February 22, 2023 at 06:41:09 PM EST
**Subject:** Communication

▇▇▇,

Based on strong recommendations from security, ▇▇▇▇▇▇'s watch will be turned off and mailed back to you. We have purchased ▇▇▇▇▇ a phone. It will be turned on and available for you to call from 8-9pm in order to limit her screen time, yet not restrict your access to her.

3

We will follow-up with a text to you from her new phone. It is not to be shared with anyone.

In addition, ▮▮▮▮▮ and ▮▮▮▮'s current numbers and/or emails won't be used for communication from this point forward. All communication for ▮▮▮▮▮ will be addressed from this email.

Thank you.

18.     I understand that the Plaintiff now claims he turned off and mailed back the GPS watch because I had been using the watch to eavesdrop on his conversations. That conspiracy theory is entirely unfounded.

19.     I never eavesdropped on his or anyone's conversations through our daughter's GPS watch. I was not aware that her GPS watch even had that capability, nor would I know how to do so even if that was a possibility. I do not know today if that is even technically possible.

20.     The biggest red flag was the withdrawal of our daughter from her school by Plaintiff's attorney, which was done without my prior consent or knowledge. I was shocked to learn from the school that it had been informed that our daughter would not be returning for the rest of the year.

21.     I previously stated that the Plaintiff has brought this lawsuit in order to intimidate me and to extract concession in our family law dispute. In response, the Plaintiff now claims that I only raised the issues of his kidnapping of our child to attempt to extort money from him. Nothing could be further from the truth.

22.     Plaintiff's attempts to harass, bully, and intimidate me include not only the filings in this lawsuit, but also the actions of Plaintiff's counsel, Attorney Greg Brown, and the surveillance and other tactics of Plaintiff's so-called "security team."

23.     The day after an unsuccessful mediation with a family law mediator, Plaintiff's counsel, Attorney Greg Brown, personally served me with the complaint in this case.

24. On November 15, 2023, Attorney Brown, who I did not know at the time, came to the hospital where I was working as an emergency room nurse. I was busy at the time with an ICU patient and was told someone was waiting to see me in the waiting room. It took about 20 minutes before I could take a break from treating the very sick ICU patient to go to the waiting room.

25. I had another nurse come out with me to the waiting room. It was very unusual for anyone to try to visit me at work, and I was extra cautions because around this same time, I noticed that I was frequently being followed by an unknown car.

26. When we got to the waiting room, there was a man waiting for me who I did not know. One of us asked him, "Who are you?" to which he responded, "I'm Greg Brown, consider yourself served."

27. Attorney Brown handed me a stack of papers and watched me as I looked through them. I did not know what the papers were as they mentioned a John Doe and Sara Smith. As I read through them, I was able to figure out that I was being sued in federal court in Maine.

28. I was mortified to have been served with a lawsuit while at work. I asked my supervisor to let me go home because I was so upset and knew I would not be in the right frame of mind to give my patients my undivided attention for the rest of the day.

29. After serving me with legal papers at the emergency room waiting room, Attorney Brown then texted me on my personal phone telling me I was illegally parked and needed to move my car. The message this text conveyed—I have your personal cell phone number, I know where you work, I know what car you drive, and I am watching you—was terrifying.

30. Later that same night, Attorney Brown texted me again indicating that he was watching me, knew I was home, and that I should contact an attorney:



31. I found Attorney Brown texting me about my car and my whereabouts to be highly invasive, intimidating, and downright creepy. There was no reason he should know which car was mine or where I live, let alone text me on my personal phone.

32. I parked where I did, in a doctor's parking place, because I had asked one of the doctors in the hospital if I could park in their spot which was closer to the entry door. I made this request because I was afraid I was being followed (which turned out to be true).

33. The fact that Attorney Brown knew when I arrived home and texted me after I walked in the door solidified for me that I was indeed being followed. Attorney Brown's conduct, including following me and texting me, frightened me to no end.

34. To this day, I continue to be followed and watched by the Plaintiff's so-called "security team." Although I have been told this is for our daughter's safety, unmarked cars often are outside my home and follow me wherever I go even when my daughter is not in my care.

35. The "security team" is aggressive and extremely visible. I understand that other parents have complained about them to our daughter's school, and I understand that the school has since asked the "security team" to stay off school property.

36. On several occasions I have observed the "security team" take down the license plates of visitors to my home. I recently asked one of the members of the "security team" about their role and responsibilities. He informed me that in addition to safety and security, they were doing personal investigation or "PI" work and had been directed to take down license plate numbers of any visitors to my home.

37. I am also concerned that the "security team" is monitoring my electronic devices. I often hear a clicking noise when I am on calls, including on calls with my attorneys, and I have had a number of unexplained dropped calls. This has been happening for months.

38. I do not feel safe or secure with Plaintiff's "security team" team watching my every move and tracking visitors to my home. I believe this is another tactic to scare me and intimidate me.

39. While the Plaintiff admits that he told his father he won the lottery, his claim that he did not tell his father anything else about his lottery winnings "beyond the simple fact that [he] had won" is not true based on my conversations with his father and Plaintiff's stepmother.

40. Plaintiff's stepmother called me in late February 2023, a day or two after the Plaintiff, our daughter, and his new girlfriend visited them at their home. She told me, "I heard the news about [Plaintiff's] lottery winnings." She said she was excited for Plaintiff. She said that

7

Plaintiff told her and the Plaintiff's father that he was going to put money into a trust for them that would give them enough money to live life on and to be able update their home, so that they would not have to worry about money in the future.

41. According to Plaintiff's stepmother, Plaintiff told them that they would never have to go into a nursing home, and they could remain in their house to take care of each other. She was so excited that she could put a new front porch on their house, which she had wanted for years. She explained that it would take a while to get the money because it was in a trust. She said she didn't know how long it would take to get the money the Plaintiff promised to give them, but Plaintiff told them it would take a couple of months.

42. Plaintiff's stepmother also told me that during the visit, Plaintiff and his dad went to look at a car to purchase for Plaintiff's dad. Apparently, Plaintiff did not purchase the car.

43. I told her I was happy for them, but I didn't tell them anything about Plaintiff's winnings or what Plaintiff told me that was planning to do with his money or to "benefit" our daughter.

I declare under penalty of perjury that this declaration is true and correct.

Executed on May 2, 2024.



would give them enough money to live life on and to be able update their home, so that they would not have to worry about money in the future.

41. According to Plaintiff's stepmother, Plaintiff told them that they would never have to go into a nursing home, and they could remain in their house to take care of each other. She was so excited that she could put a new front porch on their house, which she had wanted for years. She explained that it would take a while to get the money because it was in a trust. She said she didn't know how long it would take to get the money the Plaintiff promised to give them, but Plaintiff told them it would take a couple of months.

42. Plaintiff's stepmother also told me that during the visit, Plaintiff and his dad went to look at a car to purchase for Plaintiff's dad. Apparently, Plaintiff did not purchase the car.

43. I told her I was happy for them, but I didn't tell them anything about Plaintiff's winnings or what Plaintiff told me that was planning to do with his money or to "benefit" our daughter.

I declare under penalty of perjury that this declaration is true and correct.

Executed on May 2, 2024.

8