UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:23-cv-00423-JAW |
| | ) | |
| SARA SMITH, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| MAINE TRUST FOR LOCAL | ) | |
| NEWS, L3C, *d/b/a Portland Press* | ) | |
| *Herald/Maine Sunday Telegram*, | ) | |
| | ) | |
| Intervenor. | ) | |

## ORDER ON MOTION FOR CLOSURE OF TRIAL

Consistent with this circuit's well-established precedent on the right of public access to civil proceedings, the court denies a plaintiff's motion for a closed trial and for testimony by pseudonym at such a trial.

## I.    PROCEDURAL BACKGROUND

On November 14, 2023, John Doe, a pseudonym for the father of a minor daughter, filed a lawsuit against Sara Smith, a pseudonym for the mother of the same minor, seeking an injunction and other relief against Ms. Smith for disclosure of information subject to a Non-Disclosure Agreement (NDA) between them. *Compl.* (ECF No. 1). Specifically, Mr. Doe, a winner of the Maine State Lottery, claimed that Ms. Smith violated the NDA by informing third parties about his winnings. *Id.* at 4-5.

After the parties proceeded with discovery, trial was scheduled to commence on April 1, 2025. *Trial List* (ECF No. 178). On February 7, 2025, Mr. Doe moved for a closed trial. *Pl.'s Mot. for Closure of Trial* (ECF No. 179) (*Pl.'s Mot.*). His motion preemptively informed the Court that he intended to seek interlocutory appeal of the issue of closure. *Id.* at 1 & n.1. Ms. Smith opposed the Plaintiff's motion on February 28, 2025. *Def.'s Br. in Opp'n to Pl.'s Mot. for Trial Closure* (ECF No. 195) (*Def.'s Opp'n*). Maine Trust for Local News, L3C d/b/a Portland Press Herald/Maine Sunday Times (Maine Trust), an intervenor in this suit, submitted its opposition to the Plaintiff's motion on the same date. *Opp'n to Pl.'s Mot. for Closure of Trial, by Intervenor Me. Trust for Loc. News* (ECF No. 196) (*Intervenor's Opp'n*). On March 14, 2025, the Plaintiff replied separately to the Defendant's opposition, *Pl.'s Reply to Opp'n by Def.* (ECF No. 203) (*Pl.'s Reply to Def.*), and the Intervenor's opposition, *Pl.'s Reply to Opp'n by Intervenor* (ECF No. 204) (*Pl.'s Reply to Intervenor*).

## II.    THE PARTIES' POSITIONS

### A.    The Plaintiff's Motion

Mr. Doe notes the Court "hit the nail on the head" when it observed in a January 10, 2025 status conference that he is faced with a "Catch-22" if this case were to proceed to a public trial: "even if Plaintiff were to win on his claims, his identity and confidential information would be revealed to the public and the media; he would effectively lose the privacy war and subject himself and his minor daughter to the irreparable harm he brought suit to avoid." *Pl.'s Mot.* at 1; *see also Min. Entry* (ECF No. 174). He thus files this motion for a closed trial and informs the Court of his

intent to seek interlocutory appeal of the Court's ruling if necessary. *Pl.'s Mot.* at 1. Mr. Doe specifically requests that any trial in this matter be closed in its entirety to the public and media, or alternatively that all testimony of the parties and their family members to be submitted to the jury be taken by telephone or audio-only Zoom along with "appropriate safeguards, including, but not limited to, the partial closure of any trial to the public and media where appropriate, in order to ensure that the identities and other personal identifying information of the Parties and their family members remain anonymous." *Id.* at 2.

### 1.    Trial Closed in its Entirety to the Public and Media

Mr. Doe begins with his legal argument in favor of an entirely closed trial. He contends, first, that "[a]t issue is whether there is a First Amendment and/or common law right of public access to any jury trial in this civil matter." *Id.* He proffers that neither the United States Supreme Court nor the First Circuit has recognized a First Amendment right of access to civil trial proceedings and asserts the First Circuit previously suggested there is no such right. *Id.* (citing *United States v. Kravetz*, 706 F.3d 47, 52 (1st Cir. 2013); *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 495 (1st Cir. 1992)). If the Court were to consider whether a First Amendment right of access applied, the Plaintiff states that it would follow a two-step inquiry by first considering "experience and logic" and then assessing whether closure of the trial would survive strict scrutiny. *Id.* at 3 (citing *Press-Enter. Co. v. Super. Ct. of Cal. for Riverside Cnty.*, 478 U.S. 1, 8-9 (1986); *Courthouse News Serv. v. Quinlan*, 32 F.4th 15, 20 (1st Cir. 2022)).

Turning to the common law right of public access to civil trials, the Plaintiff argues "that access is not unfettered" and requires consideration of "[i]mportant countervailing interests." *Id.* (citing *Kravetz*, 706 F.3d at 59). "Significantly, '[p]rivacy rights of participants and third parties are among those interests which, in appropriate cases, can limit the presumptive right of access to judicial records," he says, adding that in *Kravetz*, the First Circuit instructed courts to consider "the degree to which the subject matter is traditionally considered private rather than public." *Id.* at 3-4 (citing *Kravetz*, 706 F.3d at 59, 62). The First Circuit further noted that "[f]inancial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public." *Id.* at 4 (citing *Kravetz*, 706 F.3d at 62).

Turning to his case, the Plaintiff asserts that, under the First Amendment or common law standards, the Court should close any jury trial in this case to the public and media. *Id.* at 4.

He begins by raising four First Amendment arguments which he submits support his motion for a closed trial in this matter. First, returning to his "Catch-22" argument, he cites caselaw from the Southern District of New York in which that court, adjudicating a matter involving testimony of trade secrets, "employed the least restrictive means practicable to preserve the confidentiality of legitimate and important trade secrets." *Id.* at 5 (quoting *Standard & Poor's Corp. v. Commodity Exch., Inc.*, 541 F. Supp. 1273, 1278 (S.D.N.Y. 1982) ("To have refused to close the

proceedings during the testimony concerning the trade secrets would have . . . put [plaintiff] to the Hobson's choice of not suing [defendant] for use of its name and Index, and indirectly thereby, use of its trade secrets in assuring the accuracy of that Index, or suing and losing forever all the proprietary value of that Index"). Mr. Doe concedes that "Plaintiff's identity is far broader in scope than a litigant's trade secrets, hence the request for closure of the entire trial," but contends "the concern is the same." *Id.*

Second, Mr. Doe argues that requiring him to disclose his identity would deter similarly situated litigants in the future from seeking to enforce NDAs that, by definition, protect their identity and confidential subject matter "and thereby play a negative role (as opposed to a significant positive role) in civil matters of this type." *Id.*

Third, he posits that, although the parties' minor child is not a party to this proceeding, "the child's safety is at the heart of Plaintiff's claims in this case," and asserts "[t]he most reliable way to ensure the minor child's safety and privacy is to close any trial in its entirety to the public and media." *Id.* at 5-6 (citing *Jessup v. Luther*, 277 F.3d 926, 928 (7th Cir. 2002) ("When there is a competing interest in secrecy, as in the case of trade secrets, the identity of informers, and the privacy of children, portions and in extreme cases the entirety of a trial record can be sealed . . .[]. The interest in secrecy is weighed against the competing interests case by case")).

Fourth, seeking to differentiate his case from a prior matter in this District, he says "in contrast, the dispute is purely private and does not involve any public

interest as the constitutionality of a state law." *Id.* at 6 (citing *Nat'l Org. for Marriage v. McKee*, Civil No. 09-538-B-H, 2010 U.S. Dist. LEXIS 90749, at *10 (D. Me. Aug. 24, 2010) (citation amended)).

Turning to address the common law right of public access, Mr. Doe disputes "a common law right of access to any civil jury trial in this matter" because, under *Kravetz*, "identification of Plaintiff as the winner of the lottery is the type of private financial information that weighs heavily against disclosure, as are the safety and privacy interests of the Parties' minor child." *Id.* at 6-7 (citing *Kravetz*, 706 F.3d at 62). Thus, he contends that, "when weighing the competing interests between public access and the Parties' and third parties' privacy interests, this is one of those exceptional cases where any trial in this matter should be closed in its entirety to the public and media." *Id.* at 7.

## 2. Use of Pseudonyms for the Parties and their Family Members

In addition to moving for a closed trial, the Plaintiff also asks that "the identities of the Parties, their minor child, and their family members remain unknown to the public and media, including through trial." *Id.* He avers that when evaluating the propriety of using pseudonyms in a civil case, the First Circuit has directed courts to weigh the "totality of the circumstances" and cautioned that pseudonyms should only be used in "exceptional circumstances," such as where (1) a "would-be Doe who reasonably fears that coming out of the shadows will cause him unusually severe harm (either physical or psychological)"; (2) identifying the would-be Doe would harm innocent non-parties"; or (3) "the injury litigated against would

6

be incurred as a result of the disclosure of the party's identity." *Id.* (quoting *Doe v. MIT*, 46 F.4th 61, 70-72 (1st Cir. 2022) (internal quotation marks and punctuation omitted by Plaintiff)). Mr. Doe reminds the Court of its discretion to determine the need for anonymity in a given case. *Id.* at 7-8 (citing *MIT*, 46 F.4th at 72, 74; *Doe v. Town of Lisbon*, 78 F.4th 38, 46 (1st Cir. 2023)). He also incorporates his arguments asserted in his November 15, 2023 motion to proceed under pseudonym. *Id.* at 8 (citing *Mot. for Leave to Proceed under Pseudonym and for Protective Order, and Mem. in Support* (ECF No. 4)).

### 3. Partial Closure and Zoom Testimony

If the Court does not grant the Plaintiff's motion for a trial sealed in its entirety and the use of pseudonyms for the duration of the proceeding, Mr. Doe alternatively requests that all trial testimony of the parties and their family members be taken by telephone or audio-only Zoom with "appropriate safeguards," including partial closure of any trial to the public and media "where appropriate" to ensure the identities and other personal identifying information of the parties and their family members remain anonymous. *Id.* at 8-9. He reports that, since the onset of the COVID-19 pandemic, testimony by telephone or Zoom "has become common," and, in the instant case, this approach would appropriately balance the competing interests of anonymity and public access. *Id.* at 9.

The Plaintiff concludes by reiterating his request for a closed trial and requesting oral argument on this motion. *Id.* at 10.

### B.    The Defendant's Opposition

Ms. Smith opposes what she terms the Plaintiff's "extraordinary, unprecedented request," averring he "does not cite *any* case entirely closing a trial, or indeed, cite *any* case supporting his 'alternative' request to allow witnesses to testify anonymously by telephone." *Def.'s Opp'n* at 1 (Defendant's emphasis ).  Given the Plaintiff's clear aversion to a public trial, the Defendant maintains he should dismiss his claims against her.  *Id.*  She proceeds to address the issue of pseudonyms and a closed trial raised by the Plaintiff.

### 1.    Use of Pseudonyms at Trial

Ms. Smith first reminds the Court that it said in a previous order that "the caselaw has repeatedly shown[] even when pseudonyms are allowed during the discovery phase in the run-up to trial, there is no guarantee that the Court will sanction their use if the case goes to trial."  *Id.* at 4 (quoting *Order on Mot. to Unseal* at 28-29 (ECF No. 71) (internally citing *Tourangeau v. Nappi Distribs.*, No. 2:20-cv-00012-JAW, 2023 U.S. Dist. LEXIS 29369 (D. Me. Feb. 22, 2023); *MIT*, 46 F.4th at 73) (citation amended)).  The Defendant questions whether it would be consistent with this cited caselaw to allow the parties to continue proceeding by pseudonyms at trial.  *Id.* (citing *Order on Mot. to Unseal* at 28-29; *MIT*, 46 F.4th at 67).

She next argues, "[a]s a practical matter," "it is difficult to see how allowing the parties to use pseudonyms at trial would make any difference if all of the other witnesses are relatives, partners, friends, and business associates, and their testimony concerns what the parties said and did."  *Id.*  Ms. Smith proffers that it is

"inevitable that witnesses will identify the parties at trial," particularly because some of the Plaintiff's proffered witnesses are children.  *Id.*

### 2.    Courtroom Trial Closure

Turning to the Plaintiff's motion for an entirely closed trial, the Defendant responds that federal civil trials are presumptively open as a matter of federal civil procedure.  *Id.* at 4-5 (citing FED. R. CIV. P. 43(a) ("[a]t trial, the witnesses' testimony must be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise"); FED. R. CIV. P. 77(b) ("[e]very trial on the merits must be conducted in open court and, so far as convenient, in a regular courtroom"); FED. R. CIV. P. 1)).

Ms. Smith argues the Supreme Court has established that the First Amendment guarantees the press and public a right of access to criminal proceedings and has noted in dicta that historically both civil and criminal trials have presumptively been open.  *Id.* at 5 (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580-81, 580 n.17 (1980) ("Whether the public has a right to attend trials of civil cases is a question not raised by this case, but we note that historically both civil and criminal trials have been presumptively open")).  The Defendant observes that the Plaintiff's argument to the contrary lacks citations, and reminds the Court of its prior holding that, while the applicability of the First Amendment to civil cases is unsettled in Supreme Court and First Circuit jurisprudence, there is a robust common law right of public access in civil cases.  *Id.* at 5-6 (citing *Order on Mot. to Unseal* at 9-14).  Ms. Smith proceeds to cite caselaw from other district and circuit

courts concluding there is such a First Amendment or common law right of public access to civil trials, some similarly relying on the Supreme Court's dicta in *Richmond Newspapers. Id.* at 6-7 (collecting cases). The Plaintiff's cited caselaw from the Southern District of New York and the Seventh Circuit, Ms. Doe submits, is inapposite to the closed trial requested here because these cases involved, respectively, a forty- to fifty-minute courtroom closure during the duration of one witness's testimony regarding trade secrets and the reversal of the sealing of a settlement agreement. *Id.* at 7-8 (citing *Standard & Poor's Corp.*, 541 F. Supp. at 1274; *Jessup*, 277 F.3d at 926).

Ms. Smith argues Mr. Doe "does not even attempt to clear th[e] high bar" required to overcome the presumption of public access to civil trial. *Id.* at 8-9 (citing *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059 at 1070-71 (3d Cir. 1984) ("[T]o limit the public's access to civil trials there must be a showing that the denial serves an important governmental interest and that there is no less restrictive way to serve that governmental interest")). "As Johnny Depp, Rudy Giuliani, Britney Spears, and many others have discovered," she insists, "even rich and famous people are required to try their messy, embarrassing, civil cases in public." *Id.* at 9.

### 3.    Plaintiff's Alternative Request for Anonymous Testimony

Next, Ms. Smith argues that Plaintiff's alternative request of anonymous telephone or audio-only Zoom testimony "fares even worse" and that Mr. Doe "does not point to a single case that allowed parties to phone it in at trial." *Id.* at 10 (citing *Pl.'s Mot.* at 8-10). She says that Mr. Doe "concedes it may not work and may have

deleterious collateral effects . . . and it certainly won't work because it doesn't extend to Plaintiff's girlfriend, friends, and business associates, all of whom are potential witnesses. Only a complete closure would satisfy Plaintiff's professed objective, and that is impermissible." *Id.* (citing *Pl.'s Mot.* at 9).

Ms. Smith concludes by urging the Court to deny the Plaintiff's request and order that a trial in this matter proceed open to the public and press. *Id.*

### C.    The Intervenor's Opposition

Maine Trust also opposes the Plaintiff's request for a closed trial and the use of audio-only testimony, arguing "American civil trials must be open to the public" and there is no exception for NDAs or wealthy parties, "notwithstanding the extra security problems that the very wealthy sometimes face." *Intervenor's Opp'n* at 1.

### 1.    Closed Trial

First, Maine Trust argues the Federal Rules of Civil Procedure, the common law right of public access, and the First Amendment all preclude sealing the trial in the instant case. *Id.* (citing FED. R. CIV. P. 77(b); FED. R. CIV. P. 43(a); *B.H. v. McDonald*, 49 F.3d 294, 297 (7th Cir. 1995)). The Intervenor discusses caselaw from the Supreme Court establishing that "[t]he First and Fourteenth Amendments clearly give the press and the public a right of access to trial themselves, civil as well as criminal," *id.* at 2 (quoting *Richmond Newspapers*, 448 U.S. at 599 (Stewart, J., concurring)), and "[h]istorically, both civil and criminal trials have been presumptively open." *Id.* (quoting *Richmond Newspapers*, 448 U.S. at 580 n.17). Further, it notes the First Circuit's holding that "each of [its] sister circuits have

11

considered whether the right [of public access] extends to at least some documents and proceedings in civil cases and have concluded that it does." *Id.* (quoting *Courthouse News Service v. Quinlan*, 32 F.4th 15, 20 n.8 (1st Cir. 2022), and collecting cases from other circuit courts and the Supreme Court)). Maine Trust further argues "the common-law right of access extends to judicial records in civil proceedings." *Id.* (quoting *In re Providence J. Co., Inc.*, 293 F.3d 1, 13 n.5 (1st Cir. 2002) (then collecting cases)).

In addition, Maine Trust argues none of the exceptions enumerated in Rule 43(a) or 77(b) applies to the instant matter, and no special circumstances are present to outweigh either the First Amendment or common law right of access to justify sealing. *Id.* at 2-3 (citing *Kravetz*, 706 F.3d at 62 (in some instances, courts may allow sealing of "financial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters"); *Publicker*, 733 F.2d at 1071 (under the First Amendment right of access, there must be a showing of "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest") (in turn quoting *Press-Enterprise Co. v. Superior Ct.*, 464 U.S. 501, 510 (1984)). The Intervenor stresses that the cases cited by Plaintiff do not overcome this presumption and emphasizes that, while the Seventh Circuit acknowledged "the entirety of a trial record can be sealed," that court clarified this would only apply "in extreme cases" and did not contemplate the possibility that an entire trial would be sealed as well. *Id.* at 4-5 (quoting *Jessup*, 277 F.3d at 928).

12

Further, Maine Trust argues the parties' NDA does not overcome the well-established public right of access. *Id.* at 5 (citing *Schnatter v. 247 Grp.*, No. 3:20-cv-00003-BJB-CHL, 2024 U.S. Dist. LEXIS 111010, at *4 (W.D. Ky. June 24, 2024) (the existence of a confidentiality clause does not "automatically justify sealing documents in litigation") (citation amended); *Martis v. Dish Network*, No. 1:13-cv-1106, 2013 U.S. Dist. LEXIS 160786, at *6 (W.D. Mich. Nov. 12, 2013) ("Once the parties resort to the courts, however, their confidentiality agreement does not, and cannot, authorize the sealing of a presumptively public federal court record. The parties are privileged to arbitrate in secret, but they must litigate in public") (citation amended)). The Intervenor thus argues "[h]aving not availed themselves of the option of including a confidential arbitration clause in their [NDA], the parties must litigate in a public forum." *Id.* (citing *Bloom Energy Corp. v. Badger*, No. 21-cv-02154-PJH, 2021 U.S. Dist. LEXIS 170360, at *33 (N.D. Cal. Sept. 8, 2021)). "Nor do any cases authorize the sealing of civil cases simply because the parties have a minor child whose identity they seek to conceal, or because the parties seek to conceal their wealth," Maine Trust contends. *Id.* at 6.

### 2.    Use of Pseudonyms at Trial

Turning to the Plaintiff's motion to proceed through trial under pseudonym, Maine Trust argues the Court should deny this request and proffers "[e]ven courts that have allowed pseudonyms during the early stages of trial have generally been reluctant to extend this to trial." *Id.* (citing *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000) ("[T]he balance between a party's need for

13

anonymity and the interests weighing in favor of open judicial proceedings may change as the litigation progresses"); *Order on Mot. to Unseal* at 28-29)). Acknowledging that the use of pseudonyms at trial "may be permissible in some trials involving highly intimate personal details," the Intervenor argues those circumstances are not present here. *Id.* at 6-7 (collecting cases from the Eleventh Circuit permitting anonymous testimony by alleged sexual assault victims and "women who were videotaped engaging in sexual conduct when they were minors"). Maine Trust argues that, in addition to the presumption of the public right of access, anonymous testimony could create additional issues such as "frequent unnatural pauses, unintentional mistakes, or confusion," diminished witness credibility, a tendency for pseudonymous witnesses to "fabricat[e] or embellish[] an account," and jury administration challenges in the event a witness inadvertently testified to a witness's real name. *Id.* at 7 (citing *Lawson v. Rubin*, No. 17-6404, 2019 U.S. Dist. LEXIS 181192, at *10 (E.D.N.Y. Oct. 17, 2019) (citation corrected)).

Finally, Maine Trust responds to the Plaintiff's argument that the Intervenor's co-counsel wrote in a recent law review article that "[c]ourts often note that plaintiffs can proceed pseudonymously if the 'injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity.'" *Id.* at 8 (quoting *Pl.'s Mot.* at 7-8 n.3). Maine Trust argues "Plaintiff omits the immediately following paragraph from that article," which states:

> Read broadly, this concern would authorize pseudonymity in nearly all defamation or disclosure of private fact claims . . .. After all, requiring such plaintiffs to identify themselves would only further exacerbate the injury. And a few cases have taken that view. But the dominant view

> is contrary, which is why libel and privacy cases . . . are routinely
> litigated without pseudonyms.

*Id.* (quoting Eugene Volokh, *The Law of Pseudonymous Litig.*, 73 HASTINGS L. J. 1353, 1396 (2022) (footnotes omitted by Intervenor)).  Maine Trust insists "[t]hat article's summary of the cases is thus consistent with this brief."  *Id.*

### 3.    Plaintiff's Proposed Alternatives

Finally, Maine Trust challenges the Plaintiff's proposed alternative as "overly broad and impractical."  *Id.*  "The right to attend a trial and observe witness testimony is invaluable and irreplaceable," it argues.  *Id.* at 8-9 (citing, e.g., *ABC, Inc. v. Stewart*, 360 F.3d 90, 99 (2d Cir. 2004) ("[O]ne cannot transcribe an anguished look or a nervous tic.  The ability to see and to hear proceeding as it unfolds is a vital component of the First Amendment right to access"); *Publicker*, 733 F.2d at 1072).  Audio testimony is similarly incapable of capturing such detail, Maine Trust insists.  *Id.* at 9 (citing *Morris Publ'g Grp., LLC v. State*, 136 So. 3d 770, 780 (Fla. Dist. Ct. App. 2014)).

While certain circumstances, particularly involving undercover law enforcement officials testifying against violent criminals, may justify obscuring a witness's appearance, Maine Trust asserts "this case appears to be quite distant from those rare situations."  *Id.* at 9-10 (citing *United States v. Lucas*, 932 F.2d 1210, 1217 (8th Cir. 1991)).  "To the extent that Plaintiff is concerned about possible risk to himself or his family, that possible risk stems simply from Plaintiff's wealth," and "[u]nder that rationale, the secretly wealthy would be able to testify by audio only in all cases . . . in which their wealth might be disclosed."  *Id.* at 10.  That cannot be the

15

rule of a legal system which aims to treat rich and poor equally, Maine Trust maintains. *Id.*

Maine Trust concludes by urging the Court to dismiss the Plaintiff's motion and echoing his request for the Court to schedule oral argument on this matter. *Id.*

### D.    The Plaintiff's Replies

Mr. Doe replied separately to the respective responses in opposition submitted by the Defendant and the Intervenor.

### 1.    The Plaintiff's Reply to the Defendant's Opposition

Mr. Doe's replies to Ms. Smith by reasserting his argument that "this is one of those limited cases where the total closure of trial and continued use of pseudonyms is justified." *Pl.'s Reply to Def.* at 1.  He reiterates his concern that a public trial could result in irreparable harm to the parties, their minor child, and others, and, further, that allowing the media and public access to a future trial in this matter would effectively defeat the purpose of the parties' NDA. *Id.* at 2.

Turning to his legal arguments for a closed trial, Mr. Doe restates his contention that there is no absolute First Amendment or common law right of public or media access to a civil trial, *id.* (collecting cases), and, adds that no First Amendment or common law right attaches to this specific trial. *Id.* at 2-5. Elaborating on the First Amendment right, he argues a public trial risks their minor child's safety and thus overcomes the presumption of the public right of access; alternatively, he contends that "even if a First Amendment right of access attaches in this case, closure of any trial passes strict scrutiny." *Id.* at 3-4. Addressing the

common law presumption and *Kravetz*, the Plaintiff insists the balance between the presumptive right of public access and "competing interests" weighs in favor of a closed trial in this case because "[t]here is simply no way to grant Plaintiff the relief he seeks—to protect his identity and his and his minor child's safety—if the media and public are granted access to this trial." *Id.* at 4.

Next, Mr. Doe restates his contention that the totality of circumstances warrants the continued use of pseudonyms in this case because "the Plaintiff's identity—and the risk of his and his minor child's safety by public disclosure of his identity—are <u>central</u> to the case." *Id.* at 5 (Plaintiff's emphasis).

Finally, Mr. Doe urges the Court to exercise its discretion to "consider reasonable alternatives to closing the trial," such as permitting anonymous testimony by telephone or audio-only Zoom. *Id.* at 6. He maintains that Federal Rule of Civil Procedure 43(a) grants the Court with discretionary authority to permit a witness's testimony via contemporary transmission. *Id.*

## 2. The Plaintiff's Reply to the Intervenor's Opposition

Mr. Doe replies separately to Maine Trust but raises similar arguments as in his reply to Ms. Smith, essentially contending that this is an exceptional case warranting the use of pseudonyms and "the complete closure of trial." *Pl.'s Reply to Intervenor* at 1. He argues, again, that there is no First Amendment or common law right of public or media access to any trial in this matter, *id.* at 2-5, and, under the totality of the circumstances, the continued use of pseudonyms is warranted. *Id.* at 5-6. Finally, he restates his contention that the Court should use its discretion to

17

consider reasonable alternatives to closing the trial, including through the use of anonymous witness testimony by telephone or audio-only Zoom. *Id.* at 6.

## III.   LEGAL STANDARDS

### A.   The First Amendment Right of Access

The First Circuit has explained that there are "two related but distinct presumptions of public access to judicial proceedings and records: a common-law right of access to 'judicial documents,' and a First Amendment right of access to certain criminal proceedings and materials submitted therein." *Kravetz*, 706 F.3d at 52 (quoting *In re Providence J.*, 293 F.3d at 9). In its description of the First Amendment right of access, the First Circuit was careful to observe that this right of access relates to "certain <u>criminal</u> proceedings and materials submitted therein." *Id.* (emphasis supplied). In *Courthouse News Service v. Quinlan*, 32 F.4th 15 (1st Cir. 2022), the First Circuit wrote: "[n]either this court nor the Supreme Court has recognized any right under the First Amendment to access documents filed in civil cases." *Id.* at 20.

The *Courthouse News* Court also noted that the "parties agree that there is a qualified First Amendment right in the public to access newly filed complaints." *Id.* Recognizing conflicting law on the issue, the First Circuit cited *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 10-11 (1986) as suggesting that there is such a right and *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 495 (1st Cir. 1992) as suggesting there is not. The First Circuit then resolved the appeal based on the parties' agreement that the First Amendment right of public access applied. In *El Dia*, the First Circuit wrote that it "seriously question[ed] whether *Richmond Newspapers*

18

[*Inc. v. Virginia*, 448 U.S. 555 (1980)] and its progeny carry positive implications favoring rights of access outside the criminal justice system." 963 F.2d at 495.

Based on the unsettled state of Supreme Court and First Circuit authority and, in contrast to *Courthouse News*, an absence of agreement by the parties as to the applicability of the First Amendment to this civil action, the Court follows the prudential practice of the First Circuit of "forgoing broad constitutional holdings unless such holdings are unavoidable." *Sindi v. El-Moslimany*, 896 F.3d 1, 30 (1st Cir. 2018) (citing *Hudson Sav. Bank v. Austin*, 497 F.3d 102, 106 (1st Cir. 2007) and *El Dia*, 963 F.2d at 494). When faced with whether to rest on the First Amendment in *Kravetz*, the First Circuit declined[1] to reach the constitutional claim and instead resolved the public access issue using the standards in the common law right of access. 706 F.3d at 53.

### B.    The Common Law Right of Public Access

The First Circuit extensively discussed the right of public access in *Kravetz* and reiterated that "[c]ourts have long recognized 'that public monitoring of the judicial system fosters the important values of quality, honest and respect for our legal system.'" 706 F.3d at 52 (quoting *In re Providence J.*, 293 at 9 (in turn quoting *Siedle v. Putnam Invs.*, 147 F.3d 7, 10 (1st Cir. 1998))). To uphold these values, once it is determined that the document is a so-called "judicial record," a presumption that it is public applies. *Id.*

---

[1]    In *Kravetz*, the First Circuit concluded there is no First Amendment right of public access to a Federal Rule of Criminal Procedure 17(c) subpoena. 706 F.3d at 52-54.

The First Circuit explained that a "judicial record" is a document that is "submitted by parties to aid in the adjudication of" an issue before the court and that is "meant to impact the court's disposition of substantive rights." *Id.*; *accord United States ex rel. Nargol v. Deputy Orthopaedics, Inc.*, 69 F.4th 1, 15 (1st Cir. 2023) (stating judicial records are "those 'materials on which a court relies in determining the litigants' substantive rights'") (quoting *Kravetz*, 706 F.3d at 54). Thus, the First Circuit in *Kravetz* decided that, in the criminal context, there is a right of public access to sentencing memoranda and support letters intended to influence a sentence. *Id.* at 56-59. The *Kravetz* Court further rejected the argument that a judicial record need be disclosed only if it actually influenced a judge's decision. *Id.* at 58-59.

At the same time, the *Kravetz* Court observed that "[t]hough the public's right of access is vibrant, it is not unfettered. Important countervailing interests can, in given instances, overwhelm the usual presumption and defeat access." *Id.* at 59 (quoting *Siedle*, 147 F.3d at 10). In other words, while the presumption is broad, exceptional circumstances may counter it. However, the First Circuit cautioned "'only the most compelling reasons can justify non-disclosure of judicial records' that come within the scope of the common-law right of access." *Id.* (quoting *In re Providence J.*, 293 F.3d at 10 (quoting *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987)).

The *Kravetz* Court conclusively resolved one issue: whether there is a right of public access to civil discovery. There is none. *Id.* at 55 ("We note that even with respect to civil discovery . . ., there is no right of public access"); *accord Nargol*, 69

F.4th at 15.  The First Circuit quoted the United States Supreme Court in *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984), as stating, "pretrial depositions and interrogatories are not public components of a civil trial.  Such proceedings were not open to the public at common law, and, in general, they are conducted in private as a matter of modern practice."  *Kravetz*, 706 F.3d at 55 (quoting *Seattle Times*, 467 U.S. at 33).  The *Kravetz* Court went on to say that "[c]onsistent with this authority, we also have concluded that no right of access attaches to civil discovery motions themselves or materials filed with them."  *Id.*

In balancing the competing interests in cases where the presumption of public access applies, the district court should consider whether the "personal privacy interests of third parties" are at stake.  *Id.* at 61.  "[P]rivacy rights of participants and third parties are among those interests which, in appropriate cases, can limit the presumptive right of access to judicial records."  *Id.* at 62 (quoting *Standard Fin. Mgmt. Corp.*, 830 F.2d at 411) (quotation marks omitted).  The First Circuit directed district courts to "weigh heavily" the privacy interests of third parties in the court's balancing analysis.

In addition, the First Circuit directed the district courts to "consider the degree to which the subject matter is traditionally considered private rather than public." *Id.* (quoting *United States v. Connolly (In re Boston Herald, Inc.)*, 321 F.3d 174, 190 (1st Cir. 2003)).  "Financial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion

of the public." *Id.* (quoting *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995)).  Addressing sentencing letters, the First Circuit wrote that "discussion of the ill health of members of the authors' families, incidents of domestic violence, and other domestic relations matters" involves "highly personal" information and "appears to have no direct bearing on the public's assessment of the sentences imposed." *Id.* at 62.

The *Kravetz* Court also discussed the right of public access to medical information.  *Id.* at 63.  It began with the premise that "[m]edical information is . . . 'universally presumed to be private, not public.'"  *Id.* (quoting *In re Boston Herald*, 321 F.3d at 190).  Even so, "[a]cknowledging the presumptively private nature of medical information does not end the matter" because "[t]he privacy interest in medical information is 'neither fundamental nor absolute.'"  *Id.* (quoting *United States v. Sattar*, 471 F. Supp. 2d 380, 387 (S.D.N.Y. 2006)).  In this context, the *Kravetz* Court quoted the Second Circuit in saying that "[c]ourts have long declined to allow public access simply to cater to a morbid craving for that which is sensational and impure."  *Id.* (quoting *Amodeo*, 71 F.3d at 1051).

A special consideration in the case at bar is the fact that the Maine Trust, a member of the press, is seeking access to a civil trial.  Referring to access to public criminal trials, the United States Supreme Court has written,

> Instead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media.  In a sense, this validates the media claim of functioning as surrogates for the public.  While media representatives enjoy the same right of access as the public, they often are provided special seating and priority of entry so that they may report

what people in attendance have seen and heard.  This '[contributes] to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system. . ..

*Richmond Newspapers, Inc.*, 448 U.S. at 573 (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J. concurring)).  As this Court noted in its May 8, 2024 Order on Motion to Unseal, these observations about the vital role of the press in monitoring the courts extend beyond criminal law to the civil administration of justice.  *Order on Mot. to Unseal* at 13-14 (ECF No. 71).

## IV.    DISCUSSION[2]

Considering the Plaintiff's motion in light of this precedent and these principles, the Court identifies three questions: first, whether the Plaintiff is entitled to a closed trial and, if so, to what extent; second, whether the parties are entitled to continue using pseudonyms at trial; and, third, whether witnesses may be permitted to testify anonymously over the telephone and/or through Zoom-only audio.

### A.    The Closure of Trial

From the Court's perspective, Mr. Doe's request that the trial itself be closed to the public is a nonstarter.  It runs hard against historic concepts of what the courts are and what they are not in this country.  A publicly filed court case is no longer a private matter.  In bringing this case, Mr. Doe turned to a forum established by the United States Constitution, funded by American taxpayers, comprising a branch of the federal government, whose procedures must be open and whose rulings must be

---

[2]    The Court has twice addressed the sealing issues in this case.  *See Order on Mot. to Unseal*; *Order on Mots. to Seal and Unseal* (ECF No. 171).  The Court views this order as consistent with its earlier orders.

a matter of public record.  As the First Circuit explained in *Kravetz*, there are some limitations at the edges of some unusual cases, but the presumptive rule is public access.

Both the United States Supreme Court and the First Circuit have explained that this rule is consistent with the country's history.  The Supreme Court has noted in dicta that "[t]he Bill of Rights was enacted against the backdrop of the long history of trials being presumptively open[,] . . . [and] historically both civil and criminal trials have been presumptively open." *Richmond Newspapers*, 448 U.S. at 580 n.17; *see also Huminski v. Corsones*, 396 F.3d 53, 81 (2d Cir. 2004) ("For many centuries, both civil and criminal trials have traditionally been open to the public") (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 386 n.15 (1979)); *Publicker*, 733 F.2d at 1069 ("[The] public right of access to civil trials . . . is inherent in the nature of our democratic form of government").  While the public right of access is not absolute, "[t]here is a longstanding presumption that judicial records are public and that evidence in proceedings should be presented in open court." *McKee*, 2010 U.S. Dist. LEXIS 90749, at *8-9.

Furthermore, in civil matters, the Federal Rules of Civil Procedure instruct that testimony must be taken open court.  Rule 43(a) provides, in relevant part:

> **(a) In Open Court.**  At trial, the witnesses' testimony must be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise. . ..

FED. R. CIV. P. 43(a).  In addition, Rule 77(b) provides:

> **(b) Place for Trial and Other Proceedings.** Every trial on the
> merits must be conducted in open court . . ..

FED. R. CIV. P. 77(b). An example of an exception is where the contents of a pending patent application, which are confidential by statute, are at issue in the case, and the Court determines that the public right of access must bend to the preservation of a trade secret. *See In re Columbia Univ. Patent Litig.*, 330 F. Supp. 2d 18, 21 n.2 (D. Mass. 2004); 12 CHARLES A. ALLEN, ARTHUR R. MILLER & RICHARD L. MARCUS, FED. PRAC. & PROC., § 3082 (2014 ed.) (stating that "[u]nder highly unusual circumstances, portions of the trial may be closed to protect highly confidential information").

It will come as no surprise that the Court applies this well-established precedent. By its nature, the entirety of the information to be presented at trial is a "judicial record," under the *Kravetz* definition, constituting documents and information "submitted by parties to aid in the adjudication of" an issue before the court and that is "meant to impact the court's disposition of substantive rights." *Kravetz*, 706 F.3d at 52; *accord Nargol*, 69 F.4th at 15 (stating judicial records are "those 'materials on which a court relies in determining the litigants' substantive rights'") (quoting *Kravetz*, 706 F.3d at 54).

The public presumption is not absolute, and the First Circuit has directed district courts to "consider the degree to which the subject matter is traditionally considered private rather than public." *Kravetz*, 706 F.3d at 62 (quoting *United States v. Connolly (In re Boston Herald, Inc.)*, 321 F.3d 174, 190 (1st Cir. 2003)). "Financial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily

25

against access than conduct affecting a substantial portion of the public." *Id.* (quoting *Amodeo*, 71 F.3d at 1051). Addressing sentencing letters, the First Circuit wrote that "discussion of the ill health of members of the authors' families, incidents of domestic violence, and other domestic relations matters" involves "highly personal" information and "appears to have no direct bearing on the public's assessment of the sentences imposed." *Id.* at 62.

The Plaintiff has repeatedly argued that this case involves such information: it focuses on the parties' individual finances, family affairs including those involving their minor daughter, and may include information the parties deem to be embarrassing and that they would prefer to keep private. The Court takes these considerations seriously, but the plain fact is that courts often deal with information that people would prefer to keep out of the public eye, and, if the wishes of litigants for privacy trumped the right of public access, courts would become publicly funded forums for private litigation, unaccountable to the public itself.

Furthermore, the Court is not at all as certain as the Plaintiff that the family matters at the center of this case are traditionally so private that judicial decisions are not public. To the contrary, in Maine, which does not appear to be an outlier, courts routinely describe in published divorce cases the intimate financial circumstances of the divorcing couple, sometimes in detail. *See, e.g., McKenna v. Pray*, 2024 ME 58, ¶¶ 1-8, 320 A.3d 415 (2024); *Collins v. Collins*, 2016 ME 51, ¶¶ 2-7, 136 A.3d 708 (2016); *Chase v. Chase*, CUMSC-CV-16-0433, 2018 Me. Super. LEXIS 183, at *5-7 (Me. Super. Aug. 20, 2018); *see also In re Marriage of Burkle*, 135 Cal.

App. 4th 1045, 1070 (2d Dist. Ct. of App. Cal. 2006) (declaring unconstitutional a state statute that allowed a party to a divorce proceeding to seal any pleading that provided identifying financial information); *Douglas v. Douglas*, 146 N.H. 205, 208, 772 A.2d 316 (2001) (affirming divorce court order making public financial affidavits with certain identifying information redacted). Courts generally redact personal or account identifying information from the public record, but they usually do not seal entire proceedings. *See* FED. R. CIV. P. 5.2.

This principle extends to family disputes involving minors. Where children are involved, even in custody disputes, courts routinely issue publicly available orders. The traditional way to protect minors' rights of privacy is to refer to them by initials, sometimes by the first name and a last initial, occasionally by pseudonym or simply as "child." *See, e.g., In re Christian D.*, 2025 ME 16, ¶¶ 1, 2, 8, 10, 331 A.3d 409 (2025) (referring to a three-year-old child who was the subject of termination of parental rights as "the child"); *Capelety v. Estes*, 2023 ME 50, ¶¶ 1-2, 300 A.3d 817 (2023) ("[Nicholas J.] Capelety and [Kyla R.] Estes have a child who was born in 2015"). There is no suggestion by Mr. Doe or Ms. Smith that the identity of their child should be revealed and the Court has permitted them to proceed in this manner.

The Court takes this analysis further. In considering valid exceptions to public access, *Kravetz* considered not only "the degree to which the subject matter is traditionally considered private rather than public," *Kravetz*, 706 F.3d at 62, but also the extent to which the information is "peripheral." *Id.* at 63. Even if the Court were to credit Mr. Doe's contention that this case involves some matters "traditionally

considered private rather than public," the Court cannot conclude that these matters are merely incidental in this case and "appear to have no direct bearing" on the Court's determination of the matter before it. *See Kravetz*, 706 F.3d at 62. Clearly, the issues Mr. Doe now seeks to keep from the public eye are not those that "simply . . . cater to a morbid craving for that which is sensational and impure." *Id.* at 63 (quoting *Amodeo*, 71 F.3d at 1051). Rather, they are the heart of this dispute.

To the contrary, the complaint raises allegations by the Plaintiff that the Defendant, the mother of the parties' shared child, breached an NDA involving the Plaintiff's personal finances. The Plaintiff's core concern is that this alleged breach has threatened the security of himself, the parties' minor daughter, and their family members. As is apparent from the subsequent filings, the NDA allegations are in the broader context of contested custody litigation in state court. *See Order on Mot. to Amend* at 1 (ECF No. 81) ("[Mr. Doe] now seeks to amend his complaint to, among other things, add allegations that Smith violated the NDA by disclosing protected information to her attorney and in state court custody filings regarding his and Smith's minor child"). The federal litigation devolved so that the parties sought sanctions against each other for alleged violations, claims the Magistrate Judge rejected. *Order on Mots. for Sanctions* (ECF No. 82). Furthermore, Mr. Doe currently has one appeal pending before the Court of Appeals for the First Circuit, *Notice of Appeal* (ECF No. 184), and is contemplating another appeal, if the Court does not grant his pending motion for a closed trial. *Pl.'s Mot.* at 1.

28

Furthermore, although the legal issues presented in the core allegation of a violation of the NDA in this case involve the parties' family matters, they are also undeniably matters of public interest. In some contexts, NDAs have more recently become controversial. *See* Johanna Shinners, *Article: Safeguarding Silence: The Weaponization of Nondisclosure Agreements and the Need for More Reg.*, 25 MARQ. BENEFITS & SOC. WELFARE L.R. 229 (2024). In some instances, the First Circuit has declined to enforce NDAs because they are "so broad as to be unenforceable," *see TLS Mgmt. & Mktg. Servs., LLC v. Rodríguez-Toledo*, 966 F.3d 46, 48 (1st Cir. 2020), and in others has enforced NDAs. *See Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 193 (1st Cir. 2023). In general, unlike a non-compete agreement, a non-disclosure agreement is "not disfavored under Maine law." *Philippon v. Louth Callan Renewables, LLC*, No. BCD-CIV-2023-00062, 2024 Me. Bus. & Consumer LEXIS 7, at *19 (Me. Super. Apr. 23, 2024). With rare exceptions, courts have focused on whether the NDAs are protecting a legitimate matter of confidentiality, typically in the context of a trade secret or other business-related confidential information. *See Fougere*, 79 F.4th at 188-93; *CPS Sols., LLC v. Sarle*, No. 2:23-cv-00269-NT, 2024 U.S. Dist. LEXIS 54547, at *10-12 (D. Me. Mar. 27, 2024) (finding that a noncompete clause, including a NDA, was necessary to protect legitimate business interests).

There are few cases outside the business context. However, in one non-business matter, the Maine Law Court imposed discipline upon an attorney who sexually harassed a female and entered into a NDA with her to silence her as a potential witness against him. *Bd. of Overseers of the Bar v. Carey*, 2019 ME 136,

215 A.3d 229 (Aug. 15, 2019). How Maine law should treat the NDA in the instant case, a non-business agreement designed to keep a former intimate partner from revealing wealth in the broader context of a custody dispute, is a legitimate matter of public concern.

At bottom, although some of these issues may be traditionally private until they come to court, they are the issues the parties have brought to this Court, and the Court is thus bound to consider them in making its determination on the merits. The public has a right to understand how and why the Court rules on this matter and the Court will not shut the door on the public's right of access. The Court's determination is consistent with relevant precedent on the right of public access to judicial records, public access to family matters, including those involving minor children, and NDAs.

Further, as the Court observed in its order on the motion to unseal, it is of additional consideration that Maine Trust, a member of the press, seeks access to this trial. Referring to access to public criminal trials, the United States Supreme Court has written:

> Instead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media. In a sense, this validates the media claim of functioning as surrogates for the public. While media representatives enjoy the same right of access as the public, they often are provided special seating and priority of entry so that they may report what people in attendance have seen and heard. This '[contributes] to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system. . ..

30

*Richmond Newspapers, Inc.*, 448 U.S. at 573 (quoting *Neb. Press Ass'n*, 427 U.S. at 587 (Brennan, J., concurring)).  These observations about the vital role of the press in monitoring the courts extend beyond criminal law to the civil administration of justice.

By the Court's reckoning, one of Mr. Doe's main points is that because he is now wealthy, the consequences of his filing this lawsuit are different for him as opposed to other less financially fortunate individuals.  *Mot. for Leave to Proceed Under Pseudonym and for Protective Order* (ECF No. 4) (*Pl.'s Mot. to Proceed Under Pseudonym*) ("There are unique risks inherent to being an ultra-high-net-worth individual, especially where, as here, the individual's increase in wealth is swift and dramatic").  He fears his new-found wealth will make him the target of an inquisitive and occasionally malevolent people.  *See id.* ("Plaintiff has had to hire a highly respected security firm and strictly adhere to a safety program that requires property security, surveillance, and ongoing threat assessments to ensure his and his minor daughter's safety and privacy").  However legitimate his concerns, a party's wealth alone is not a legitimate reason to restrict the right of public access.  Indeed, as he notes in his motion for leave to proceed under pseudonym, Mr. Doe's new-found wealth allows him to afford levels of security and isolation not generally available to the general public, thus mitigating the impact of the public revelation of his new financial status.  *See id.*

Upon entering a judgeship, Congress requires each federal judge to take an oath to "administer justice without respect to persons, and do equal right to the poor

31

and to the rich." 28 U.S.C. § 453. "Every litigant is entitled to have his case heard by a judge mindful of this oath." *Laird v. Tatum*, 409 U.S. 824, 838 (1972). This Court cannot reconcile its sworn oath with Mr. Doe's demand that his trial be closed to the public because he is rich. Indeed, as the United States Supreme Court has explained, the Fourteen Amendment "requires that all persons subjected to . . . legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008) (quoting *Hayes v. Missouri*, 120 U.S. 68, 71-72 (1887)). The Supreme Court's reference to "legislation" includes this Court's congressionally mandated oath of office. *See* 28 U.S.C. § 453.

For the foregoing reasons, the Court declines to grant the Plaintiff's request for a closed trial, either partially or fully. The Court now turns to the narrower issue of whether it will permit the parties and witnesses to proceed under pseudonym at trial.

## B.    The Parties' Use of Pseudonyms at Trial

The Court is fortunate to have the benefit of two cases decided recently by the First Circuit and setting forth a comprehensive examination of the use of pseudonyms in federal court proceedings. *See MIT*, 46 F.4th at 61-77; *Doe v. Mills*, 39 F.4th 20, 22-27 (1st Cir. 2022). In *MIT*, the later case, the First Circuit engaged in a detailed examination of the sources of "[j]udicial hostility to a party's use of a pseudonym" and concluded that it "springs from our Nation's tradition of doing justice out in the open, neither 'in a corner nor in any covert manner.'" *MIT*, 46 F.4th at 68 (quoting

*Richmond Newspapers*, 448 U.S. at 567).  This Court accepts, as it is bound to do, the First Circuit's conclusion that there is a "strong presumption against the use of pseudonyms in civil litigation," *id.* at 69, and it applies that strong presumption to this case.

The *MIT* Court also discussed the "standard for determining when a party may litigate under a pseudonym." *Id.*  After noting that "several of our sister circuits have devised elaborate multi-factor tests," *id.*, the First Circuit declined to establish in this circuit a "multi-factor test[]" because it would not "establish a clear standard." *Id.* Yet, the First Circuit recognized that "some general guidelines may be helpful to the district courts." *Id.*  The First Circuit then stressed the "big picture" in that "[l]itigation by pseudonym should occur only in 'exceptional cases.'" *Id.* at 70 (citation omitted).  Ruling that the district court should consider the "totality of the circumstances" in making its determination, *id.*, the *MIT* Court provided "four general categories of exceptional cases in which party anonymity ordinarily will be warranted": (1) where the would-be Doe "reasonably fears that coming out of the shadows will cause him unusually severe harm (either physical or psychological)"; (2) where identifying the would-be Doe would harm "innocent non-parties"; (3) where anonymity is "necessary to forestall a chilling effect on future litigants who may be similarly situated"; and 4) where the lawsuit is bound up with a prior proceeding "made confidential by law." *Id.* at 71-72.

In his memorandum, Mr. Doe refers to his original motion for leave to proceed under a pseudonym for the record support for his current position. *Pl.'s Mot.* at 8

(discussing *Pl.'s Mot. to Proceed Under Pseudonym*)).  As the Court has analyzed it, only two of the four *MIT* factors appear in this case: Mr. Doe's fears of severe harm from disclosure and his concern of harm to his daughter, an innocent third party.  In that motion, as addressed above, Mr. Doe focused on "the unique risks inherent to being an ultra-high-net-worth individual, especially where, as here, the individual's increase in wealth is swift and drastic."  *Pl.'s Mot. to Proceed Under Pseudonym* at 3.  Mr. Doe lists the following risks: (1) kidnap for ransom, (2) stalking and harassment, (3) unwanted attention to his daughter, (4) increased attention to his other family members, (5) cybersecurity vulnerabilities, (6) impersonation and financial fraud, (7) media attention, (8) extortion, (9) solicitation for financial support, and (10) disruptions and restricted movement in daily life.  *Id.*

The Court does not reject the possibility that any of these harmful consequences of great, sudden wealth could happen if the Plaintiff's name were revealed at trial.  But, for many of the reasons the Court has already discussed, it does not conclude that these risks from disclosure of a sudden fortune fit him within the narrow group of exceptional cases where anonymity is allowed.  Depending on how the lines are drawn, this rationale could be applied to a relatively large and certainly prominent slice of the American population.  It would extend beyond lottery winners to heirs to large fortunes, top tier professional athletes, highly successful entrepreneurs, nationally prominent entertainers, including actors and musicians, celebrities of all ilks, including those newly famous on social media; the list goes on and the risks can include members of their families.  Mr. Doe's feared risks from

public exposure are equally applicable to individuals who are famous for reasons other than wealth, including politicians and ordinary people thrust into the bright light of publicity because of happenstance.

Even so, the entire tier of rich and famous persons could be subject to the same risks Mr. Doe fears and would for the most part prefer not to have their court cases exposed, litigated, and discussed in public. But, as the Court noted earlier, for many of these individuals, great wealth comes with the financial capacity to afford enhanced security and privacy. Mr. Doe is among them, stating in his motion for leave to proceed under pseudonym that he has hired a "highly respected security firm" and that he "strictly adhere[s] to a safety program that requires property security, surveillance, and ongoing threat assessments to ensure his and his minor daughter's safety and privacy." *Id.* Thus, for Mr. Doe, the risks of disclosure are lessened by the precautions he has taken to mitigate such risks.

It is true that Mr. Doe's case is unusual in that his sudden lottery wealth is known but to a very few people, and he is seeking to maintain his anonymity, not somehow restrict his already well established high public profile. As the Court has mentioned to the parties, Mr. Doe faces a classic Catch-22[3]: a lawsuit to enforce his NDA, which prohibits the disclosure of private information, and an upcoming trial at which the private information could be publicly disclosed. But Mr. Doe's dilemma is one of his own making. Parties to sensitive contracts sometimes agree to a confidential arbitration or a confidential mediation, but here the NDA expressly

---

[3]    JOSEPH HELLER, CATCH-22 (1961).

provides that Mr. Doe will be "entitled to temporary injunctive relief" upon breach by Ms. Smith.  *See Compl.*, Attach. 1, *Nondisclosure Agreement* ¶ 5.  As only a court can issue temporary injunctive relief, Mr. Doe's NDA contained the seeds of its own ineffectiveness.

As regards his daughter, the Court has already noted that she would be identified only by initials and Mr. Doe has provided no evidence for the Court to conclude that if his name were revealed, her privacy would be in jeopardy.  Even if it could happen, this possibility does not justify denying the public the right to access this court proceeding.  In short, applying the four *MIT* guidelines, the Court concludes that Mr. Doe has not sustained his burden to demonstrate that he fits within the exceptional case where public access should be denied or significantly restricted.

In short, without diminishing the Plaintiff's proffered security concerns for himself and the parties' minor daughter, the Court cannot conclude that these fears of harm outweigh the public's robust interest in open courts.  While the presumption of public access is not absolute, it is paramount and an essential component of our legal system, so "important because it 'allows the citizenry to monitor the functioning of our courts, thereby insuring quality, honesty and respect for our legal system.'" *Mills*, 39 F.4th at 25.

The Court's prior determination in this case that parties could proceed under pseudonym for the early stages of the litigation does not change this outcome.  As Ms. Doe correctly states in her opposition, this Court said in its order on motion to unseal that "the caselaw has repeatedly shown[] even when pseudonyms are allowed during

36

the discovery phase in the run-up to trial, there is no guarantee that the Court will sanction their use if the case goes to trial." *Def.'s Opp'n* at 4 (quoting *Order on Mot. to Unseal* at 28-29 (in turn citing *Tourangeau*, 2023 U.S. Dist. LEXIS 29369; *MIT*, 46 F.4th at 73)). As foreshadowed, the Court now determines that it cannot make such an allowance at trial. While the parties may, in the run-up to trial, move for minor children to proceed under pseudonym, this is a separate matter not currently before the Court, and the Court now declines to grant the Plaintiff's request for the blanket use of pseudonyms by all parties and all witnesses.

### C.    Plaintiff's Proposed Alternative

Consistent with its view of the law, the Court also rejects Mr. Doe's fallback position, which is to allow the testimony of the parties and their family members submitted to the jury by telephone or audio-only Zoom. *Pl.'s Mot.* at 8-10. Mr. Doe proposes that the Court partially close the trial during this testimony to the public and the media to assure the anonymity of the parties and the family members. *Id.* at 9. He stresses that if the Court accepted this alternative, the parties and their family members must remain anonymous. *Id.* Both Ms. Smith and Maine Trust object to this proposal. *Def.'s Opp'n* at 10; *Intervenor's Opp'n* at 8-10.

For all the reasons the Court has already discussed, it does not accept Mr. Doe's alternative proposal. Rule 43 provides:

> For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location.

FED. R. CIV. P. 43(a).    The advisory committee's notes on this alternative are instructive:

> Contemporaneous transmission of testimony from a different location is permitted only on a showing of good cause in compelling circumstances. The importance of presenting live testimony in court cannot be forgotten. The very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling. The opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition.

FED. R. CIV. P. 43(a) advisory committee's note to 1992 amendments.    The advisory committee notes further "[t]he most persuasive showings of good cause and compelling circumstances are likely to arise when a witness is unable to attend trial for unexpected reasons, such as accident or illness, but remains able to testify from a different place . . .. Other possible justifications for remote transmission must be approached cautiously." *Id.*    Rule 43, and the advisory committee's narrowing instructions, are consistent with the United States Supreme Court's observation that "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970).

Assuming the Court has the authority to allow for telephonic testimony in a civil jury trial under Rule 43(a), *see Allen v. Wine*, 297 Fed. Appx. 524, 533 (7th Cir. 2008), the Court would not allow it in this case. The centrality of the credibility of the parties and family members to the resolution of the issues in dispute seems obvious. Mr. Doe not only proposes that his identity still be kept secret, but also that the identity of the other critical witnesses be kept secret as well. In fact, he requests

not only that the witnesses' names and identities be secret, but that a jury be restricted from viewing them all, including their facial expressions, body movements, and all other non-verbal responses and expressions.   Moreover, as the Court understands it, under Mr. Doe's proposal, questions would not be allowed if they could reveal the witness's identity.   Therefore, questions about the witness's age, education, employment, where they grew up, current residence, marital status, children, life experiences, and other similar matters that jurors typically rely upon in assessing a witness's credibility would be off-limits, and the information would be unavailable to the jury.   Thus, a jury would hear the testimony by telephone or audio-only Zoom of disembodied voices from anonymous witnesses, including the parties, whose credibility would be critical to its deliberations.   In the Court's view, Mr. Doe's proposal does not comport with any trial that the Court is familiar with or that is legally permitted in this country for the issuance of a fair and informed verdict.   In short, the Court does not accept Mr. Doe's alternative proposal.

### D.   Oral Argument

Finally, despite the parties' request, the Court declines to hold oral argument on this motion.   The resolution of the legal issues in this case seems quite clear to the Court and is unlikely to change, even after the efforts of learned counsel. Furthermore, Mr. Doe has stated his intention to appeal this order, if unfavorable, to the Court of Appeals for the First Circuit, and therefore the scheduling and holding of an oral argument would only delay the day when the First Circuit will issue a definitive ruling on the issues presented by Mr. Doe's motion.

## V.    CONCLUSION

The Court DENIES Plaintiff's Motion for Closure of Trial (ECF No. 179).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 10th day of April, 2025