**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

---

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:23-cv-00423-JAW** |
| | ) | |
| **SARA SMITH,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## NOTICE OF DESIGNATION

---

PLEASE TAKE NOTICE that, pursuant to the Confidentiality Order entered on April 18, 2024 in the above-captioned action, counsel for Plaintiff John Doe ("Doe") attaches herewith a redacted copy of the August 27, 2026 deposition of Plaintiff's father ("Deponent") and designates all redacted portions of Deponent's deposition and all of Deponent's deposition exhibits as CONFIDENTIAL, under the terms of the Confidentiality Order (ECF No. 70), to protect the anonymity of Plaintiff and his minor child. The redacted portions of Deponent's deposition are deemed CONFIDENTIAL by Plaintiff because they contain the actual names of the pseudonymous parties, their minor child, immediate family members, and/or identifying or sensitive personal information that is likely to be detrimental if disclosed. The redacted portions of Deponent's deposition include the index, which is not attached herewith. Due to the number of redactions, this Notice of Designation does not include each page and line number.

Dated this 18th day of September, 2026.

By: /s/ *Louise M. Aponte*
Gregory Brown (ME Bar No. 9023)
Louise M. Aponte (ME Bar No. 9285)
LOWE YEAGER & BROWN PLLC
920 Volunteer Landing, Suite 200
Knoxville, Tennessee 37915
Phone: (865) 521-6527
Fax: (865) 637-0540
gb@lyb.law
lma@lyb.law

and

Stephen B. Segal, Esq., Bar No. 5422
VERRILL DANA LLP
One Portland Square
Portland, ME 04101
(207) 774-4000
ssegal@verrill-law.com

*Attorneys for Plaintiff John Doe*

ESQUIRE
DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

JOHN DOE, :
Plaintiff, :
vs. : No. 2:23-cv-00423-JAW
SARA SMITH, :
Defendant. :
--------------------------------

VIDEOTAPED TRIAL DEPOSITION OF
[redacted]

August 27, 2026
9:07 a.m.

[redacted]

BEFORE: [redacted] R. [redacted] RMR, CRR, Notary Public
[redacted] Videographer

[redacted]

APPEARANCES OF COUNSEL

On Behalf of the Plaintiff, John Doe:

LOWE YEAGER & BROWN PLLC
By: GREGORY BROWN, ESQ.
920 Volunteer Landing Ln
Suite 200
Knoxville, Tennessee 37915
865.521.6527
gb@lyb.law
ss@lyb.law

On Behalf of the Defendant, Sara Smith:

BRANN & ISAACSON
By: PETER J. BRANN, ESQ.
113 Lisbon Street
P.O. Box 3070
Lewistown, Maine 04243-3070
207.786.3566
pbrann@brannlaw.com

INDEX TO EXAMINATION

WITNESS: [redacted]

| EXAMINATION | PAGE |
| --- | --- |
| [redacted] | |
| Direct Examination By Mr. Brann | 4 |
| Cross Examination By Mr. Brown | 24 |

- - -

INDEX TO EXHIBITS

| [redacted] | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 1 | [redacted] Declaration signed 12/21/23 | 6 |
| Exhibit 2 | [redacted] Supplemental Declaration signed 4/26/24 | 6 |
| Exhibit 3 | Handwritten card - SMITH_000011 | 76 |
| Exhibit 4 | Handwritten letter dated 11/22/23 | 80 |
| Exhibit 5 | Six-page handwritten letter - SMITH_000036 | 92 |
| Exhibit 6 | Handwritten card - SMITH_000013 | 105 |
| Exhibit 7 | Email dated 3/20/23 | 107 |
| Exhibit 8 | Email chain dated 7/30/23 and 7/31/23 | 118 |
| Exhibit 9 | Email chain dated 9/5/23 | 121 |

(Electronic exhibits included with transcript.)

[redacted]

([redacted]Exhibit Nos. 1 and 2 were marked for identification.)

THE VIDEOGRAPHER: The following is the recorded deposition of Mr. [redacted]in the matter of John Doe v. Sara Smith being heard for the United States District Court for the District of Maine, Case File No. 2:23-cv-00423-JAW.

Today's deposition is being held at [redacted] in [redacted]with today's date being August 27th, 2026, and the time on the record stating 9:08 a.m. My name is [redacted]and I am the videographer. The court reporter today is Mr. [redacted]

Counsel, at this time would you please place your appearances for the record. Afterwards Mr. [redacted]will swear in the witness.

MR. BROWN: Greg Brown for the plaintiff.

MR. BRANN: Peter Brann for the defendant.

* * *

[redacted] [redacted]having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BRANN:

Q. Good morning, Mr. [redacted] Could you state your name and address for the record, please.

A. Okay. My name is [redacted] and my address, the mailing address is [redacted]

Q. As you heard, I'm Peter Brann. I represent the defendant. We met this morning.

A. Yes.

Q. I am gonna -- let me just give you the rules of the road briefly before we plunge into the deposition.

I'm going to be asking you questions, and Mr. Brown will be able to ask you some questions as well, and what we both want you to do is just tell us what you know.

A. Okay. Sure.

Q. And -- and tell us not what your guess -- not guess but just tell us what you know.

A. Yeah. Okay.

Q. The second question -- the second point is it's very important for you to wait for me to finish asking my question before you answer, and I'll try and wait for you to finish before I ask my next question. That's for the benefit of the transcript and the -- and the court reporter.

A. Okay.

Q. And it's important obviously that you

[redacted]

answer orally so that -- although it will be picked up by the video, if you shake your head or go uh-huh, it's not obvious what --
A. Okay.
Q. -- your answer is.
A. Sure.
Q. And if any of the questions are unclear or you don't understand them, just say so, and I'll try and rephrase it.
A. Okay.
Q. Do you recall that you signed two different declarations that were submitted in this case?
A. Yes.
Q. Okay. I'm gonna show you what's been marked as Exhibit -- [redacted] Exhibit No. 1 and ask you if that is a -- a declaration that you signed in this case.
A. Yes.
Q. And I'm going to show you what's been marked as [redacted] Exhibit No. 2 and ask you if that is a second declaration that you signed in this case.
A. I don't know if I signed it here, but I'll take a look. Yeah, they're both signed by me.
Q. Okay. And I'm going to turn my attention to the first declaration, so if you could have that

[redacted]

in front of you, that [redacted] Exhibit No. 1. Well --
A. Let's see here.
Q. Let's close this so it's not distracting.
Okay. And you -- is that your signature on the bottom of the -- of the page?
A. Yes.
Q. And is it dated December 21, 2023?
A. Yes.
Q. Okay. And it says in this declaration above your signature, "I declare under penalty of perjury that this declaration is true and correct." Do you see that?
A. Yes.
Q. And was that declaration true and correct when you signed it on December 21, 2023?
A. Yes.
Q. And have you had an opportunity to read it since then?
A. Briefly, when I was looking it over before I came here. I have a copy of it.
Q. And we're going to go through it in a little bit of detail, but as far as you know is that declaration true and correct as of today?
A. Well, yeah.
Q. Okay. All right.

A. Yes.

Q. Well, let's -- let's just go through it for a little bit here.

It says in paragraph 2, it says, "I am a resident of [redacted] I take it that is correct?

A. Yes, sir.

Q. And how long have you lived in [redacted]

A. Well, I'm [redacted] years old. In [redacted] So take four years in [redacted] for the Air Force. Uh, 74 years.

Q. Okay. It says, "I am the father of [redacted] Is that correct?

A. Yes, sir.

Q. Paragraph 4 says, "I understand that [redacted] claims that he learned in September of 2023 that [redacted] -- how do you pronounce her last name?

A. [redacted]

Q. Thank you. -- "disclosed to me and my wife ([redacted] stepmother) that [redacted] had won the Maine State Lottery, and that as a result of [redacted] disclosure to us, other third parties, including [redacted] sister, became aware of that

[redacted]

fact. That is not correct."

A. Well --

Q. Hold on.

A. Okay.

Q. I haven't asked my question yet.

A. Okay.

Q. Okay. Do you see that in the declaration?

A. Yeah.

Q. Is that statement true?

A. Yes.

Q. All right. I want to go now to paragraph 5. "In or around February or March of 2023, [redacted] came to my house in [redacted] and informed me and my wife that he won a large amount of money in the Maine State Lottery."

Is that statement true and correct?

A. Yes. Yes, it is.

Q. Paragraph 6 says, "Neither I nor my wife were asked to or ever signed a nondisclosure agreement with respect to [redacted] lottery winnings. I subsequently told [redacted] sister and others of that fact." Is that true?

A. Yes.

Q. Paragraph 7 says, "I was the one who told [redacted] sister about his having won the Maine

[redacted]

State Lottery, not [redacted] Is that true and correct?
A. Right. As far as I know I told my daughter [redacted] this, yeah.
Q. And when you told your daughter, was she surprised?
A. Oh, yeah.
Q. Did she give you any indication she had heard it from anyone else?
A. No. The answer to this in one question, no.
Q. Okay.
A. No.
Q. All right. All right. I want to turn now to [redacted] Exhibit No. 2. And if you go to the last page of that document, my question for you, is that your signature on this document which is dated August -- April 26, 2024?
A. Well, it's kind of stuck down here. Is it? That is my signature.
Q. Okay. And it says, "I declare under penalty of perjury that this declaration is true and correct." Was that declaration true and correct when you signed it on August -- on April 26, 2024?
A. Yes.
Q. And as far as you know is that -- are the

[redacted]

statements in the supplemental declaration true and correct as of today?

A. You mean this, (indicating) is it -- can you repeat your question?

Q. Sure.

A. I don't understand what you mean.

Q. Yeah, yeah, sure.

As far as you know, are the statements that appear in the -- in the supplemental declaration still true and correct?

A. Yes.

Q. All right. If you go to the first page of the document, it says in paragraph 3: "As I have previously stated, in or around February or March of 2023, my son came to my house in [redacted] and informed me and my wife that he had won a large amount of money in the Maine State Lottery."

Is that true and correct?

A. Yes.

Q. Okay. Paragraph 4 says, "I understand that my son has stated he told me nothing about his money other than 'the simple fact that I had won.' That is not true." Is that correct?

A. Well, let me read this again. "I understand that my son has stated" --

Q. And just if you read it to yourself, it would be probably easier.
A. You know, I don't -- I don't understand it.
Q. Okay.
A. This is not true. I --
Q. All right. Because let's go to paragraph 5.
MR. BROWN: I'd like it to have him --
MR. BRANN: Yeah. Let him finish? Okay.
MR. BROWN: Yeah. Were you done with your answer?
THE WITNESS: Pardon?
MR. BROWN: Were you done with your answer?
THE WITNESS: Yes.
MR. BROWN: Okay. I'm sorry.
BY MR. BRANN:
Q. Okay. All right, let's go to paragraph 5.
Paragraph 5 says, "He told me he won over a billion dollars in the lottery, but after taxes it would come in around 500 million. He also said he gave his girlfriend half, so they would have 250 million each." Is that true?
A. Well, that's what he told me.
Q. Okay. And -- and so -- so he told you more than the simple fact that he had won?

[redacted]

A. Right.
Q. Paragraph 6 says, "He also told me a number of things he planned to do -- planned on doing with his money even though I didn't ask him for anything." Is that true?
A. Yes.
Q. "For example, he told me he was going to build me a garage and buy me some cars to fix up." Did he tell you that?
A. Yes, he did.
Q. "He knew I previously enjoyed working on fixing up old cars." Is that true?
A. Yes.
Q. Paragraph 7 says, "He also told me that he wanted to buy us the house that we had lived in with me and his mother (his previous wife) when he was young. He said, 'Find out what you want -- what they want for it, and I'll pay double,' or words to that effect." Is that true?
A. Well, this is what he had told me, yes.
Q. Okay.
A. That is true.
Q. And it goes -- paragraph 7 goes on to say, "This is not something my current wife and I wanted to do." Is that true?

[redacted]

A. Yes.
Q. Paragraph 8 says, "He also told me he wanted to set up a $1,000,000 trust fund for me which would pay me a monthly check." Did he tell you that?
A. Yes.
Q. "He said we would be able to have 24-hour care if needed and be able to stay in our home so that we would never need to go into assisted living or into a nursing home." Did he tell you that?
A. Yes, he did.
Q. Paragraph 9 says, "I questioned him about how that would work with taxes and why we needed to have a trust fund." Did you do that?
A. Yes, I did.
Q. "As a" -- the paragraph 9 goes on to say, "As a retired [redacted] in my 70s, I did not see the need for a trust fund at my age." Is that true?
A. Yes.
Q. "I also asked him about taxes and what to do if we needed some money to help fix up the house in the meantime." Did you -- did you do that?
A. Yes.
Q. It goes on to state, "He became upset and told me to contact his accountant." Is that true?
A. Yes.

[redacted]

Q. "I also understand he has stated that [redacted] speaking with me and my wife ruined the relationship between me and my son. That is not true." Is that a -- is that a correct statement?
A. Wait. Let me see it --
Q. Um-hum.
A. -- let me read. May I read this to myself?
Q. Of course. That's the whole point.
A. "I also understand that he stated that [redacted] --
Q. Just read it to yourself and then answer. It would be easier I think.
A. I don't think this is true, this . . .
Q. Do you recall him stating that he -- that he -- that [redacted] speaking with you and your wife ruined his re -- the relationship between you two?
A. He never said it ruined it. No --
Q. Okay.
A. -- he never said that.
Q. Okay. Paragraph 11 says, "It was my son who insisted that neither I nor my wife have any communications or contacts with [redacted]
Did he say that?
A. Yes.
Q. And -- and [redacted] is the -- she is the

[redacted]

defendant in this case, correct?
A. Yes.
Q. And the mother of your granddaughter?
A. Yes, sir.
Q. Okay. And it goes on to say, "[redacted] is the mother of our grandchild, and we have a good relationship -- and we have had a good relationship with her over the years." Is that true?
A. Yes, sir.
Q. You go on to say, "I thought she was a good mother, and we did not want to turn our back on her as he insisted." Is that true?
A. Yes, sir.
Q. When you said, "I thought she was a good mother," why did you say that, or why did you think that?
A. Well, from -- you know, we lived in [redacted] they lived in [redacted] From what I saw she was a good mother.
Q. Okay.
A. She had another son, an older son, which would have been [redacted] stepson.
Q. Um-hum.
A. As far as I could see. I mean I wasn't there all the time.

Q. Sure. Paragraph 12 says, "I told him that 'You're not the son I knew.'" Did you say that?
A. Yes, I did.
Q. It goes on to say, "He got angry, calling me a 'dictator' and an 'asshole.'" Is that true?
A. Yes, sir.
Q. Paragraph 12 says, "I have not heard from my son since. . . ." Is that true?
A. Yes.
Q. And it also goes on to say, ". . . and he has not done any of the things he promised." Is that true?
A. That's true.
Q. And when you talk about the things he promised, are we talking about the things that we were talking about up above, about the trust fund and buying the house, so forth?
A. Yeah. The old cars and that he wanted to buy us the house he grew up in. But it was too big; we didn't want it. We were happy where we were.
Q. Okay. All right. Let's get a little bit more information and background about you. What is your birth date?
A. [redacted]
Q. So you're [redacted]?

[redacted]

A. Yeah.

Q. Okay.

A. Almost as old as the Statue of Liberty.

Q. Okay. All right. And what -- I think there's a reference in one of the declarations that you had been a former [redacted]

A. Yes.

Q. What -- just in broad terms tell us what -- tell us about your employment history.

A. I'm from --

Q. What did you do for work over your career?

A. Well, basically if you wanted to call it [redacted] It was a quiet town, it was a -- the [redacted] of [redacted] It was a -- when I -- when I got out of the Air Force, I became a part-time [redacted] and then became the full-time [redacted] for 36 years.

Q. And then -- and you were eventually the [redacted]

A. Yes. Yeah.

Q. And how long are you the [redacted]

A. About 36 years.

Q. Oh, okay.

A. There were only three people in the [redacted], it's a [redacted] I think -- no

[redacted]

businesses other than two country clubs and things like that, but it . . .

Q. Okay. And I assume you're retired if you're [redacted] years old?

A. Yeah. Yeah.

Q. When did you retire?

A. I would say 19 -- or 2011.

Q. Okay. And now that you're retired do -- do you get social security?

A. Yes.

Q. Do you get a pension from --

A. Yes. Yeah.

Q. And what is that? Not the amount but just who do you get it from?

A. We get it from -- oh. That's from the [redacted] In other words, you get X number. But it was on what they call a drop program, so what I got was they -- you could have on paper retire and they would hire you back.

Q. Um-hum.

A. You know, there was so much money in the account that they did that.

Q. Okay.

A. So --

Q. All right. Let me try it a little bit

[redacted]

differently. Today you -- you receive some form of a government pension?

A. Oh, yeah.

Q. So you have social security and a government pension.

A. Right.

Q. Do you have any other sources of income?

A. No. No.

Q. I take it you're Medicare?

A. Yeah.

Q. Okay. And how would you describe your health these days?

A. Well, there's two stents put in here, (indicating) but I think my health is -- is pretty good at [redacted] And they told me if I didn't get my stents I wouldn't last two years, but I'm still here and they got us -- no, pretty good, and for [redacted] years old, I mean.

Q. Okay. There's some references in the declarations to the house you live in. How long have you lived in your current house?

A. About 30 years.

Q. Okay. And is -- and I think there was some reference to repairs. Are there any need for any repairs for the house?

A. Well, the gutter, the -- my roofing thing. If it rains real hard, we get a little drip in the upstairs hall, so I've gotta have the roof done there, and I think the plumbing I mean for the septic tank should be ground out. It's -- the house has been there about 90 years.

Q. And in the -- one of the ref -- one of the declarations, which was signed in 2024 --

MR. BROWN: Exhibit 2?

Q. Exhibit 2, [redacted]Exhibit 2. Thank you. Says -- which was signed in April of 2024, says, "I have not heard from my son since."

So when was the last time you spoke to your son?

A. I think when his daughter was [redacted] years old or [redacted] years old I -- at least two years ago.

Q. Okay.

A. At least two years ago.

Q. And do you have his phone number today?

A. No. I have the phone number, but -- and it rings, but he doesn't answer, no.

Q. When was the last time he called you?

A. You know, I don't really remember because I call him.

Q. Okay.

[redacted]

A. We'd call each other many times before all this shit happened.

Q. Okay. And when you say all this happened, are you referring to winning the lottery?

A. No. Well, we didn't have -- [redacted] and I was -- he was one of the best sons anybody could have until this all happened. He was generous. He was generous to my wife, he was generous to me, and I was generous to him. We -- we -- he would do anything I asked him to do, he was a -- he's a good kid.

When this -- when this money came in and whatever, whatever, whatever, it changed a whole lot.

Q. Okay. And have -- there's a reference in here to him coming to see you when he told you about winning the --

A. Well, he told me about winnings --

Q. -- the money -- hold on. Let me -- let me finish my question.

A. Okay.

Q. That's -- that's one of our rules here.

When he -- when he came to visit you and told you about, you know, winning the lottery in March of 2023, has he visited you since that time?

A. Maybe once or twice.

[redacted]

Q. Okay. Have you ever been to visit him?
A. No, I haven't.
Q. Do you know where he lives today?
A. I have no address where he lives or anything.
Q. Okay. Does he send you any cards?
A. No.
Q. Does he send you any presents?
A. No.
Q. Okay. Does he call you on your birthday?
A. No.
Q. Okay. Does he call you on holidays?
A. No.
Q. Okay. There's a reference to in one of -- in one of these declarations to that when he won the money he had -- there's a reference in [redacted] Exhibit 2 to his -- his girlfriend. Do you know her name?
A. You know, I really don't. This was a new girlfriend. When him and -- him and his ex broke up, that's when he had the girlfriend. I met her twice but not . . .
Q. Okay. And do you know whether or not he's married her?
A. I doubt he did.

[redacted]

Q. Okay. Do you know whether or not they have had a child together?
A. From what she told us, she couldn't have a child, so she felt that she wanted [redacted] daughter and she wanted to be his -- her mother.
Q. Okay. And so as far as you know they don't have a child?
A. No, other than [redacted] and [redacted] little girl.
MR. BRANN: That's all I have.

* * *

CROSS EXAMINATION

BY MR. BROWN:
Q. Good morning, Mr. [redacted]
A. (Nodding head up and down.)
Q. Do you go -- do people call you -- do people still call you [redacted]
A. Oh, yeah. Call me -- I get -- that's -- that's a nice one compared to the other ones. Yeah, you can call me [redacted] or [redacted] or whatever.
Q. Okay. I'll probably just call you Mr. [redacted] but I was -- I was just curious.
A. Call me [redacted], please.
MR. BRANN: Just -- let me just jump in here. It's important. Let him finish his question

[redacted]

before you answer --

THE WITNESS: Okay.

MR. BRANN: -- or it's gonna make a mess of our record. That's -- I'm just a -- I'm bad about that sort of thing because I'm friends with a court reporter. So just let him finish but then answer. Okay?

BY MR. BROWN:

Q. It's hard for me because I tend to -- I tend to enjoy conversations with people.

When was it that you moved to, well, Mayberry as you called it?

A. Oh, I grew up there other than --

Q. Oh.

A. -- four years in the Air Force.

Q. Okay. And then -- and you were in the Air Force where?

A. Four years in [redacted] during Vietnam. I was in hospital administration in [redacted] for four years, and I thank God for that; I didn't have to go over. I -- I was a medic -- a -- oh. This is what happens when you're [redacted] years old. I was in the medical -- I wasn't a medic, I was a paper writer, I was a -- in charge of some rooms and things like that, but I was not a medic even though you were in

[redacted]

the hospital.

Q. Did you have any medical training?

A. Briefly in -- in -- in basic training and tech school we had some medical training. And some of the medical training in the [redacted] department, too, you know, CPR, et cetera, et cetera.

Q. I saw there was a reference at some point you let your first aid certification expire?

A. That happened -- lost the certification and we got it back. We were turned in.

Q. Who turned you in?

A. We had a guy that -- we had to qualify once a year. He was a qualification, he was one of our policemen. He said, oh, just -- just do it and I'll scratch it out. This is what doctors do the same thing; they don't go to their things, they just sign it off.

And two people turned us in, it went to the [redacted] the [redacted] came and did it. Nothing happened to us, it was just go back and do it. Because the [redacted] for the last two years didn't have the [redacted] to qualify anyway.

And my feeling was, the way it is today you're better off as a [redacted] not to hit somebody with a [redacted] But we never had any problem. We were

never laid off, anything like that; it was taken care of.

Q. I think you might be talking about two different situations. You're talking about the qualification paperwork, the [redacted] qualification?

A. Yeah.

Q. Okay. And in that situation you -- you signed off that you had done the qualification work when you had not, correct?

A. No, we didn't; no, I didn't. I did not sign off that we did it.

Q. Who signed?

A. Nobody signed. I -- when I signed it, I put that we didn't do it. Okay? Which -- so the lady from the -- in -- the [redacted] in [redacted] kind of run -- the one that run the locals, so what she said was just go get your certification, it's no problem, but do it. Okay?

So we were not -- we were not in trouble, we were not -- nothing. The whole town was in back of us; there were two of us. We weren't trying to sneak anything. Okay? I took every update they had. We have records for the last X number of years of every updates we had to go to, take tests. But that was one year that it went over a year and we

[redacted]

didn't -- we didn't do it.
Q. Who told you to just sign off on it and said that doctors do the same thing and don't . . .
A. Nobody told me to -- I didn't sign off on it; I put that we didn't do it. I didn't lie and say I did it.
Q. Who was it that told you -- a moment ago --
A. What?
Q. -- you said that there was a guy who did the paperwork, and he said just sign here, he says --
A. Yeah. That was a jerk that was one of our [redacted] that was a -- what do you want to say? A [redacted] expert. So he says sign it off, I'll take care of it, we'll do it later. That's all it was.
Q. Okay. And so what did you sign off?
A. I didn't sign off anything.
Q. You said that he told you just sign off and we'll take care of it.
A. No, he didn't say to sign off. I didn't sign off because I put that we didn't have -- take it.
Q. Okay. And -- and then he reported you?
A. Oh, yeah. Yeah.
Q. And what did he report you for?

[redacted]

A. That.

Q. What?

A. That we didn't do fire -- we didn't do the [redacted]

Q. Okay. And the [redacted] investigated?

A. Yeah.

Q. Okay. And I guess you just got a slap on the wrist kind of thing?

A. Not even a slap on the wrist. They thought -- they said, well -- their attorney said, well, take off for a week, and we got paid for it. It was a . . .

Many -- many times it's like people inspecting a car. You know, oh, I inspected it, it's fine; and if you look at it, it needs work. No. And we had everybody in town on our side.

I mean as far as the first aid, I forgot -- I never forgot how to put on a Band-Aid or a -- (indicating) what you call it.

Q. So I'll ask the second -- that's another situation, right?

A. No. They were both at the same -- hit the same thing.

Q. Okay. You were suspended for the first aid certification issue, were you not?

A. No.
Q. It was reported in all the newspapers --
A. Pardon?
Q. -- you were suspended -- it's reported in all the newspapers that you were suspended for not having your first aid certification.
A. Yeah. And we got it back, so it was --
Q. How long were you suspended for?
A. A week. And we still got paid for it, so.
Q. So the medical training that you had, you said you -- I brought that up because you mentioned you got some working in the [redacted]. But your -- your hospital time in [redacted] was administrative --
A. Yeah.
Q. -- primarily? So you weren't touching patients, you were --
A. Well, you'd help, but no. No, it was mostly hospital administration.
Q. Okay. And you were discharged in what year?
A. 1970.
Q. Okay.
A. I went in -- I went in on 2006 -- or 2000. Ninety -- 1986. Seventy-six, '66. Sixty-six I went

[redacted]

in, and I got out in seven -- '66, '67, sixty -- I got out in 1970.

Q. Okay.

A. Four years.

Q. And was it -- were you discharged completely?

A. Yeah. Well, no. You have two years inactive duty. Okay? But -- that's if something happens you could be called out. Okay? So you do your four years, but you still have a two-year whatever; they could recall you if there was a problem.

Q. Okay. But did you ever -- were you ever recalled?

A. No, thank God.

Q. Was your discharge an honorable discharge?

A. Yes. Yes.

Q. Did you ever do any reserve duty --

A. No.

Q. -- after that?

A. No. Because there was no Air Force Reserve unit up in this area.

Q. Okay. How much time was there from when you left the Air Force to when you went to work in the [redacted]

[redacted]

A. About three or four years. When I got out of the Air Force, I worked for a Chrysler dealer. I then worked for a Dodge dealer. Then I worked for the same Chrysler dealer back, and then we were laid off on Christmas Eve in 1974, so I thought it was time to find a more stable job.

Q. And where were those dealerships?

A. In [redacted] and [redacted]

Q. Okay. And when did you move -- were you living in the [redacted] at that time?

A. Yes.

Q. And how did you get your job in the [redacted]?

A. Well, I -- how did I get my job? Because I put my time in -- or put my papers in. I was part-time before that in the [redacted].

Q. While you were working at the dealership?

A. Yeah, but just to kind of -- you know, if there's a fire or accident you go but not -- not that much enforcement, you know, like speeding or anything like that.

Q. Was that -- was that a paid position or --

A. It was paid, yeah.

Q. It was? Okay.

A. But then we -- when it was '74 and when

[redacted]

Christmas Eve we were laid off, I thought it was a better time I get a job.
Q. How long did it take you to go full-time at the [redacted]
A. Well, once it -- when I went full-time is when we got lost -- when we lost the jobs at the Chrysler/Plymouth dealer. So later that month, let's say in January I was hired.
Q. It's January '75?
A. Yeah.
Q. Okay. How many -- how many people worked for the [redacted] at that time?
A. Three. [redacted]
Q. How many work there now?
A. Three or four now. But it's all mostly residential. There's one store and things like that. It's a -- it's an upscale version of [redacted] I mean it's . . .
Q. I watched your retirement video.
A. Oh. Was it good?
Q. I thought so.
A. Do you think it was true what I said about things?
Q. I have no idea; I have no idea.
How many children do you have?

[redacted]

A. Huh?
Q. How many children do you have?
A. [redacted]
Q. Okay. What are their names?
A. [redacted] and [redacted]
Q. Okay. And who is oldest?
A. [redacted] is the oldest. That's [redacted] half brother.
Q. Half brother.
A. And [redacted] half brother, yeah.
Q. Okay. How many times have you been married?
A. Three.
Q. Okay. What was your first wife's name?
A. [redacted] That would have been [redacted] mother.
Q. Okay. How long were you married -- or what years were you married to her?
A. About seven years, the seven-year itch. And then I married [redacted] -- or [redacted] mother.
Q. What years were you married to [redacted]
A. Oh. Seventy-nine till '86 maybe.
Q. Oh. So you didn't marry until you were in your mid-30s. You held out for a while?
A. No, I wasn't mid-30s when I got married; I

[redacted]

was --

Q. You said '46 to '79? You married [redacted] in '79?

A. Sixty-nine. I'm sorry.

Q. Oh, oh, okay.

A. I'm sorry, '69. Don't --

Q. Okay.

A. That's what happens when you get [redacted] years old. Sixty-nine.

Q. It happens when you're in your 50s, too.

Okay. And you -- so and you were married seven years, so '69 to '76?

A. Yeah.

Q. And when did you marry [redacted]

A. Eighty -- seventy -- that's [redacted] mother. Seventy-eight.

Q. Okay. And when did you divorce [redacted]

A. She divorced me. [redacted]

Q. (Nodding head up and down.)

A. Not soon enough. Ten years later, '88.

Q. Okay. And was [redacted] also the child of [redacted]

A. No. [redacted] and -- and [redacted] are brothers and sisters. My daughter [redacted] and my son [redacted] are sister and brother.

Q. Okay. So they both had [redacted] for a mother?
A. Oh, yes. (facial expression) Even [redacted] will agree with me for that.
Q. Tell me -- tell me about [redacted]
A. [redacted] and her whole family had some bipolar things. [redacted] was bipolar; would be nice one day and a son of a B the next and -- as a matter of fact, [redacted] was catered more by [redacted] and her parents than [redacted] was.
Q. What do you mean by that?
A. Well, they kind of -- they didn't want [redacted] to go to grandpa's house [redacted], you know what I mean? [redacted] was kind of the poor bastard, where [redacted] knew how to get around everybody. And although the grandparents were good to [redacted] they -- [redacted] -- he didn't get the attention that -- that [redacted] got.
Q. When you talk about the grandparents, you're talking about [redacted] parents?
A. Yeah.
Q. Did you hit [redacted]
A. What?
Q. Did you hit [redacted]
A. No. That's bullshit. I've never touch -- hit her, and that is a lie. I have never hit her.

[redacted]

Q. Who told the lies?
A. She did.
Q. Did you ever hit [redacted]
A. No. Oh, a whack in the ass maybe. No, I never hit or hurt [redacted]
Q. What about [redacted]
A. No.
Q. Do you have contact with [redacted] now?
A. Yeah.
Q. When was the last time you spoke to [redacted]
A. The other day. She's a [redacted] down in [redacted]
Q. Do you have contact with [redacted]
A. "Ih." (short I sound) Once in a while, not much. [redacted] that whole family has been in the loon bin. Okay? And I'm not being smart, I'm just saying it; and if you -- if [redacted] says anything about her, [redacted] is right.
[redacted] when he was [redacted] lived in [redacted] hitchhiked four o'clock in the morning up to my house because he couldn't put up with [redacted] or her husband.
Q. He was [redacted]?
A. [redacted] yeah.
Then when he -- in his [redacted] he

[redacted]

came to live with us because he couldn't put up with [redacted] and her husband. He was fine. Up until this thing happened he was the best kid you'd want, and I still love him.

Q. Tell me about [redacted]

A. [redacted] A pain in the ass; could wreck cars, be an ass. At [redacted] years old he's straightened out pretty good now. That's his half brother, and he's doing pretty good.

Q. In your retirement video you -- you basically said you had one son --

A. That was trouble.

Q. Yeah.

A. Not big trouble. DUI crap, stuff like that, wreck the car. I mean he didn't rob people, rape people, anything like that. He -- he was just a horse's ass, but he's straightened out now. Because I still love him, I mean it --

But he was one -- I told the truth in the video; I didn't lie to anything.

Q. Did you hit [redacted]

A. No. I should have. No, no.

Q. When was the last time you spoke to [redacted]

A. Oh. A couple -- three weeks ago. Him and his gal came up from [redacted] and helped me do

[redacted]

some things around the house and got a dumpster and threw out crap that we've been saving for 30-some years.

Q. How long have you been in the house you're in now?

A. Thirty years.

Q. So in the '90s you bought --

A. Yeah, '97. We were married in '96, and we bought this old house. And [redacted] was with us one year [redacted] Not [redacted] I'm sorry. [redacted] was with us for a year.

Q. How has your health been?

A. It's not too bad. I've had two stents put here. (indicating)

Q. When were those put in?

A. Earlier this year. And I did fall on my ass and broke your -- what do you -- your coccyx in the back, I mean that hurt for a little bit. Pretty good I think, pretty good.

Q. Are you able to travel?

A. Yeah. Well -- yeah. I don't want to fly anywhere. I mean we have relatives in [redacted] We haven't gone there in a year or two, but. Yeah, we're getting around good.

Q. I mean could you go to [redacted] if you

[redacted]

needed to or if you wanted to?

A. Pardon?

Q. Are you still able to travel to [redacted]

A. Yeah, if I want to.

Q. Why don't you want to fly?

A. Well, I don't want -- because I really only went to [redacted] in [redacted] and [redacted] I -- I didn't go to Carolina, I didn't want to fly. But both --

Q. Is it -- is it for health reasons that you don't want to fly, or is it you just don't like flying?

A. No, I don't need to fly, I don't have to go anywhere. [redacted] comes up. No, I don't want to fly.

Q. So if you wanted to go to [redacted] how would you get there?

A. Drive. Or -- or fly, I mean it . . .

But I -- the last time we were in [redacted] was like over two years ago.

Q. Okay. What was the occasion that you were in [redacted] two years ago?

A. With [redacted]

I'm gonna tell you something, you're not asking this. [redacted] was the best kid you'd want

[redacted]

until after this money and whatever happened with [redacted] But before that [redacted] would do anything for me and my wife. He was the best kid I ever had. You can tell him that. If you would, I'd appreciate it.

And I don't know. And I'm saying -- you're not asking me a question. I don't --

MR. BRANN: Yeah, you should wait for a question.

Q. What -- here's the question. What was it you wanted to say?

A. What did I want to say? Is that when he had the money, he had the new girlfriend; I don't know if the girlfriend's impressing him or he's doing it. I don't know what happened. The biggest fight that [redacted] and I had is that I talked to [redacted] and I think it's -- she was a member of like the family for 15 years; I think I had the right to talk to my granddaughter's mother.

Q. Before the money became an issue --

A. Yeah.

Q. -- tell me about your relationship with [redacted]

A. Excellent; excellent. He would do anything. If he came in, he would stay at a hotel, but he would get my wife her coffee from [redacted] and

[redacted]

all kinds of things. He was -- he was the best kid you'd want, and I hope -- I hope that it could still be the same way sometime.

Q. How often did you see him?

A. A couple times a year.

Q. And was that you visiting him and him visiting you both?

A. Yeah, vice versa, yeah, he -- yeah. We'd play with the cars, and I picked him up a Suburban. I mean he paid for it, and we worked on that some and . . .

This is after what happened with the money and that thing with him -- when he first broke up with [redacted] he said to talk to her, he was fine with it, and I don't know. I'm sorry. I'm probably going where I shouldn't talk, but I gotta say what I want to say, too.

Q. When -- when [redacted] and [redacted] broke up --

A. Yeah.

Q. -- what do you remember about that time?

A. What I remember was she was a vis -- traveling nurse, and I think there was shit going on before I ever figured out what was going on. Okay?

Q. She was cheating on him, is that what you

mean?

A. What?

Q. She was cheating on him, is that what you mean?

A. I don't know if -- no, I don't think it was cheating. I don't know, but there was friction --

Q. Um-hum.

A. -- there was friction between. Not real bad, but you know -- there was something. And then [redacted] took care of his daughter, which he took very good care of his daughter, loved his daughter. So does his mother, or her mother. I don't know.

Q. Do you recall when [redacted] left [redacted]

A. Left him? I don't know if he left her or she -- she -- she was in Florida as what they call a traveling nurse or something. They have these -- they go make three, four grand a week going -- you know? But I didn't think a lot of it until the end, and then he kind of told me what went on with them. So I really don't know.

Q. Were you aware -- when [redacted] was taking care of his daughter alone, were --

A. And his -- and --

MR. BRANN: Hold on. Let him finish the question.

[redacted]

Q. Were you aware of that at the time?
A. Aware of what now?
Q. When [redacted] was taking care --
A. Yeah.
Q. -- of [redacted] by himself.
A. Yeah.
Q. Okay. What happened -- what happened next in your recollection?
A. Well, when his grandfather sold the [redacted] business, [redacted] got some money. He paid off the -- supposedly the house that him and [redacted] -- the house was in his name, not [redacted] name. He sold that firetrap for like 700,000 or something, and he bought a house in the country. Okay?
But [redacted] lived down the road in -- maybe in the next state, between [redacted] and [redacted] I'm not sure. They were getting along fine. He said, well, talk to [redacted] and you can -- and then when this money came in and whatever happened is when all this shit happened with what's going on now.
Q. Okay. Tell me your recollection of what happened.
A. What do you mean? With the -- what happened between [redacted] and I?

[redacted]

Q. No. Before that, before that.

Well, let me ask you a question. Were you aware in the fall of 2022 before the money came that [redacted] was [redacted] in [redacted] -- when [redacted] had her?

A. Well, [redacted] said --

MR. BRANN: Objection.

A. -- [redacted] --

THE WITNESS: Hmm?

MR. BRANN: I just said objection.

THE WITNESS: Can I say something?

MR. BRANN: Oh, yeah, yeah. That --

THE WITNESS: Oh. [redacted] had told me that. I don't know whatever became of it, I don't know what [redacted] said that [redacted] said. I don't know how -- what kind of [redacted] I mean.

BY MR. BROWN:

Q. [redacted]

A. Possibly or -- I really don't know. We [redacted] But no, I don't know. [redacted] did tell me something about that.

Q. Do you know what year [redacted] was born?

A. Oh, gees. She's [redacted] now. I'd have to look at -- you know what I mean? What year? I forget -- I forget really. My wife is -- does the

[redacted]

birthday cards and everything.

Q. Did -- did he tell you -- so [redacted] would have been what, [redacted] when the [redacted]

A. No, maybe a little older. Maybe a little older; I'm not sure. I know he had told me. Yes, he did.

[redacted]

MR. BRANN: Objection. Go ahead.

A. He didn't say what. I don't know if it was a relative, a neighbor. I don't know.

Q. Did he tell you that [redacted] took [redacted] back to a place where the [redacted] was again after the -- the [redacted]

A. No, I didn't hear that.

Q. Did you hear any concerns from [redacted] about [redacted] parenting at that time?

A. [redacted] what?

Q. Parenting.

A. You mean with -- with the --

Q. Taking care of [redacted] around the [redacted] did [redacted] talk to you about that at all?

MR. BRANN: Objection.

[redacted]

A. Not too much really. I -- I think that whatever happened, [redacted] did -- I will say that [redacted] took care of his daughter real well.

Q. Did you have any conversations with [redacted] about any of that?

A. No. No. We didn't talk to [redacted] that much, I mean. And once in a while she would call. When you -- when you have somebody in your family, even though they're not married, for 15 years and treated you decently, you treat her, too. So I . . .

Q. [redacted] girlfriend.

A. Yeah.

Q. You said you met her twice?

A. Yeah.

Q. What was the first meeting? Do you recall?

A. When he was bringing her shit back from her grandmother's house up in the Midwest somewhere.

Q. Do you recall any conversations with her?

A. No. Just the old crap about that [redacted] It sounded like a lot of bull crap to me. But she was nice to me, there was no problem between her and I; and [redacted] was nice to her. I didn't begrudge her for anything.

[redacted]

Q. When was the second time you met her?
A. When they came in in the trailer going down south to you.
Q. To me?
A. Yeah.
Q. No, it wasn't me.
A. She never came down?
Q. (Shaking head from side to side.) I don't know where -- you're talking about when they -- in early 2023?
A. Well, he had a big [redacted] and a trailer on the back. So maybe he didn't go to see you, but he went down south somewhere.
Q. I didn't know him at the time.
A. Okay.
Q. How long did they stay with you during that visit?
A. Oh, a couple days.
Q. Did you have any conversations with her at that time?
A. What do you mean? Conversation?
Q. Did you talk to [redacted] girlfriend during that visit?
A. Well, yeah, like we're talking now, yeah, just like you talk to somebody that's at your house.

[redacted]

She seemed likely enough, she was polite enough. I mean I didn't begrudge [redacted] for that at all.

Q. Do you remember what month it was that [redacted] came to visit you?

A. Well, that would have been probably the early spring. I'm not sure. He said he wanted to take her and he'd do homeschooling. Took her out of school and they were going out somewhere. I thought they were gonna see you. But he was going somewhere down south.

Q. Did he -- when he was coming down here, what did he tell you about the reason for his visit?

A. I don't know. I don't know if he -- what he wanted to do. He had the little girl with her, he took her out of school.

Q. Did he tell you -- before he showed up at your house did he tell you he was coming?

A. Says what?

Q. Before he showed up at your house --

A. Yeah.

Q. -- did he tell you he was coming?

A. Yeah.

Q. Okay. What did he tell you?

A. Not much. He came with his [redacted] and a big trailer on the back. It looked like the

[redacted]

Grapes of Wrath.  But no.  He was there, we got along fine.  Went to dinner, discussed this, discussed that, and . . .

Q.    Did he tell you on the phone that he had won the lottery?

A.    Yes.

Q.    What did he say?

A.    He said to me, "I can't tell you right now, but you don't have to worry about a thing the rest of your life."

I said, "What did you -- what did you get:  Whipple's fortune?"  That would have been his grandfather's.  He said, "No.  That's pocket change."

And he told me it was -- he didn't tell me it was the lottery at first, he told me what he won.  Well, obviously if you won and you didn't have to work the rest of your life, it's obviously the lottery.  He was nice about it.

Q.    So this is a phone call?

A.    Yeah.

Q.    Tell me -- tell me -- tell me more. Tell -- what else did he say?

A.    Well, just that basically.  You know, come in and see you, we're gonna decide what we're gonna do.  He was fine.  We were fine until this shit

[redacted]

started with him threatening me not to talk to [redacted]

Q. And did you talk to [redacted] about him coming to visit you?

A. No.

Q. How -- how frequently were you talking to [redacted] in early 2023?

A. I didn't. My wife talked to [redacted] mostly. Okay? I didn't talk that much to her.

Q. Did you tell your wife what [redacted] had told you about money?

A. About what?

Q. About money?

A. Talk to my wife about what?

Q. Did you tell her what [redacted] said on the phone?

A. Yeah, my wife.

Q. Um-hum.

A. I want to know. He also sent somebody, two -- two detectives, detectives to my house and his sister's house for a threat evaluation or something. They -- I'm gonna threaten my son?

Q. Do -- when did that happen?

A. About maybe a year and a half, two years ago. A nice guy. He was a private detective or whatever. He -- I don't know if he talked to [redacted]

[redacted]

my daughter on the phone or left a message. That he came, he had [redacted] -- or he had plates either your sta -- either [redacted] or wherever.

He was a nice guy. And then I talked to him for a minute, he said okay. But why would they come to my house for -- to see if there's a threat? I mean, I didn't threaten my son.

Q. Do you recall the names of those two detectives?

A. No.

Q. Did they give you business cards?

A. No. I wasn't home. He went to the door. My wife talked to him, and then -- she might have had a business card. I don't have it. [redacted] should know because he sent them. And he was -- they weren't -- they weren't shit bags or anything, but I just said there's no threat. Threat assessment. Of what? Why would I threaten my son?

Q. Did you consider that maybe you were not the only threat?

A. Well, my wife wasn't a threat, his sister wasn't a threat.

Q. Was this before his visit with you?

A. Pardon?

Q. Was this before he visited you?

[redacted]

A.    Before he what?
Q.    Before he visited.
A.    No, this was after he visited.  This is after I think the crap happened with -- when he told me that I could not talk -- you and [redacted] cannot talk to -- nobody's telling me who I'm gonna talk to.
He has changed his whole attitude of life.  He was the best kid.  I was proud of him.  He was a [redacted]  When he was a [redacted] in [redacted], he did a good job, but they were assholes there.  When he went to [redacted] -- [redacted]?  They were assholes, too, so he quit.
Then he had a [redacted].  I gave him my two [redacted] my [redacted] that I had, my [redacted], and my -- the [redacted] my dad gave me.  And I said yeah, I'd like you -- if you would like to have them.
They were the good times going.  All of a sudden, boom.  (indicating)
Q.    I want to back up to something you told me about a couple minutes ago.  The first time you met [redacted] girlfriend was before the money, before the lottery, correct?
A.    You know, I think so, I think so.  Because -- I think it was because they picked up stuff.  She had a little [redacted] truck.  Well, a

regular [redacted] truck, and they had furniture. They must have went out to the Midwest to her grandmother's house or something, and they brought some things back.

Q. And they stopped here on the way?

A. They stopped on the way home.

Q. Okay.

A. Okay? And then the next time they came down they had a trailer.

Q. The -- what car were they driving on that first visit?

A. A green [redacted] smaller [redacted] pickup but not a [redacted] What's the other one? A [redacted]

Q. [redacted] How long -- how long did they stay that visit?

A. Maybe a day or two.

Q. Did they stay with you?

A. She was driving it and [redacted] was riding. They hit a deer with it, and he had to saw off the one part of the bumper and the -- on the way out to the Midwest.

All I can say is he was the best kid I ever had, and I don't know.

Q. Okay. So the -- so in early 2023 after [redacted] won the lottery --

[redacted]

A. Yeah.
Q. -- he called you on the phone?
A. Yes.
Q. And he said -- tell me again what he told you?
A. He said, "Dad."
I said, "What's going on, [redacted]
Well, I'll tell you how he was. When he sold the house, he came. How generous he was, he came. And I had a Mercedes, an E class, big one. And he said, "What do you owe on that Mercedes?"
And I said 2500 bucks. It was a big car, nice -- late model car, but it was trouble, and he gave me $2500 and said pay the car off.
And I mean everything was -- everything was fine. This is when he was still getting along with [redacted] when he lived in his little house that he bought after he sold the bed and breakfast or whatever you want to call it.
I don't really know what happened, I mean. We never threatened each other of any physical harm or anything like that.
Q. Were you aware -- were you critical of [redacted] parenting of [redacted]
A. No. No. He treated [redacted] with silver

[redacted]

gloves, he loved her. Or he loves her I mean.

I haven't seen [redacted] in almost two and a half years or so. It is my granddaughter. And although my wife, that's her step granddaughter, but we haven't seen her and I think heard from her once or got a Christmas thing from her that [redacted] must have got it and sent to my wife.

Q. [redacted] -- [redacted] sent something from [redacted] to your wife?

A. I think so, yeah.

Q. When was that?

A. Little Christmas decorations, around Christmas. Something that a [redacted] would pick out for her grandmother.

Q. And when was this? Last Christmas?

A. Yeah.

Q. 2025?

A. Yeah.

Q. When was the last time you spoke to [redacted]

A. Oh, shit. Months ago; months ago.

Q. What did you talk about?

A. I didn't say -- just hello. I didn't talk to her too much at all. And at some -- my wife: "Well, how is [redacted] doing?"

She's doing good; she's doing this,

[redacted]

she's -- [redacted] is kind of like the little actress, you know. And she's involved in school, doing okay, stuff like that. I didn't get into many talks with [redacted]

Q. Your wife's name is [redacted]

A. [redacted]

Q. Did [redacted] talk to [redacted] mostly?

A. Yeah. I mean girly stuff, yes.

Q. What did they tell you that [redacted] is up to?

A. [redacted] She goes to like whether [redacted] or something like that. I guess [redacted] has her two weeks and -- well, [redacted] has the two other weeks. I just hope it doesn't screw up the kid.

Q. Did she tell you anything else that [redacted] is up to?

A. No.

Q. Did she tell you anything else that [redacted] is up to?

A. No.

Q. What did she tell you about the -- the lawsuits between them?

A. You know, I -- I don't know what she told me about the lawsuit. I think it was in the paper of what he was suing her for. A friend of mine is from

[redacted]

[redacted] Somebody was sending me things from the --
THE WITNESS: What town are you from? Your --
MR. BRANN: Hmm?
A. Your town, that's Portland, right? Some people sent me some articles.
Q. You're making -- you're making Mr. Brann nervous. He doesn't want to testify.
A. No, he's from Portland. But no, it -- it just -- this happened. I don't know, I really don't know. It's . . .
Q. Okay.
A. But I wasn't there, I didn't see them that much.
Q. The visit, when [redacted] visited you in early 2023, tell me everything you remember about that visit.
A. You mean the first time?
Q. When he visited you after he won the lottery.
A. He came in with a trailer and a big [redacted] whatever, and not much. That's about all. You know, we -- we went looking at -- he was looking for some [redacted] shops and [redacted] and I was looking for model cars, that's what I go to do.

[redacted]

That's about all I -- you know, there was nothing to overly remember by. Just they were there, they slept in the trailer. This is before shit hit the fan with what's going on now as far as I know.

Q. When you say what's going on now, what are you referring to?

A. What [redacted] is going through and what [redacted] is going through.

Q. What is that?

A. The lawsuit, et cetera, et cetera.

Q. I need to understand -- I need to know what you mean when you say et cetera, et cetera. What's your understanding of what's going on between them?

A. The understanding I got was from the thing that he's suing her for telling people; that he signed a form, she signed a form, telling people that he won. She didn't tell me he won. I don't know who else she told. It was [redacted] that told me he won.

Q. Who told [redacted]

A. Huh?

Q. Who told [redacted]

A. I did. That's my wife. Yes, I told [redacted]

Q. Who told [redacted] Your daughter [redacted]

[redacted]

A. I did.
Q. Did you tell [redacted]
A. I don't think so. Because I know that [redacted] father died, and he'll be getting a little -- little grease job and my daughter [redacted] will, because they were worth millions. But -- I don't know. I wasn't involved in the big breakup that happened there until it happened.
I knew there -- she was in [redacted] for being a nurse, and he was home with the [redacted] and [redacted] Then he came in, and I kind of said, well, what's going on? You have [redacted] here with you. And I got a little wind of it but not -- not much of it at all.
Q. What was the little wind that you got?
A. Before I met the girlfriend that [redacted] and [redacted] were having some problems, from [redacted]
Q. And he was taking care of [redacted]
A. [redacted] was, yeah. When she was in [redacted] for ever how long or wherever she was. But like I said, it wasn't a big -- I mean I wasn't up there that much or whatever.
Q. When [redacted] came to visit you in early 2023, tell me -- tell me what you, what were you -- what did you talk about during that time?

[redacted]

A. Talk about finding another house maybe. This is after he won the money?

Q. (Nodding head up and down.)

A. He had wanted to buy another house in order to be closer to where [redacted] is. I don't know if it was [redacted] or [redacted] But just the normal bullshit. What are you doing here? Let's go look for this car, let's go -- he was looking for [redacted] driving around, and we did that and we got along fine.

Q. Did you talk about money?

A. No. No. He's the one that talked about money.

Q. What did he say?

A. Well, he -- he said that he was gonna give me X number of dollars, and he was gonna help me put up a garage, do this, do that, we'll get cars. That kind of stuff.

MR. BROWN: We've been going for an hour. Let's take a five-minute break and give the witness a break.

MR. BRANN: You're reading my mind. Let's go off the record.

THE VIDEOGRAPHER: We're gonna go off the record. The time is 10:14.

[redacted]

(A recess was taken.)

THE VIDEOGRAPHER: We are now back on the record. The time is 10:36.

BY MR. BROWN:

Q. Mr. [redacted] when [redacted] visited you in early 2023, was that the last time you saw him?

A. Wait. 2024? It might have been '24. I really can't remember.

Q. I'll represent to you that the lottery was in January of 2023.

A. Okay. You know, I don't -- I don't think -- I think '23 was the last time I saw him.

Q. Okay. In that -- in that meeting when you -- when [redacted] visited you the last time, did he talk to you about what he was going to do with the money?

A. His money?

Q. Yes.

A. Not really. Oh, they were gonna be philanthropists and help out things like that and that. I don't think that was the time he talked to my wife and I.

Q. That was not the time he talked to you?

A. I don't think so.

Q. Was there another time that he talked to

your wife and you?

A. Just once on that.

Q. During that same visit?

A. No. It might have been another visit. I -- it may have been. I really don't re -- I -- whew, I'm trying to think. It may have not -- I don't remember the date on it.

Q. It sounds like you're talking about two -- two times in your memory. One --

A. I've seen -- I've seen [redacted] and --

MR. BRANN: Let him finish his question.

Q. Of seeing [redacted] after he won the lottery. Are you remembering two -- two separate times?

A. I think so.

Q. In your memory what was the first time that you saw him after he won the lottery?

A. When he came in and told me what he was gonna do for me, et cetera, et cetera.

Q. And what did he say?

A. Well, like I said before, about the give me money so I can fix the house, play with some cars, build a garage, that type thing. And that's when he said did he want -- did we want to go back to the house that he grew up in, that his mother and my --

[redacted]

and my -- we said no, so that was -- I don't know if I saw him after that or not. Okay? I really don't.

Q. What else did he say, if you remember anything else?

A. Not much. He was going down south or he went somewhere with the trailer and the little girl and his girlfriend with him. They went down south somewhere.

Q. Did he -- did he make any promises to you?

A. Yes, he did. It was -- it was already in there what he -- what he said about a million-dollar trust fund.

Q. Okay.

A. That was the promises he made, yeah.

Q. That he would put a million dollars in a trust fund?

A. He was gonna put it in.

Q. In a trust fund for you?

A. Yeah.

Q. And what did he say about that trust fund?

A. Well, that -- we got into it and out of it, because at the time I questioned him a lot of things. I never got an ans -- a straight answer on it.

Q. What were the things you questioned him?

A. Well, I questioned him about I could have

had PNC Bank here in [redacted] take over that. Oh, good, I'll send the things here. He gave me a bunch of crap, and that's all I heard about.

And then -- the worst thing I heard was -- he never said I'm screwing you. Him and I, the last time we talked was, it was the little girl's birthday. I said happy birthday. I said, [redacted] -- then he got a little snotty with me. I said, you know, you're not the -- you're not the [redacted] I know. He was never like that before, but.

Q. You're talking about a conversation around [redacted] birthday?

A. Yeah.

Q. Okay. Let's stay focused on when he visited you, and you were talking about the promises that he had made and the trust fund, and I want to know what he said.

A. He said?

Q. Yes.

A. Well, he said that he was gonna give me a trust fund, and he was gonna make sure that I won't have to go to a nursing home or my wife, we could be living at home. Okay? And we could get some cars and do this and that just like I said before. He made those -- those were the basic things.

[redacted]

And then I'd ask him questions about it, and I got no answers to anything. And I said -- it's right in the thing there what -- what he said to me what he was gonna give me.
Q. What were the questions you asked him?
A. Huh?
Q. What were the questions you asked him?
A. I asked him, "When is this gonna happen?"
"It's gonna take a long time."
I said, "Okay. Okay." I said, "Well, I've gotta do some things."
"Well, that's a" --
Then he told me to get to his accountant. I didn't know who his accountant was; he never told me that. That was the last thing we talked about, and there wasn't much left after that.
Q. How many times did you speak to him after that visit?
A. Maybe once. I'm not really sure. I'd say possibly once.
Q. When do you think that was?
A. That was the last time I saw him. I don't know if it was '23 -- I think it was in '23 sometime when he went down south.
Q. When was the last time you spoke to him?

[redacted]

A. On her [redacted] birthday. About two years ago, a little over two years ago. I mean I never -- I didn't write it down on the calendar. It's been over two years that we haven't talked.

Q. And what was said in that conversation?

A. I said, What's going on?

I'm gonna take her to Chuck E. Cheese or something, and I don't want you talking, you or [redacted] He was -- it was almost like a threat. And, you know, "I don't want you to talk to [redacted]

I said, "I'll talk to who I want to." She's been in the family for like 15 years or so. And that I think put the end to it as far as [redacted] talking to me.

Q. Okay.

A. Tried to call him a few times, questioned him a few times. I have bankers here. That's PNC Bank that would work with him there or whatever that we could get it out of here, and nothing ever hap -- nothing curtailed of it. So that's the -- that's all I could tell you.

Q. Were you upset that he didn't come through with the money?

A. Well, I wasn't crying my heart out, but I mean I'm still paying my bills with this. And

[redacted]

especially now it's -- it's damn tough.

I was upset that -- he made the promises. I made promises to him. I kept the promises I made to him, and I gave him what I could. But I don't know. All I said was, [redacted] you're not -- you're not the [redacted] that I know. What he's telling me to do and things, it was completely different than what he was. So.

Q. How frequently were you talking to [redacted]

A. Huh?

Q. How frequently were you talking to [redacted]

A. I don't know how frequently because [redacted] usually talks to my wife, and I don't know what they talked about. I mean -- I don't know. I haven't talked to her that much briefly at all.

Q. Were you aware that [redacted] accused [redacted] of kidnapping [redacted]

A. I thought that was in the -- in the paper if I'm -- not kidnapping her, but he wanted to take her and homeschool her or something.

Q. No, I'm talking about kidnapping. Were you aware that [redacted] alleged, went to the police, reported him for kidnapping [redacted]

A. I don't know if it was kidnapping. I know that he took her out of school. I didn't -- it

[redacted]

wasn't called kidnapping to me. I mean it was her father, but.

Q. During the trip that he visited you with his girlfriend --

A. Yeah.

Q. -- and [redacted] he had to -- he had to go back because [redacted] accused him and the -- to the police and to the court of kidnapping [redacted] Were you aware of that?

MR. BRANN: Objection.

THE WITNESS: Huh?

MR. BRANN: You can answer. You can answer.

A. Briefly I -- I'm really not sure, because that was after I stopped talking to [redacted] so.

Q. No. It was before [redacted] birthday. Did you -- did you hear from [redacted] that she reported or tried to report [redacted] for kidnapping [redacted]

A. I didn't hear that from [redacted]

Q. Did you hear it from [redacted]

A. I don't know who I heard it from. Maybe I heard it from [redacted] I don't know. Was it in the paper?

Q. I can't answer questions for you --

[redacted]

A. Well . . .
Q. -- any more than Mr. Brann can.
Did you -- did [redacted] tell you anything about -- that [redacted] might have said about kidnap -- about [redacted] kidnapping?
A. I don't really recall it, I don't really recall it. All he said to me one time when he was going, that he was gonna do homeschooling.
Q. Um-hum. You were a [redacted] for --
A. Yeah.
Q. -- 36 years.
A. Yeah.
Q. Kidnapping is a serious crime, correct?
A. I would say kidnapping isn't. But if it's your kid and that's your daughter, I think it would be a little different than kidnapping.
Q. I agree with you. My question is, it's a serious allegation, isn't it? It's a serious crime, kidnapping?
A. Well, you'd have to investigate it. If an investigation came out . . . I've never had one say that -- I've never had a call saying that my husband kidnapped my daughter. Okay?
All I know is that they wanted her to do home -- they wanted to homeschool her. That was

[redacted]

the only thing he had said to me. There was nothing about kidnapping, and maybe --

Q. Were you aware that [redacted] started the litigation? The court cases between [redacted] and [redacted] were you aware that [redacted] started them with an allegation that [redacted] had kidnapped [redacted] when he took her on the trip down to see you?

MR. BRANN: Objection.

THE WITNESS: Huh?

MR. BRANN: Go ahead. You can answer.

A. No, I don't -- I don't know. I -- I wasn't considering that he was kidnapping.

Q. Well, it wasn't, but how do you feel about [redacted] accusing [redacted] of kidnapping [redacted]

MR. BRANN: Objection.

THE WITNESS: Huh?

MR. BRANN: Go ahead.

Q. You can answer the question, sir.

A. Well, probably the same thing as [redacted] is -- what she's -- he's doing with her. It's a -- it's a dog and pony show, it's a (indicating) fight. I'm not in -- I was not in the middle of any of the shit that went on.

Q. How do you feel about [redacted] accusing [redacted] of kidnapping [redacted]

[redacted]

MR. BRANN: Objection.
Q. In court.
MR. BRANN: Objection.
Q. In court.
MR. BRANN: Objection. Go ahead.
A. If I -- I don't know where I heard it.
Q. How do you feel about it?
MR. BRANN: Objection.
A. Well -- how do I feel about it? I have no feel about it. Did he come home with the kid?
Q. You know he did.
A. Yeah.
Q. So it wasn't kidnapping, right?
A. I wouldn't call -- I wouldn't call it kidnapping, but you could call -- or they could call it whatever they want to.
Q. Okay. How do you feel about [redacted] calling it kidnapping?
MR. BRANN: Objection. You've made your point. I mean, look, this isn't --
MR. BROWN: He hasn't answered.
MR. BRANN: Hold on. This is supposed to be a trial deposition. If you've ever tried a case, you would have -- you would know that you can't possibly get -- hope that any of this ever comes in

[redacted]

at trial, so why are you wasting our time?

MR. BROWN: If you had read the Rules of Civil Procedure, you would know that there's no such thing as a trial deposition and that a deposition can be used for any purpose; and here, because he's an unavailable witness, portions of it will be used; but it's also a discovery deposition.

THE WITNESS: Yeah, but why am I getting --

MR. BRANN: Okay. All right. Okay.

THE WITNESS: -- all these fucking questions? I'm not --

MR. BRANN: Hold on, hold on. Let -- just let him ask his question.

Go ahead. What's your question?

BY MR. BROWN:

Q. I want to know what you think about [redacted] accusing [redacted] of kidnapping, in court, accusing him in court --

A. I didn't -- I didn't -- I didn't -- wasn't in court.

Q. [redacted] accused [redacted] in court of kidnapping [redacted]

A. Okay. Okay.

Q. What do you think --

A. What happened?

Q. What do you think about that?

MR. BRANN: Objection.

A. I don't know. I don't know. I wasn't involved in it. Okay? I was not involved in it, I was not -- talked about kidnapping with either one of them. This might have happened after we stopped talking. Okay?

Q. Are you aware that [redacted] started the litigation? The court cases between [redacted] and [redacted] that [redacted] started them; are you aware of that?

A. No.

MR. BRANN: Objection.

Q. Are you aware that [redacted] receives approximately [redacted] from [redacted]

A. No. No.

Q. Are you aware of any settlement offers that were made between [redacted] and [redacted]

A. No.

Q. Is [redacted]

A. No.

Q. If [redacted] wrote to [redacted] and said that she was aware of it, what would you think about that? I would -- would I need to ask [redacted] about that?

[redacted]

MR. BRANN: Objection.
A. No.
Q. Is it fair to say that [redacted] talks to [redacted] a lot more than you do?
A. No. She hasn't talked to her hardly at all.
Q. Well, before the -- before [redacted] stopped communicating, is it fair to say that -- that [redacted] talked to her a lot more than you did?
A. No. No. We talked, but with her? They broke up when this, all this shit started. He threatened me that I can't talk to [redacted]
Now, I didn't talk to [redacted] over any of this crap. Okay? This thing could be worked out real easily.
Q. How much did [redacted] offer [redacted] to settle?
MR. BRANN: Objection. Go ahead.
A. I don't know what [redacted] offered her.
Q. Does [redacted] know?
A. I don't know if [redacted] knows. [redacted] is not here, and I wasn't involved in it. I don't know.
Q. How close are you with --
A. With who?
Q. [redacted]

[redacted]

A. I haven't seen [redacted] in a couple years. He lives in this area. He lives in this area. And I think he works at -- oh, one of the grocery stores off [redacted] and I think he lives in [redacted] I haven't seen him in a couple years. My wife seen him once in a while if she goes into [redacted] Market, he's down in [redacted] but I haven't talked to [redacted]
Q. Have you ever talked to [redacted] about the lottery?
A. About what?
Q. [redacted] money?
A. No. No.
Q. Who's [redacted]
A. Hmm?
Q. Who is [redacted]
A. I don't know who [redacted] is.
MR. BROWN: Let's mark this as an exhibit, please.
([redacted] Exhibit No. 3 was marked for identification.)
BY MR. BROWN:
Q. You've just been handed a document that's been marked as Exhibit 3. Have you seen this before?
A. What?

Q. Have you seen this before?
A. No.
Q. Do you recognize the handwriting?
A. No. Is that my wife? I don't know who it is. There's a [redacted] I don't know.
Q. Is that your wife's signature at the bottom?
A. I don't know.
Q. In your 36 --
A. I'm not involved in it.
Q. In your 36 years of [redacted]?
A. No. I don't know.
Q. You don't know your wife's handwriting?
A. Not really.
Q. Do you know your wife's signature?
A. What did I just say? No.
Q. How long have you been married?
A. Thirty-six years.
Q. You've been married to [redacted] 36 years?
A. Yeah. Yes.
Q. But you don't know her handwriting?
A. I don't recognize it. What do you want me to do? I don't recognize it. Here. (indicating) I thought we could have a nice conversation here and

try to work things out, and all you're doing is breaking my balls.

Q. In this letter it was written, "The money he promised us would have made our end years easier. Do you know why he did this, [redacted]

A. Well, so what. That's not lying, is it?

MR. BRANN: Let -- hold on. Let him finish his question.

Q. Do you know whether [redacted] ever responded to this letter?

A. I don't know. First of all, she responded to [redacted] How did you get it? Does [redacted] go in and steal it?

Q. The last paragraph says, "[redacted] said that you show [redacted] the cards I send her."

A. Who, what?

Q. It says right here. You have it in front of you. "[redacted] said that you show [redacted] the cards I send her." Who's [redacted]

A. [redacted] there's no [redacted] I don't know a [redacted]

Q. And then it says, "It breaks my heart what he's doing to you." Right? So it means [redacted] what [redacted] is doing to [redacted] Do you know what he --

[redacted]

A. Well, my wife has the wife to say -- the right to say that if she wants to, doesn't she?

Q. My question to you is, what is he -- what is she referring to that [redacted] is doing to [redacted]

MR. BRANN: Objection.

A. I don't know. I don't know.

Q. You don't? Do you -- what --

A. Who got that? Where did you get that?

Q. What is [redacted] doing to [redacted]

A. I guess he's suing her for something because she told people about his winnings. That's the only thing I know about it.

Q. You're not aware of the custody suit, the child support, her --

A. No.

Q. -- her wanting money?

A. No. I wasn't involved with it.

Q. The allegations of kidnapping, that [redacted] kidnapped [redacted]

A. I wouldn't call it kidnapping to begin with. I don't know; I don't know about it.

MR. BROWN: Okay. Let's mark the next one.

A. Did she call the cops on him?

MR. BROWN: Wait. Hold on. Let me just

[redacted]

make sure . . .

([redacted] Exhibit No. 4 was marked for identification.)

THE WITNESS: Yeah, my wife has the right to write this.

BY MR. BROWN:

Q. Have you seen this before?

A. What? No, I --

Q. Exhibit 4?

A. What?

Q. Exhibit 4, have you seen it before?

A. No. And the funny thing of it is, if my wife writes it to [redacted] how did you get it? How did -- how did you get it? Did [redacted] take it?

Q. On the first page of the letter it says, "Any way, I want you to know that we stand with you against what [redacted] said."

A. Yeah. You're damn right.

Q. And then on the last page it said, "If you need us to be on your side, we'd be happy to come up there."

A. Yeah, to stick up for her the way he's acted towards her.

Q. How has he acted --

A. And us; and us.

[redacted]

Q. I asked you a couple minutes ago what he has done to her, and you couldn't tell me a single thing. What are you standing up --

MR. BRANN: Objection.

Q. -- for her against him, what he's doing to her?

A. Not against him. Not against him, let -- let those two fight it out. But I've got along -- I wanted to get along with both of them. One is my son, and the other is the mother of our granddaughter.

Q. This letter is signed [redacted] -- [redacted] and [redacted] That's you, right?

A. Oh, I didn't sign it. Take it -- wipe your ass with that, will you, please? Where the hell did you get those?

Q. Is this your wife's handwriting?

A. Where did you get those?

Q. Is this your wife's handwriting?

A. I don't know. Where did you get those? They must have been stolen off her. And don't give me any bullshit they weren't.

Q. There's a sticker on the envelope that says Ms. [redacted] Is that you? Or is that your wife?

[redacted]

A. Yeah.
Q. It says --
A. What? Is that illegal?
Q. [redacted]
A. Is that illegal?
Q. Is [redacted] the post office where this would be mailed from if your --
A. I don't know.
Q. -- wife sent it?
A. It could be mailed out of anywhere.
Q. [redacted]
A. Yeah, that's it; that's it. Where did you get those, where did he get 'em? He must have stole them off her.
Q. Do you agree with me that this letter was written by your wife?
A. I guess. And what are you gonna do about my wife writing a letter? I didn't write a letter. And those two are friends.
Q. Well, it's signed by -- it has your name on the signature block, right?
A. I don't give a shit. I didn't sign it.
Q. When it says, "If you need us to be on your side, we'd be happy" --
A. Yeah, you're goddamn right. I would stick

[redacted]

up for her the same as I stick up for my son; both of them, because I love both of them. So don't bust my fuckin' balls because you're getting on my fuckin' nerves. Do you understand?

Q. So tell me.

A. Yeah, I'm telling you.

Q. When you're on her side --

A. Yeah.

Q. -- what are you on her side against?

A. The way he -- the way he's treated her.

Q. How is that?

A. Threatening her -- threatening her with shit.

Q. What is he threatening her with?

A. I don't know. Here, why don't you wipe your ass with those. Okay?

Q. What is he threatening her with?

A. I don't know.

Q. Well, you just said that you're standing with her against the way he's treating her.

A. Blow it out your ass, please. You know what? I've dealt with lawyers, I've dealt with people. You're one of the most ignorant, goddamn son of a bitches I've met, and you -- I know that you're never gonna tell [redacted] I stuck up for him. Now,

[redacted]

goddamn it, grow up.

Q. Are you ready to answer my questions?

A. No.

Q. Are you gonna refuse to answer my questions?

A. Yeah. What are you gonna do about it?

Q. My next question for you is, if you were gonna stand up -- if you were gonna take [redacted] side --

A. Yeah.

Q. -- against what [redacted] is doing to her -- that's what you said, right?

A. I didn't say it.

Q. What are you gonna take [redacted] side against?

A. I said we -- we'd stick on both sides. She was a member of the family the same as he is.

Q. When you -- when [redacted] wrote in this letter that has your name at the bottom of it --

A. Yeah, how did you get that, how did he get that letter?

Q. -- "If you need us -- if you need us to be on your side" --

A. Where did they steal that letter from?

Q. My question is --

[redacted]

A. Where did they get to steal -- where did you get that letter from?

MR. BRANN: Let him -- let him ask his question.

Q. My question is, this letter with your name at the bottom of it and it says "If you need us to be on your side," what were you going to be on [redacted] side against?

A. Against him. I think it was that he wanted to take the girl off her if I'm correct; he wanted -- I don't know, I don't know anything about it.

Q. Who told you?

A. I just want to know how -- did [redacted] give you those? I don't think so.

Q. Who told you that?

A. I don't know.

Q. Did anybody tell you that --

A. No.

Q. -- or are you making it up?

A. No.

Q. Are you making it up?

A. Yeah.

Q. So what, why -- what are you gonna take [redacted] side against?

A. Take the side against? There was supposed

[redacted]

to be -- there was supposed to be that he wanted the kid a hundred percent. Okay? He threatened me not to talk to [redacted]

Q. Who told you he wanted the kid a hundred percent?

A. He did. He did.

Q. And when did he tell you that?

A. I don't know.

Q. Well, you haven't mentioned it before, it's not in your declarations. Are you making it up now?

A. You can "declarate" my ass. Come on, you're -- you're pushing.

Q. Are you making it up?

A. You're pushing.

Q. You know that -- [redacted]

A. Yeah.

Q. You know perjury is a crime, right?

A. Yeah.

Q. Okay. So are you making it up now?

A. No.

MR. BRANN: Objection.

Q. So when did he -- who told you that [redacted] wanted [redacted] a hundred percent?

A. [redacted] did.

Q. When?
A. I don't know. With this argument with [redacted] he wanted her, he wanted the -- [redacted] He told me that.
Q. And you wanted to take [redacted] side against [redacted] in that?
A. I'm taking both of their sides.
Q. Well, that's not what the -- that's not what your letter says.
A. I don't care. I didn't write the fuckin' thing, so don't come down on me, buster.
Q. So you -- are you telling me --
A. I did not write it.
Q. So is -- this is just [redacted]
A. Maybe. But I would stick up for [redacted] for what she thought.
Q. Against what, stick up for [redacted] against what?
A. Against your -- my son acting like an asshole and what he's going through.
Q. Okay.
A. That's it.
Q. How is your son acting like an asshole?
A. You got it right there. I love my son as much as anybody.

[redacted]

Q. How is your son acting like an asshole?
A. I don't have to answer that either.
Q. You kind of do have to answer my questions.
A. What?
Q. You have to answer my questions.
A. What are you gonna -- what are you gonna do if I don't? Are you gonna arrest me? Huh?
Q. Are you refusing to answer my question?
A. Yeah. Yeah, I am.
Q. Okay.
MR. BRANN: You can answer his question.
THE WITNESS: What?
MR. BRANN: Just answer his question.
A. Yeah, what -- what do you want me to answer?
Q. I want you to -- I want you to tell me. You just said that your son -- you stand up with [redacted] against your son acting like an asshole.
A. Yes, sir.
Q. That's your words.
A. Well, he was acting me -- calling me an asshole and a -- whatever.
Q. My question is different.
A. Oh.
Q. My question is, you said that you're

standing up with [redacted] against [redacted] being an asshole.

A. I didn't say that, I didn't say the whole thing. I don't care what somebody wrote. Maybe my wife wrote it. Do you want to drag her ass down here? And what are you gonna do about it? You can't do anything about it. What are you trying to prove?

Q. I'm just trying to get your -- get you to answer some questions, Mr. [redacted]

This letter says that you're gonna -- that you and [redacted] are taking [redacted] side. My question is, against what?

A. Against [redacted] -- what [redacted] and her are fighting about.

Q. What are they fighting about?

A. The color of the fuckin' moon. You know what they're fighting, but don't be -- look like an ass. It's be a goddamn gentleman and let's talk sense instead of your nonsense right there.

Q. Do you know what they're fighting about?

A. Yeah.

Q. What?

A. The little girl.

Q. Okay. And you're taking [redacted] side against your son then?

[redacted]

A. No, I'm not gonna -- no. No, no, no.
Q. Well, when this letter says, "If you need us to be on your side" --
A. How did -- how did you get that? Can I ask you a question?
Q. No. When -- when this letter says, "We'd be happy -- if you need us to be on your side, we'd be happy to come up there," you're take -- you're talking about taking [redacted] side against your son with regard to the custody of his daughter?
(Cell phone ringing.)
A. I didn't write that. My wife wrote it; those two are friends. Okay? They both loved each other, they both liked each other, they both loved their -- her daughter and his daughter. Now, I don't want to argue with you anymore.
Where did you -- where did you get those? Where did you get those? Somebody robbed that, somebody probably got that from -- somebody went through somebody's mail or something.
Q. Do you know -- if [redacted] wrote this letter -- do you think [redacted] wrote this letter?
A. I don't know. I wasn't there when anything was written.
Q. Would somebody -- would [redacted] sign your

[redacted]

name to a letter without you reading it first?
A. I don't know.
Q. Has she ever done that before?
A. I don't know. No.
Q. When she wrote or when somebody wrote, "If you need us to be on your side, we'd be happy to come up there," do you agree with that statement?
A. I'm on her side the same as I'm on my son's side. Yeah, I agree with it. I would go up and help her out.
Q. Against [redacted]
A. Against what's going on.
Q. What's going on?
MR. BRANN: Objection. This was asked and answered. You've done this a ga -- a gazillion times.
MR. BROWN: He's either -- he either doesn't know or he knows, and I can't tell yet.
THE WITNESS: I don't know.
MR. BRANN: He's --
THE WITNESS: I didn't write the document.
MR. BRANN: Excuse me, excuse me. I'm talking.
So he's told you repeatedly what he thinks and why he thinks it. All you're doing is

[redacted]

just going back and again and again. I mean there's no point serve -- there's no further point to be gained by doing that.

MR. BROWN: Are you done?

MR. BRANN: Yes. I object.

MR. BROWN: Okay. Let's mark the next one.

([redacted]Exhibit No. 5 was marked for identification.)

MR. BROWN: This is 5?

THE REPORTER: Five, yeah.

BY MR. BROWN:

Q. Do you recognize the document that's been marked as Exhibit 5, Mr. [redacted]

A. Pardon?

Q. Do you recognize the document that's been marked as Exhibit 5?

A. Recognize what?

Q. Do you recognize that document?

A. I don't recognize any of that. I never saw it.

Q. Do you recognize the handwriting?

A. No. I'm not a handwriting analysis.

Q. On the last page it says "Love, [redacted]

A. So what's wrong with that? She was a member of the family.

[redacted]

MR. BRANN: Hold on. Wait for a question.
A. She can write whatever she wants.
MR. BRANN: Mr. [redacted] just wait for his question. Okay?
All right. What's the question?
Q. Do you believe that your wife wrote this letter?
A. Possibly. I don't know.
Q. On the first page it says, "[redacted] cut grass yesterday and got the leaves all gone so it looks nice." Is -- [redacted], that would be you, correct?
A. When was that written?
Q. It's not dated. It just says Sunday.
A. It had to be the fall if I got rid of the leaves.
Q. Mr. [redacted] I'm gonna ask you some questions about the fourth page.
A. This? Is that the fourth? (indicating)
Q. It starts -- at the top it says "I would hope [redacted] relationship," at the top.
A. I don't know where it is. Wait a minute.
Q. I think it's the third from the back.
A. And what do you want me to answer to?
MR. BRANN: Why don't you read the fourth page to yourself, and then he'll ask you some

[redacted]

questions.

A. All right. I can't read her writing that good anyway, but go ahead.

Q. The bottom paragraph says, "[redacted] several times when the money thing was up in the air you told me that you couldn't understand why [redacted] was holding things up for us. That showed me how much you cared."

A. Yeah.

Q. What conversations did you or [redacted] have with [redacted] about [redacted] money?

A. I don't know. I didn't talk about [redacted] money with [redacted]

Q. Did [redacted] talk about [redacted] money with [redacted]

A. Well, obviously. You have it right there, don't you, supposedly.

Q. Further up it says, "I need 'you' as I would do for you 'to help.'"

A. Yeah.

Q. What help were you and [redacted] asking for from [redacted]

A. What help? To help -- somebody back her. Nobody is.

Q. No.

[redacted]

A. He's got his goddamn -- he's got his goddamn cronies, his policemen, he still -- he told her he could take -- he could take that kid away any time he wants to.
Q. My question is different. This language says, "I need you as I would do for you to help."
A. Well, yeah. So what?
Q. So what help is [redacted] asking --
A. I don't know.
Q. -- for from [redacted]
MR. BRANN: Hold on, hold on. Just let him finish his question, give me a chance to object, and then you can answer. Okay. What's your question?
Q. What help is [redacted] asking for from [redacted]
MR. BRANN: Objection. Go ahead.
A. What help? Is [redacted] asking for [redacted] [redacted] needs some help?
Q. No, from [redacted] From [redacted]
A. I don't know. I want to know where these all came from. You can't answer that, can you?
Q. There's another paragraph here. It says, "You mentioned a while ago that we could use Messenger on Facebook to talk. That would be private."
A. No, nothing is private.

[redacted]

Q. Have [redacted] and [redacted] communicated on Facebook Messenger?
A. I don't know.
Q. Do you use Facebook Messenger?
A. No.
Q. Do you have a Facebook page?
A. No.
Q. Have you ever had a Facebook page?
A. No. I'm [redacted] years old. I don't play with computers.
Q. Have you -- have you had any discussions with [redacted] about whether she communicates with [redacted] on Facebook Messenger?
A. No. No. I'd like to know where you got all these letters from. I'm sure [redacted] didn't give them to you, or give them to [redacted]
Q. The very last sentence says, "We will be here for you if you need us."
A. You're damn right we would be.
Q. And that's specifically against your son [redacted]
A. Oh.
Q. Correct?
MR. BRANN: Objection. Go ahead.
Q. When [redacted] wrote to [redacted] about taking

[redacted]

[redacted] side and being there to help [redacted] and so on in the conflict with your son [redacted] do you understand that to be taking sides against your son?

MR. BRANN: Objection.

A. Pardon? No. No. I was trying to help out that girl that he's trying to crucify any way he can --

Q. How is he try --

A. -- and I won't take his shit. How's that?

Q. How is he trying to crucify [redacted]

A. I don't -- I don't know.

Q. Do you have any -- and can you give me any examples of how [redacted] is trying to crucify [redacted]

A. Well, obviously. You have it all.

Q. Can you answer my question?

A. No.

Q. Are you refusing or you can't?

A. I'm refusing to answer.

MR. BRANN: If you have an answer, just give it to him.

THE WITNESS: Pardon?

MR. BRANN: If you can answer, go ahead.

THE WITNESS: No, I -- I don't -- I don't -- he's asked the same question a hundred

[redacted]

times.

MR. BRANN: Fair enough.

THE WITNESS: What do you think: [redacted] gave these to [redacted] Or did [redacted] take 'em?

THE VIDEOGRAPHER: Counsel, before you start your next question, can I just change my tape?

MR. BROWN: Yeah, sure.

THE VIDEOGRAPHER: I have about ten minutes before that needs to be changed.

MR. BROWN: Okay.

THE VIDEOGRAPHER: This concludes DVD No. 1. We're gonna go off the video with the time reading 11:16 a.m.

(A brief recess was taken.)

THE VIDEOGRAPHER: This is DVD No. 2. We are now back on the record with the time reading 11:18 a.m. You may resume questioning.

MR. BRANN: Do you want another one?

THE WITNESS: Huh?

MR. BRANN: Do you want another water?

THE WITNESS: No, I'm good.

MR. BRANN: You're good? Okay.

THE WITNESS: Yeah. Thanks.

MR. BROWN: Can I see that exhibit right there? I just want to make sure. Okay.

[redacted]

BY MR. BROWN:

Q. On the same page we were looking at a moment ago, Mr. [redacted] it says, "If I had [redacted] write to [redacted] would you forward that to his address or send it to that mediator that you deal with so there's no info that [redacted] can say you gave out?"

Has [redacted] ever asked you to write to [redacted]

A. I don't -- I don't remember. I didn't write to [redacted] I don't remember if [redacted] ever said that. Because after what happened with [redacted] and I and the mail, I don't think he would open it anyway.

I still wonder where -- where he got all these things. I'm sure [redacted] didn't give them to him.

Q. There's a reference in here. It says, "Well, [redacted] --

MR. BRANN: Do you want to give us the page?

Q. I'm sorry. Yeah, it's the -- it's the second-to-last page of Exhibit 5.

A. "We will be here for you" --

MR. BRANN: Whoa, whoa.

THE WITNESS: Oh.

MR. BRANN: Wait a minute. He's gonna --

[redacted]

wait for his question.

MR. BROWN: Yeah, you can read it. Mr. [redacted] if you want to just read it, and then I'll just ask you a question about a piece of it.

THE WITNESS: Okay.

MR. BRANN: Just read it to yourself though.

BY MR. BROWN:

Q. The very last sentence on that page says, "I don't think you owe him anything after his destructive behavior." Do you know what destructive behavior [redacted] was referring to?

A. No, I don't.

Q. In the paragraph before that says, "Tell me ... has [redacted] asked about why her dad has stopped all communication between us?"

Is it your impression that [redacted] unilaterally made the decision to stop all communication --

A. With me?

MR. BRANN: Whoa, whoa. Let him finish his question.

Q. Between [redacted] and [redacted] and you and [redacted]

A. Yeah.

Q. Who told you that that was [redacted]

[redacted]

decision?
A. What?
MR. BRANN: Objection. Objection.
Q. Did somebody tell you that that was [redacted] decision?
A. That's what I believe it was. Nobody told me.
Q. Why do you believe it?
A. It's obvious. He turned his back on her, turned his back on me and my wife.
Q. Is it possible that you took sides with [redacted] against your own son --
A. No.
Q. -- and that's the reason he turned his back on you?
A. I didn't take --
MR. BRANN: Hold on. Let him finish, please. Objection. Go ahead.
Q. Did you understand my question? Do you --
A. What is your question?
MR. BRANN: Just ask it again so we have a clean record.
Q. Yeah. Did you take sides against your son?
MR. BRANN: Objection. Go ahead.
A. No.

[redacted]

Q. When [redacted] wrote these things about taking [redacted] side, was she speaking for herself and not you?

A. Possibly.

MR. BRANN: Objection. Objection. Go ahead.

A. What: Did [redacted] give those to you, those papers? Where did you get 'em?

Q. There's a reference in one of these letters -- I can show you if you want to -- where [redacted] asks [redacted] can we communicate with you through your boyfriend, [redacted]

MR. BRANN: Objection. Show him the reference.

Q. Do you know what I'm talking about?

A. No. I'd just like to know where --

MR. BRANN: Hold on.

THE WITNESS: Okay.

MR. BRANN: Just wait.

MR. BROWN: Can you hand me the exhibits? I just want -- and I'm not sure which one this got marked as. Let's see. It's not that one. Can I see the others?

THE WITNESS: This is just a --

MR. BRANN: That has an attachment to it

[redacted]

though which is --

THE WITNESS: Pardon?

MR. BROWN: Yeah. That's not it though.

THE WITNESS: Wait a minute.

MR. BRANN: Well, you have one in front of the court reporter.

MR. BROWN: That's 5. Oh, it's Exhibit 3. Here we go. I have it.

MR. BRANN: Which one is it?

MR. BROWN: Three.

MR. BRANN: What page?

MR. BROWN: It's a one-page document.

MR. BRANN: Oh.

BY MR. BROWN:

Q. In the first paragraph it says, "Have you given any thoughts to my suggestion I gave you about having your boy friend sending me a few pictures of [redacted] Would [redacted] be able to know he had -- he did this? I wouldn't think so."

Do you know if [redacted] boyfriend has sent -- has been communicating with you or [redacted]

A. I don't think she did -- he did. I'm not sure. I don't think so.

MR. BROWN: I think I'm done, but I want to take just a moment and just look through my notes and

[redacted]

stuff.

THE VIDEOGRAPHER: I'm gonna take us off the video while you do. We're gonna go off the record. The time is 1:20 -- is 11:27.

(A brief recess was taken.)

THE VIDEOGRAPHER: We are now back on the record. The time is 11:33.

BY MR. BROWN:

Q. Mr. [redacted] I want to ask you a couple questions about the house that [redacted] grew up in. You said that [redacted] offered -- or wanted to buy the house back for you?

A. Yeah.

Q. That wasn't something you wanted?

A. No.

Q. How did you lose the house?

A. What?

Q. How did you lose that house?

A. That was my parents' house. [redacted] mother and I added on to it when she wanted to divorce. She was so miserable like the rest of her family. We split up the house, sold it. I got half, she got half.

Q. Did you want to sell the house?

A. What?

[redacted]

Q. Did you want --
A. No.
Q. -- to sell the house?
A. No.
Q. It was your family's house, right?
A. Well, it was [redacted] mother's and my house.
Q. And before that?
A. It was my parents'.
Q. Do you wish you could go back there?
A. No. Because it was bad luck there; it was not a good time there with his mother.
Q. Because of [redacted]
A. Yeah. And if [redacted] is the way he is, it's because of [redacted] not me.
([redacted] Exhibit No. 6 was marked for identification.)
BY MR. BROWN:
Q. Do you recognize --
MR. BROWN: What is this? Six?
THE REPORTER: Yes.
Q. Do you recognize Exhibit 6 as being a letter from [redacted] to [redacted]
A. Looking at it say hello [redacted] and [redacted] I guess it is.
Q. Do you recognize [redacted] handwriting on

[redacted]

this document?

A. I can't really recognize her handwriting. Okay? I can't read her handwriting half the time.

Q. In the first paragraph it says, "I was thinking if I gave you a envelope stamped addressed to my friend [redacted] This way if you were worried about [redacted] seeing your letter. You would write to me. But then again maybe you don't trust me?"

A. Who's that?

MR. BRANN: Well, wait for the question. Okay.

Q. Why would -- do you have any idea why [redacted] would want [redacted] to communicate with her without you knowing?

MR. BRANN: Objection.

A. I don't know. I don't know.

Q. And further down it says, "Maybe you can give us his address just to see how the rich and famous live." Do you know if [redacted] ever gave you or [redacted] address?

A. No, she never did.

Q. Do you know what state [redacted] lives in?

A. Pardon?

Q. Do you know what state [redacted] lives

[redacted]

in?

A. No. I don't know if it's -- it's still in [redacted] or it's in [redacted] I don't know where he lives.

Q. Okay.

A. That's what I tried to get so I could try to get in touch with him and maybe work this nonsense out.

MR. BROWN: This will be the next exhibit.

([redacted] Exhibit No. 7 was marked for identification.)

BY MR. BROWN:

Q. Mr. [redacted] I just handed you an email marked as Exhibit 7.

A. Pardon?

Q. I just handed you an email marked as Exhibit 7?

A. Yeah.

Q. Is that [redacted] email address at the top?

A. I don't know. I don't use her Etran -- her -- I don't use the computer. I don't know what her email is. What's the date on this? Monday, March something. I don't know.

Q. It's -- yeah, I -- it's March of 2023?

A. Yeah.

Q. What is the document that [redacted] read?
A. I don't know. I can't read it. Maybe you have better eyes than I do.
Q. Here, I'll read it to you.
A. Please.
MR. BROWN: You can look at it after and confirm that I read it correctly.
Q. It says, "Hi, I read it. It's one-sided. Your decision has to be in three days. What would he put out there if you don't accept that? This is about [redacted] welfare, so I would think a lot of discussing should be ahead. [redacted]
What -- do you have any idea what she read?
A. No.
Q. Do you know of it -- what documents [redacted] may have sent to [redacted]
A. No, but we didn't get any documents.
Q. Do you know if [redacted] sent [redacted] a settlement offer --
A. No.
Q. -- that she received from [redacted] on --
A. No.
Q. -- on that date?
A. No, no. I didn't even know if there was

[redacted]

any settlement offer.

Q. Do you know how much money [redacted] has offered to pay [redacted]

A. No. For what?

Q. For anything.

A. Not really.

Q. What does not really mean? I mean --

A. I don't know. Is he giving her child support or are they just splitting it themselves. I don't know. I haven't talked to my son since all this bullshit happened.

Q. Have you ever heard through [redacted] how much she's getting in child support?

A. No.

Q. Do you know where [redacted] is going to school?

A. No. I don't know where [redacted] goes to school. I don't know where my son is, that I can't even converse with him.

Q. Prior to you arriving here today when was the last time you spoke to [redacted]

A. Oh. Oh, Christ. A long time ago.

Q. Is that weeks, months, years?

A. I don't remember. Months maybe. I'm not sure.

Q. Prior to you arriving here today when was

the last time you spoke to Mr. Brann?
A. Yesterday.
Q. Okay. What did you talk about?
A. What do you think we talked about?
Q. Tell me.
A. What we're gonna do here today, that's what we were talking about.
Q. Did Mr. Brann tell you what he wanted you to say today?
A. Did he what?
Q. Did he tell you what to say?
A. No.
Q. Did he tell you what questions he was going to ask?
A. No.
Q. Then what did he say?
A. I'd say nothing that's -- that he hasn't -- I talked to him on the phone.
Q. Yesterday?
A. Yeah.
Q. Did you meet him, did you meet in person yesterday?
A. No. I met him today, yeah, this morning.
Q. What time did you meet him this morning?
A. What difference does it make?

[redacted]

Q. Please answer my question.
A. I'm not gonna answer it.
MR. BRANN: Go ahead, just answer.
A. Oh. Was it nine -- about 7:30? Or no. About eight, eight o'clock? Eight o'clock this morning.
Q. Okay.
A. Eastern Standard Time.
Q. Okay. I think it's Eastern Daylight Time now.
A. Okay. Well, it's the same thing.
Q. Did you -- did you have breakfast with Mr. Brann this morning?
A. No.
Q. Has -- has Mr. Brann or anyone from his firm paid for anything for you to be here today?
A. No. No. And the other thing is, he told me to answer you correctly and be nice about it and we both would be, yeah. And if I --
MR. BRANN: Just for --
A. -- blew, I think I had a right to.
MR. BRANN: Just for the record -- for the record, we did spring for the parking.
A. Yeah, he --
MR. BRANN: Just so you know.

[redacted]

A. Yeah, the parking, yeah.

MR. BRANN: Yeah.

Q. Have you received anything of value from [redacted]

A. No.

Q. Has [redacted] ever sent you or [redacted] any money?

A. No. No. She sent -- [redacted] sent [redacted] a little Christmas thing, something a little girl that age would pick up and send.

Q. But nothing else?

A. No.

Q. Prior to -- how long did you talk to Mr. Brann on the phone yesterday?

A. I don't know.

Q. What's your best estimate?

A. What we talked about was where we're gonna meet this morning.

Q. Okay. Did you talk anything about facts or --

A. About what?

Q. Any -- any facts or events, anything to help you remember?

A. Remember what?

Q. Anything.

A. What did we talk about? You talked about

[redacted]

coming in. I talked to you last night, and I said I'll see you tomorrow -- tomorrow morning. That's what we talked about.
Q. Okay. Prior to yesterday when was the last time you spoke to Mr. Brann or anyone from his office?
A. A couple weeks ago I guess.
Q. And what was that about?
A. What do you think it's about?
Q. You taking sides against your son?
MR. BRANN: Objection.
A. No, I'm not taking a side against my son.
Q. Well, you asked me -- you asked me -- that's the one question I'll answer for you.
So my question to you is, what did you talk about two weeks ago?
A. What did I talk about what?
Q. What did you talk about with Mr. Brann two weeks ago?
A. About coming here.
Q. Okay. Did you talk about the facts that you would testify to?
A. What?
Q. Did you talk about what your testimony would be?

[redacted]

A. No.
Q. And prior to that when was the last time you spoke to Mr. Brann before that?
A. Maybe a couple months ago. I'm not sure.
Q. When you're -- the two affidavits that are marked as Exhibits 1 and 2, who contacted you about making those aff -- those declarations?
A. Make what?
Q. The declarations that are -- that you signed?
A. Yeah.
Q. Exhibit 1 and Exhibit 2 here in the deposition.
A. Let me see them. Where are they?
Q. I believe they're in that stack.
A. The declaration?
Q. Or in that folder. Can we --
THE WITNESS: You know -- what does he want, what's he asking for?
MR. BRANN: He's asking about the first two exhibits that were marked. Those declarations. Remember?
MR. BROWN: What's in that folder? Is that --
THE WITNESS: That's --

[redacted]

MR. BRANN: Those are the declarations.
THE WITNESS: Yeah, that's all it is. It's this.
BY MR. BROWN:
Q. Okay. So it -- yeah, Exhibit 1 and 2. So those are the two -- the two documents you're holding in your hand?
A. Yeah.
Q. Okay. They're signed on different dates, correct?
A. I guess. I don't see the date on here. Let me see. It should be on the back. April 26, '24.
Q. Okay. When you were -- who contacted you about signing that declaration?
A. It wasn't him, it was the -- it wasn't his lawyer.
Q. [redacted] lawyer?
A. Yeah.
Q. Okay. Mr. Brann is [redacted] lawyer. So is -- it was a different?
A. He wasn't [redacted] lawyer at that time when we did it.
Q. Was it a Mr. Nuzzi?
MR. BRANN: Nuzzi.

[redacted]

A. It might have --

MR. BRANN: Nuzzi.

MR. BROWN: Nuzzi? I'm sorry.

Q. [redacted] Nuzzi, does that -- does that ring a bell?

A. Yes.

Q. Okay. Mr. Nuzzi contacted you about doing a declaration?

A. No. Well, you mean this here?

Q. Yes.

A. Yeah, just -- yeah.

Q. Okay. And what did he say?

A. Obviously you see it there what he told me to say. I told him what I said.

Q. And who draft -- who wrote it?

A. I don't know.

Q. Did you type it?

A. No.

Q. Okay. So one of [redacted] lawyers wrote it?

A. Possibly.

Q. Who gave it to you?

A. I got it in the mail.

Q. Do you use email?

A. No. I'm [redacted] years old; I'm looking at, on a -- turn on a radio. No. I -- so what does that

have to do with what?

Q. I'm trying to understand, I want to know more about your communications with them leading to these documents. What were you told or asked?

A. What?

Q. What did Mr. Nuzzi --

MR. BROWN: Nuzzi?

MR. BRANN: (Nodding head up and down.)

Q. What did Mr. Nuzzi say to you prior to you signing these documents?

A. I really forget. He just asked me would he -- could I make a statement on what's going on here. He was representing [redacted] and he asked me if I could -- you know, this -- I don't know.

Q. Why did you have to sign a second one?

A. I don't know, I don't know why I had to. They didn't put a [redacted] I'm trying to get this straightened out between [redacted] and [redacted] and it's going nowhere.

Out of all the questions I'd like to know where all those letters came from that my wife wrote to her. Nobody will tell me that, will they?

Q. You can talk to Mr. Brann about that later if you want to.

A. Oh, I'll talk to -- I'll talk to him about

[redacted]

them later. Because somebody went in and took those out of [redacted] house.

Q. If I told you that [redacted] fully supported cutting off communication with you, would you believe me?

A. No.

([redacted] Exhibit No. 8 was marked for identification.)

BY MR. BROWN:

Q. Mr. [redacted] I -- and I'm sure you've probably never seen this before. Correct?

A. No, I haven't.

MR. BRANN: Do you have a question about this document or are you done?

MR. BROWN: I was under the impression he was reading it.

A. Yeah, I'm not reading it because my glasses. I've gotta go for cataracts. Can somebody read this to me correctly?

Q. Yeah.

A. Please?

Q. It's the second paragraph. Or do you want me to read you the whole thing?

A. Yeah.

Q. Okay. So the first email is the bottom

one.

A. Okay.

Q. All right? And it's from [redacted] to [redacted] and it says, "[redacted]

"Another note. Below is communication from [redacted] This type of shaming and trying to coerce [redacted] is unacceptable, and I will be removing [redacted] from [redacted] phone. I don't think it's a healthy relationship, and [redacted] and my dad said they communicate with [redacted] through you. [redacted] has communicated to me that she wishes not to have to talk to [redacted] I will not tolerate the way [redacted] was spoken to, and just because she is married to my dad does not grant access to [redacted]

Okay. That was [redacted] email?

[redacted]

A. Yeah. Well, that -- [redacted] email? This is a bunch of bullshit.

Q. [redacted] responded, said, "[redacted] thank you so much for the email. [redacted]

"When [redacted] arrived home she did talk to me about how she feels pressured to talk to [redacted] She started that conversation. I told her I support her decision not to talk to them. I initially thought maintaining a relationship with your parents in the past was good as they are getting older. [redacted] would reach out when I was in [redacted], [redacted] From the text message you let me view I'm super upset and disheartened that [redacted] would remotely have the gall to send [redacted] a message like that. That isn't how grandparents work. I'm going to take your lead with this one and protect [redacted] from this nonsense. [redacted] will have no contact with them. [redacted] I support your decision fully."

A. When was this? What's the date on it?

[redacted]

Q. That was July 31, 2023.

([redacted] Exhibit No. 9 was marked for identification.)

THE WITNESS: Is that another one?

BY MR. BROWN:

Q. Mr. [redacted] I'll read this one to you also.

A. Okay.

MR. BROWN: Peter, do you know if this is a -- it doesn't appear to me that it's -- that the second page is part of the same text thread? Or maybe it is. Like if that came later?

MR. BRANN: I do not know.

MR. BROWN: Okay.

BY MR. BROWN:

Q. All right. I'm just gonna -- I'm gonna read the first one, Mr. [redacted] It says, "[redacted] I would be fine with a Wednesday to Wednesday just to try and see how it works, nothing set in stone.

"My attorney told me that Peter is in court on the 8th, so mediation will be rescheduled." That's not Mr. Brann by the way.

"I would like to discuss something with you. I have not let your parents have any contact with [redacted] as discussed in mediation. I've never had a problem with either of them in the past

we would talk just to keep communication open, such as send pictures from time to time. I thought that would be okay.

"After our last mediation, I specifically texted [redacted] that [redacted] did not want to speak with her and after that text message it made [redacted] quote, feel terrible about herself, like I'm a bad person, end quote.

"They are not taking this lightly. They think because I'm not responding to them that I have been" -- it says "pd." I think that might be -- I don't know what that is -- "and threatened. Your dad left me a voicemail stating he would be getting a lawyer if he can't talk to his granddaughter and other not so nice things that was upsetting and very threatening. At this time I have officially blocked them from my phone. Our daughter's welfare is much more important. I want peace from all sides, I have no drama at all.

"I don't know the upcoming date of mediation, but I do believe this warrants a discussion." And then there's talk about school.

Do you agree with me now -- or do you believe me now that the decision to cut off communication was [redacted] also?

A. But what happened was the communications now.

MR. BRANN: Hold on. Let him finish the -- let him finish the question and let me get a chance to say something. Go ahead.

Q. You said that -- you said that if I told you that it was -- that [redacted] it was [redacted] decision also, you would not believe me. My question is, after having these read to you, do you believe me now that the decision was [redacted] also and not your son's --

MR. BRANN: Objection.

Q. -- alone?

A. I never saw that, I never heard it.

Q. Do you agree with me now that the decision to cut off communication was not [redacted] alone?

MR. BRANN: Objection. Go ahead.

A. No. I don't know.

I'd like to know where all the mail came from from [redacted] to [redacted] It's kind of funny somebody got that, and I'm sure it wasn't [redacted] that gave it.

Q. Is that because you expect the communications to be secret?

MR. BRANN: Objection.

[redacted]

A. What?

Q. Why are -- why are you concerned about [redacted] communications with [redacted] being disclosed?

A. I want to know where you got the copies of those letters.

Q. Why are you concerned about that?

A. Well, you're showing them to me. You're -- you're -- and you're not telling where they came from? I'll tell you where they came from, and you know where they came from. I'm not that stupid.

Q. My question is a little different. Why do you care where they came from?

MR. BRANN: Objection.

THE WITNESS: Pardon?

MR. BRANN: Objection. I mean I -- there's no point to any of this. Go ahead, answer his question.

THE WITNESS: No, I'm not gonna say any more.

MR. BRANN: No, no. Answer his question.

THE WITNESS: I'm sure that my wife wrote [redacted] I'm sure she didn't give [redacted] those letters, but [redacted] got them somehow and gave them to you. And I'd like to know where he got them.

MR. BROWN: I'm really almost done. I just

[redacted]

have -- I'm just checking one thing.

MR. BRANN: I know. You keep saying that.

MR. BROWN: I know.

MR. BRANN: So I no longer believe it.

MR. BROWN: Okay.

BY MR. BROWN:

Q. Do you have any -- do you have any health issues that would prevent you from traveling to [redacted] for the trial in this case?

A. No, I'm not going to [redacted] no. Yeah, I do have health. I'm not going to any trial.

Q. What health issues would prevent you --

A. I'm not going to any trial. I did nothing. I'm not going to any trial.

Q. When -- what health issues would prevent you from traveling?

A. None of your business.

Q. Do you -- have you told Mr. Brann's office that you have health issues that would prevent you from traveling?

A. No.

MR. BROWN: All right. I have no more questions.

THE WITNESS: I'm not traveling. You know what? If you want to do your job, get her and him

[redacted]

together and let's stop this nonsense.  You might not get your checks at the end of the month is good, but goddamn it, this is bullshit, and I've been through bullshit.  That's my feeling.

MR. BRANN:  Nothing further.  We're done.

THE VIDEOGRAPHER:  All right.  This will now conclude the recorded deposition.  We're gonna go off the record with the time reading 11:57 a.m.

THE REPORTER:  Just to get orders. Attorney Brann, you want this transcribed and do you want copies?

MR. BRANN:  Yes.

MR. BROWN:  Yeah, the same here.

(Deposition concluded at 11:57 a.m.)

[redacted]

C E R T I F I C A T E

September 1, 2026

I hereby certify that the evidence and proceedings are contained fully and accurately in the notes taken by me of the testimony of the within witness who was duly sworn by me and that this is a correct transcript of the same.

[redacted]

[redacted] R. [redacted]
Registered Merit Reporter
Certified Realtime Reporter
Notary Public

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served on the following counsel of record on this 18th day of September, 2026:

Peter J. Brann
Hannah Wurgaft
BRANN & ISAACSON
PBrann@brannlaw.com
HWurgaft@brannlaw.com

*/s/ Louise M. Aponte*
Louise M. Aponte