**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 2:23-cv-00423-JAW** |
| | ) | |
| **SARA SMITH,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**NOTICE OF DESIGNATION OF SARA SMITH DEPOSITION**

PLEASE TAKE NOTICE that, pursuant to the Confidentiality Order entered on April 18, 2024 (ECF No. 70) in the above-captioned action, counsel for Plaintiff John Doe ("Doe") attaches herewith a redacted copy of the September 3, 2026 deposition of Defendant Sara Smith ("Defendant") and designates all redacted portions of Defendant's deposition and all of Defendant's deposition exhibits as CONFIDENTIAL, under the terms of the Confidentiality Order, to protect the anonymity of Plaintiff and his minor child. The redacted portions of Defendant's deposition are deemed CONFIDENTIAL by Plaintiff because they contain the actual names of the pseudonymous parties, their minor child, immediate family members, and/or identifying or sensitive personal information that is likely to be detrimental if disclosed. The redacted portions of Defendant's deposition include the index, which is not attached herewith. Due to the number of redactions, this Notice of Designation does not include each page and line number.

Dated this 18th day of September, 2026.

By: /s/ *Louise M. Aponte*
Gregory Brown (ME Bar No. 9023)
Louise M. Aponte (ME Bar No. 9285)
LOWE YEAGER & BROWN PLLC
920 Volunteer Landing, Suite 200
Knoxville, Tennessee 37915
Phone: (865) 521-6527
Fax: (865) 637-0540
gb@lyb.law
lma@lyb.law

and

Stephen B. Segal, Esq., Bar No. 5422
VERRILL DANA LLP
One Portland Square
Portland, ME 04101
(207) 774-4000
ssegal@verrill-law.com

*Attorneys for Plaintiff John Doe*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

Docket No. 2:23-cv-00423-JAW

JOHN DOE, )
)
Plaintiff, )
)
vs. )
)
SARA SMITH, )
)
Defendant. )

VIDEOTAPED DEPOSITION OF: SARA SMITH,

taken before [redacted], Notary Public, in and for the State of Maine, pursuant to notice given, at the United States District Court, Jury Room 2, 202 Harlow Street, Bangor, Maine, on September 3, 2026, commencing at 10:03 a.m.

C O N F I D E N T I A L

# A P P E A R A N C E S

For the Plaintiff:

Gregory Brown, Esq.
Louise M. Aponte, Esq.
LOWE YEAGER & BROWN PLLC
920 Volunteer Landing, Suite 200
Knoxville, Tennessee 37915
gb@lyblaw.net
lma@lyblaw.net

For the Defendant:

Peter Brann, Esq.
Hannah Wurgaft, Esq.
BRANN & ISAACSON
113 Lisbon Street
P.O. Box 3070
Lewiston, Maine 04243-3070
pbrann@brannlaw.com
hwurgaft@brannlaw.com

Also Present:

[redacted], Videographer
Hon. John C. Nivison

# INDEX

| DEPONENT: [redacted] | PAGE: |
|---|---|
| BY MR. BROWN | 5 |

## EXHIBITS

| NUMBER: | DESCRIPTION: | PAGE: |
|---|---|---|
| Exhibit 1 | Nondisclosure Agreement | 5 |
| Exhibit 2 | Meeting Notes SMITH_000340 - SMITH_000341 | 8 |
| Exhibit 3 | Screenshot of Text Message, June 22, 2023 LYB000009 | 12 |
| Exhibit 4 | Screenshot of Blocked Calls Smith_000002 | 42 |
| Exhibit 5 | Text Messages SMITH_000336 | 52 |
| Exhibit 6 | Letter to [redacted] from [redacted] SMITH_000011 | 54 |
| Exhibit 7 | Letter to [redacted] from [redacted] SMITH_000013 | 60 |
| Exhibit 8 | Letter to [redacted] from [redacted] SMITH_000029 - SMITH_000030 | 65 |
| Exhibit 9 | Letter to [redacted] from [redacted] SMITH_000031 - SMITH_000033 | 70 |
| Exhibit 10 | Letter to [redacted] from [redacted] SMITH_000036 - SMITH_000041 | 74 |
| Exhibit 11 | Email to [redacted] from [redacted], March 20, 2023 SMITH_000464 | 79 |

STIPULATION

(It is hereby agreed by and between the parties that signature is not waived.)

* * * * *

TRANSCRIPT OF PROCEEDINGS

* * * * *

THE VIDEOGRAPHER: This is the beginning of Media 1 in the deposition of Sara Smith in the matter of John Doe versus Sara Smith, Case Number 2:23-cv-00423-JAW. Today's date is September 3, 2026, and the time this morning is 10:03 a.m.

My name is [redacted], and I am the videographer. The court reporter is [redacted]

Counsel, please introduce yourselves, after which the court reporter will swear in the witness.

MR. BROWN: Gregory Brown for the plaintiff, and with me is Louise Aponte.

MR. BRANN: Peter Brann with Hannah Wurgaft for the defendant.

SARA SMITH, having been duly sworn by the Notary Public, [redacted] was deposed and testified as follows:

EXAMINATION

BY MR. BROWN:

Q. Good morning.

A. Good morning, Greg.

Q. Ms. [redacted] you understand we're here to talk about -- you and I have a couple of different cases together, but we're here today to talk about the case involving the nondisclosure agreement?

A. Correct.

Q. Okay. If you -- if it seems like one of my questions is asking about something other than that, I'm not, and just ask me to clarify. Okay?

A. Okay.

Q. I know you've given a deposition before. Do you have any questions about the procedure?

A. No.

Q. Okay. I'm going to [redacted] as our first exhibit a copy of the document entitled, Nondisclosure Agreement.

MR. BROWN: Do you want me to just put stickers on it?

(Exhibit 1, Nondisclosure Agreement, marked for identification.)

BY MR. BROWN:
Q. Here you go. Do you recognize this document?
MR. BRANN: Just so I know, how are you marking these?
MR. BROWN: That was Smith 1.
MR. BRANN: Oh, okay. Got it.
A. I do recognize it, Greg. However, I wouldn't have signed -- my name, [redacted] So my DocuSign would have been my [redacted]. That's not my spelling of my last name, just so you're aware. But I do recognize the document.
BY MR. BROWN:
Q. Okay. Did you -- did you apply your signature to this document?
A. I had to type it.
Q. Okay. So it was -- it was a typographical error?
A. I believe so. Not on my end, though.
Q. Okay.
MR. BRANN: Let me just -- make sure he's finished his question before you start.
THE WITNESS: Sorry.
MR. BRANN: Okay. Because otherwise, we're -- I'm the court reporter's friend in

this. So just make sure he's done before you start talking.

BY MR. BROWN:

Q. Is there any question in your mind about whether you signed this document?

A. No question.

Q. Okay. At the time that you signed this document, did you have any questions about what it required?

A. No.

Q. Okay. The date on that document is February 8, 2023. Do you see that?

A. I do.

Q. Okay. Had you had communications prior to that with anybody about --

MR. BROWN: Point of order, are we going to use the Doe and Smith names in this deposition or [redacted] and [redacted]

MR. BRANN: I think we should use the real names.

BY MR. BROWN:

Q. Ms. [redacted] had you -- prior to that date, had you had any communications with anyone other than [redacted] about his lottery win?

A. No.
Q. Okay. What about [redacted], had you talked to [redacted] about [redacted] lottery win prior to that date?
A. No.
Q. Okay. Do you recall the circumstances under which this nondisclosure agreement was signed, where you were, that kind of thing?
A. Are you asking, if I may clarify, where I was when I signed --
Q. Sure.
A. -- the document?
Q. Yeah.
A. I was at home.
Q. Okay. And were you -- were you in a call, in a meeting or -- like a virtual meeting with other people when you signed this?
A. Yes.
Q. And who was -- who was in that meeting with you?
A. Myself, my now-husband, [redacted], [redacted], and multiple people that I can't recall.
Q. Okay.
(Exhibit 2, Meeting Notes, marked for identification.)

BY MR. BROWN:
Q. I've got those for you. I just handed you a document that's been marked as Smith 2. Do you recognize this document?
A. Yes.
Q. What do you recognize it to be?
A. I recognize it to be meeting notes and a recap.
Q. Okay. And it's the same -- it's the meeting that you were in at the time you signed the nondisclosure agreement?
A. Yes.
Q. This was produced by your counsel. Do you recall receiving this in 2023?
A. I don't recall.
Q. Did you receive this shortly after the date of that meeting?
A. I did receive it at some point, I just don't know when.
Q. Okay. Obviously, [redacted] was at that meeting with you, according this; is that -- is that accurate?
A. Yes.
Q. Okay. Were you aware -- at the time of this -- when this meeting started, were you

already aware that Mr. [redacted] had won the lottery?
A. Yes.
Q. Okay. Was [redacted] already aware at that point?
A. Yes.
Q. Okay. Was that from a discussion between the two of you?
A. No.
Q. Do you know -- do you know how he became aware?
A. Yes.
Q. How was that?
A. [redacted] had called me to let me know he won the lottery. When he called me, my phone was on speakerphone; so he overheard that when he was telling me.
Q. Okay. Did you -- did you review this when you received it? Do you recall?
A. I believe I did review it.
Q. Do you believe this to be an accurate summary of that meeting?
MR. BRANN: Objection. Go ahead.
A. I don't recall.
BY MR. BROWN:
Q. Do you want to take a moment and look at it?

MR. BRANN: Mr. Brown, as you know, and as we've had discussion prior, I mean, the deposition is supposed to be limited to disclosures to other people as opposed to meeting notes and meetings and so forth and so on. I understand the need to [redacted] the nondisclosure, but if we could move on to the topics, I'd appreciate it.

MR. BROWN: Okay. That's fine. We'll withdraw that question.

BY MR. BROWN:

Q. Ms. [redacted] do you know why [redacted] was invited to that meeting?

A. I don't recall why he was.

Q. Okay. Did you understand the purpose for the nondisclosure agreement?

A. Yes.

Q. Okay. What was your understanding?

A. My understanding of the nondisclosure, when I faithfully signed it, was to not tell anybody about the winnings.

Q. Okay. Did you understand that that was for the protection of your daughter?

A. Yes.

///

(Exhibit 3, Screenshot of Text Message, June 22, 2023, marked for identification.)

BY MR. BROWN:

Q. Ms. Smith, I'm handing you a document marked as Smith 3.

A. Okay.

Q. Do you recognize this document?

A. I recognize this.

Q. Okay. What do you recognize it as?

A. I recognize this was sent to me via text from [redacted]

Q. Okay. Do you -- do you recognize the phone number at the top?

A. Can I ask you a question?

MR. BRANN: No. No.

THE WITNESS: No, okay.

BY MR. BROWN:

Q. I mean, if it's a question for your counsel, maybe --

A. I recognize the number.

Q. Okay. Whose number is that?

A. That is my mother's boyfriend's number.

Q. Okay. Did you -- were you in communication -- what's your mother's boyfriend's name?

A. [redacted]

Q. Have you had communications with [redacted]
about Mr. [redacted] lottery win?
A. I have not.
Q. It appears from this text message marked as Exhibit 3 that he was aware of it. Do you know how he became aware of it?
MR. BRANN: Objection, I disagree with that characterization. Go ahead.
A. I don't know.
BY MR. BROWN:
Q. Do you know whether -- how frequently do you have communications with Mr. [redacted]?
A. Once a week.
Q. Okay. And has that been true from early 2023 to the present?
A. Yes.
Q. Have you had conversations with Mr. [redacted] about [redacted] lottery win?
A. No.
Q. Have you had conversations with Mr. [redacted] about the allegations and the circumstances in the litigation between you and Mr. [redacted]
A. No.
Q. Have you discussed with Mr. [redacted] any settlement offers by Mr. [redacted]

A. No.

Q. Is Mr. [redacted] aware of the child support that you're receiving?

A. No.

MR. BRANN: Objection. Hold on. Let me -- objection. Go ahead.

BY MR. BROWN:

Q. You said no?

A. No.

Q. Is Mr. [redacted] aware of the two litigations that you're involved in with Mr. [redacted]

MR. BRANN: Objection.

A. No.

BY MR. BROWN:

Q. He doesn't know about them at all?

MR. BRANN: Objection.

BY MR. BROWN:

Q. You can answer the question. He doesn't know?

A. No.

Q. Okay. If Mr. [redacted] is your mother's boyfriend, did you have communications with your mother about [redacted] lottery win?

A. No.

Q. Is your mother aware that Mr. [redacted] won the lottery --

MR. BRANN: Objection.
BY MR. BROWN:
Q. -- to your knowledge?
A. My mother has passed away. When [redacted] told me about his winnings, I called my mother and said, [redacted] called me and asked me to be a stay-at-home mom. And that's all I said to her.
Q. Okay. When did she pass away?
A. Approximately two years ago.
Q. Okay. 2024 sometime?
A. Mm-hmm.
Q. Did you -- did you -- that was -- that conversation was when [redacted] first called you?
A. Yes.
Q. Okay. So that was before the meeting where the NDA was signed?
A. Yes.
Q. Okay. And did you have follow-up communications with her about -- about things between you and [redacted]
A. No.
Q. Did you -- did you tell your mother any context as to why [redacted] would want you

to be a stay-at-home mother?
A. I did not.
Q. Did she have any questions for you as how he could afford that if he was, to her knowledge, unemployed at the time?
A. The only thing she said was, Wow, that's great.
Q. Did you have any communications with your mother or Mr. [redacted] after the NDA was signed where you talked about what Mr. [redacted] was doing with his money or anything like that?
A. I did not.
Q. Do you know how Mr. [redacted] obtained Mr. [redacted] cell phone number?
A. Yes.
Q. How?
A. [redacted] and I were together 17 years. So he had [redacted] number and [redacted] had his, I would assume.
Q. How many -- do you have a -- is your father alive?
A. My biological father, no.
Q. Do you have a stepfather that you're close with, somebody other than Mr. [redacted]
A. No.

Q. Do you have siblings?
A. I have siblings.
Q. How many?
A. Two.
Q. Are they aware of the conflict between you and [redacted]
A. No.
Q. Are they aware of the child support you're receiving from [redacted]
A. No.
MR. BRANN: Let me just interject -- I don't know how -- if that's the end of those questions. But they're not listed on the names of people that we're supposed to be talking about, right? So I -- if that's all -- if that's all you have, then that's fine, but if you keep going, I'm going to have some problems.
BY MR. BROWN:
Q. Now, you have how many children?
A. I have two children.
Q. Okay. And your -- your two children, what are their names?
A. [redacted] [redacted]
Q. Okay. Did you have any communications with

[redacted] about the lottery?
A. No.
Q. Did you have communications with [redacted] about [redacted] having money?
A. No.
Q. Did you have communications with [redacted] about any of the settlement offers that have taken place between you and [redacted]
A. No.
Q. Have you communicated with Mr. [redacted] about anything that [redacted] is doing for or with [redacted]
MR. BRANN: Objection.
THE REPORTER: With who? I'm sorry.
MR. BROWN: [redacted] And just for your benefit, there's -- [redacted] is the daughter, and sometimes they call her [redacted] and it's [redacted] [sic], just in case that comes up.
A. Could you repeat the question again, please? Sorry.
BY MR. BROWN:
Q. Have you communicated with [redacted] about anything that [redacted] is doing for or with [redacted]
MR. BRANN: Objection.

A. No.
BY MR. BROWN:
Q. Have you communicated with [redacted] about anything that [redacted] is doing for or with [redacted]
A. Yes.
Q. Okay. And what was that?
A. My --
Q. Tell me about those communications?
A. -- son had called me and told me that [redacted] bought him a new car.
Q. Okay. What else was said in that communication?
A. I said, That's wonderful, you deserve it.
Q. Okay. Anything else?
A. Not that I recall.
Q. When was the last time you communicated with [redacted]
A. I can't recall an exact date, but three days ago.
Q. Okay. Is he aware that you're giving a deposition today?
A. No.
Q. Other than the communication you just spoke about regarding the car, have you had any

other communications in any form with [redacted] about [redacted] money or what he's doing with it?
A. Yes.
Q. And what were those?
A. I communicated to my son more of frustration about what [redacted] is doing to me regarding suing me.
Q. Okay. What did you say to him?
A. I didn't really have to say anything. Everybody in the United States and outside of the country saw that someone was supposedly suing me or there was a lawsuit out, and I would assume that my son knew it was me. And he would assume it was me because I'm [redacted], I live in [redacted]
Q. I'm -- thank you for that, but I'm more interested about your communications with your son.
What did you tell your son?
A. That it's been a living nightmare going through being sued and having to miss work and just everything being relentless.
Q. Okay. Anything else?

A. Not that I'm aware of.
Q. In terms of you being sued, that's this lawsuit that we're here for today, correct?
A. Yes.
Q. Did you -- did you also talk to him about the lawsuit, the custody lawsuit that you filed against [redacted]
A. I don't recall if I did.
Q. Did you communicate with him that because of [redacted] money, you were afraid that [redacted] would kidnap your daughter?
A. Yes.
Q. And what did you say to him?
A. I don't recall exactly what I said.
Q. How did you explain to him [redacted] ability to kidnap your daughter with his money? What did you tell him?
MR. BRANN: Objection, asked and answered.
BY MR. BROWN:
Q. You can answer.
A. I believe I said, [redacted] has an enormous amount of money, which he already knew, and that he has the capability of taking my daughter any place on a private jet, and I was concerned

that I would never see her again.

Q. Did you communicate to [redacted] that [redacted] had taken [redacted] places on a private jet?

A. I don't recall.

Q. Anything else that you remember?

A. Not that I'm aware of.

Q. [redacted] has a girlfriend?

A. A fiancee.

Q. What is his fiancee's name?

A. [redacted]

Q. Have you spoken to [redacted] about [redacted] money?

A. I don't recall.

Q. Have you spoken to [redacted] about things that [redacted] is doing with [redacted]

A. I don't recall.

Q. Have you spoken to [redacted] about the litigations?

A. I have.

Q. When's the last time you spoke to [redacted]

A. I don't recall the exact date. Possibly three days ago.

Q. When was the last time you saw [redacted] or

[redacted]

A. I don't recall the exact date, but possibly in March, maybe earlier than that. I'm not quite sure on the date.

Q. Did you -- did you talk to [redacted] about [redacted] taking [redacted] on a private jet and going places?

A. I don't recall if I did.

Q. Do you recall any communications with [redacted] about [redacted]

A. Yes.

Q. Okay. Did any of those communications concern [redacted] lifestyle?

MR. BRANN: Objection.

A. I don't recall.

BY MR. BROWN:

Q. Did you have any communications with [redacted] about things [redacted] may have been doing for [redacted] and/or [redacted]?

A. I don't recall, to be honest.

Q. What's the name of [redacted]'s father?

A. [redacted].

Q. When was the last time you spoke to [redacted]?

A. Truthfully, when he probably graduated high

school, I saw him at his high school graduation.
Q. When who graduated from high school?
A. My son. When my son, or our son, graduated from high school.
Q. All right. And how old is he now?
A. [redacted]
Q. Okay. So you haven't spoken to [redacted] in more than ten years; is that fair?
A. Correct.
Q. Have you communicated with him, other than speaking to him, in the last ten years?
A. No.
Q. By email or letter or anything like that?
A. (Shaking head.)
Q. What about through your attorneys?
A. No.
Q. Who are -- who's in [redacted]'s immediate family?
MR. BRANN: I'm going to object. I mean, that's not one of our four people that's listed in this on the names here.
MR. BROWN: Are you instructing her not to answer, or do we need the --
MR. BRANN: Well, I mean, where are we going on this?

MR. BROWN: I'm going to ask about her awareness or her communications with those people.

MR. BRANN: With who?

MR. BROWN: Whoever's in [redacted]'s family.

MR. BRANN: All right. I will object, because we're supposed to be limited to the names. That was what was --

MR. BROWN: Actually, what the order says is, Prior to the deposition, plaintiff shall provide defendant with the names of all individuals to whom plaintiff contends defendant disclosed the protected subject matter.

MR. BRANN: Correct.

MR. BROWN: This is -- that's -- in terms of actually having information and being able to assert a contention, we've given you those names. But the point -- the purpose of the deposition is to find out who she has communicated with, and I don't think we're limited to the four that we can contend that -- you know, affirmatively that she's spoken to. I'm entitled to ask whether she's disclosed information to people other than

those four.

MR. BRANN: All right. Well, why don't we just ask that, other than these four people, did she disclose it to anyone else, and than follow up from there, as opposed to -- as opposed to going through everyone that you know?

MR. BROWN: I want specific -- thank you for that suggestion. I know that would be faster, but I want specific answers to specific questions.

MR. BRANN: We'll see how this goes, but I will -- I may pursue this, depending on how much of it -- how much of it is.

MR. BROWN: Okay.

BY MR. BROWN:

Q. I'm sorry, tell me again, [redacted]'s immediate family?

A. His children, shall we start there?

Q. Sure.

A. [redacted]

Q. Okay.

A. [redacted]

Q. And what about his parents?

Are those the -- [redacted] children?

A. [redacted] children.
Q. What about his parents?
A. [redacted] is his mother; [redacted] father.
Q. Is [redacted] his biological father?
A. Mm-hmm.
Q. Does he have a stepfather?
A. No.
Q. Okay. Are you -- are you aware of -- do you know whether [redacted] know anything about [redacted] having money?
A. No.
Q. You don't know -- I'm sorry, I asked the question poorly.
Do you know whether they know?
A. They do not know.
Q. Okay. How do you know that?
A. I never disclosed any information to them.
Q. Okay. Have you discussed with any of [redacted] four children -- well, how frequently do you see them?
A. Holidays. The [redacted] girls are in college.
Q. Are they local?
A. No. [redacted], more often, as he's local.
Q. Okay. Are you -- have you been -- are you

aware of any discussions with them concerning anything that [redacted] is doing with his money?
A. No.
Q. Or the fact that [redacted] won the lottery?
A. No.
Q. What about things that he's doing for [redacted]
A. No.
Q. Are they aware of any of that?
MR. BRANN: Objection.
BY MR. BROWN:
Q. Are they aware that [redacted] has taken [redacted] places on a private jet?
A. No.
Q. Okay. What about [redacted] 's mother, what does she know?
MR. BRANN: Objection.
A. I haven't told her anything.
BY MR. BROWN:
Q. Okay. My -- can you answer my question, though? Do you know what she knows?
MR. BRANN: Objection. There's no foundation for that. Go ahead.
BY MR. BROWN:
Q. Do you know -- do you know what she knows?

A. I do not know.
Q. Okay. Do you know whether she knows anything about the lottery?
A. I do not know.
Q. How often do you see her?
A. Not very often.
Q. Can you give me some -- once or twice a year or --
A. If I was able to quantify, probably twice a year.
Q. Okay.
A. Maybe a little bit more, depending on the circumstances.
Q. Okay. Are you close with her?
A. I feel I'm close with her.
Q. Okay. So how frequently do you speak to her?
A. I don't speak to her on the phone.
Q. Do you -- do you email or text with her?
A. I don't.
Q. Do you send letters?
A. I don't send letters.
Q. Okay. What about [redacted] are you close with [redacted]
A. I feel I'm close with [redacted]
Q. How often do you communicate with [redacted]

A. When he comes over to the house.
Q. Are they both local?
A. They're in [redacted]
Q. What's that, about an hour and a half?
A. I would think it's less than a half hour from my house.
Q. Oh, sorry. I was thinking [redacted]. Never mind. Okay.
But you only see -- they're close, but you see [redacted] once or twice a year?
A. Yes.
Q. Okay. And do you see [redacted] more often?
A. I do.
Q. How frequently does he come to the house?
MR. BRANN: I'm going to object. Why don't you ask her if she's disclosed anything to him as opposed to, you know, finding out how the family is getting along? I mean, I just don't think that's getting us anywhere.
MR. BROWN: I'll move on from that.
BY MR. BROWN:
Q. Just answer my question. How often does he -- is he at the house?
A. Possibly once every two weeks. Depending if he's in the area, he'll stop by.

Q. Is he -- is he aware of -- is he aware of the litigation ongoing between you and [redacted]
MR. BRANN: Objection.
A. No.
Q. Is he aware that [redacted] won the lottery?
MR. BRANN: Objection.
A. Not that I'm aware of.
BY MR. BROWN:
Q. In the -- did you tell [redacted] that [redacted] is aware that [redacted] won the lottery?
A. I don't recall.
Q. If you told [redacted] that [redacted] knows about the lottery, was that an accurate or inaccurate statement at the time you made it?
MR. BRANN: Objection.
A. My meetings with [redacted] I never disclosed that information to her. I never talked to her about who knows winnings.
MR. BRANN: Are you referencing to some other document that has not been produced in this case?
MR. BROWN: No. I'm referencing her

communications with somebody.

MR. BRANN: Is this the guardian ad litem?

MR. BROWN: Mm-hmm.

MR. BRANN: Is it your view that she's not allowed to talk to the guardian ad litem in an ongoing custody dispute?

MR. BROWN: That's not a relevant question.

MR. BRANN: That, I'm going to object to. There should not be -- I object to any -- any questions that run to communications with the guardian ad litem in an ongoing custody account -- battle in [redacted] Completely -- it's completely beyond the pale, and it certainly is not anything to do with the disclosures in this case.

It may -- it has a lot to do with how your client was felt by the guardian ad litem to be completely inappropriate as a parent, and therefore, he should have very few, if any, rights, as according to the guardian ad litem.

But I object. And if you ask more questions, I will ask the judge to shut you

down.

BY MR. BROWN:

Q. Ms. [redacted] as I understood what you just said, you did not tell [redacted] [redacted] anything about who knows about [redacted] money; is that -- is that -- did I understand your testimony?

A. I believe that's correct.

Q. Do you know whether [redacted] has shared information with his family about the lottery?

A. He has never said that he shared anything.

Q. Are you aware of any communications between him and anybody in his family concerning [redacted] money and the lottery?

A. No.

Q. There was a -- there was a period of time -- you have security at your house when [redacted] -- when [redacted] is with you?

MR. BRANN: Objection.

A. Yes.

BY MR. BROWN:

Q. Have you been required -- have you needed to explain to anybody why there is -- why there is security for [redacted]

A. I don't feel that there's a need to have to

talk to security about why they're overseeing her care.

Q. I'm sorry, my question -- yeah, let me ask the question again.

A. Okay.

Q. I think you interpreted my question to be asking about you talking to security. My question is, have you had to explain to other people why there is security for [redacted]

A. No.

Q. Has anybody ever asked you questions about why there is security for [redacted]

A. Yes.

Q. Okay. And who were those people?

A. [redacted]

Q. Anybody else?

A. Mm-mm.

Q. What did [redacted] ask you?

A. I guess I should probably -- one day we were going to [redacted] friend's house. Your security team followed me. They knew we were going to the home. Your security team -- I just say yours -- pulled up on her lawn.

Q. I heard about this.

MR. BRANN: Let her finish.

A. She -- I went into the house. I asked him to move. He said that he didn't have the go to do that. So I proceeded to go into her house. The kids, her kids, noticed security on her lawn.

And then we were going for pizza, which is a walk halfway down the block. While we were going out, she said, Excuse me, who are you? And he says, I'm safety and security for [redacted] Upon walking, she asked about that. I said that I could not talk about it. And she said, Well, this is a concern, because I have an ex, and I'm wondering if this has anything to do with him.

Q. With her ex?

A. Mm-hmm.

Q. Okay.

A. And that's it.

Q. That was the end of the conversation?

A. (Nodding.)

Q. Did you -- did you say anything further to explain why security was there?

A. I did not.

Q. Did you tell her that security was being managed by [redacted]

A. I told her if she had any questions, to talk to her father.
Q. Do you mean [redacted] Wait, talk to whose father?
A. I told [redacted] that if she had any questions, she could talk to her father.
Q. Talk -- so [redacted] could talk to [redacted] father?
A. [redacted] could talk to [redacted] father.
Q. Okay. I just wanted to get the pronouns straight so I --
A. Correct.
Q. Okay. So you told her that if she had any questions, she could talk to [redacted]
A. Correct.
Q. Okay. I know I started to ask this, and I can't recall if I closed the loop on it.
You have a [redacted]?
A. I have [redacted].
Q. Okay. Are you close to them?
A. I feel like I'm closer to them since my mother passed away, yes.
Q. Your sister, her name is [redacted] --
A. Yes.
Q. -- is that correct?
What's her last name?
A. [redacted]

THE REPORTER: Can you spell that?

THE WITNESS: [redacted]

THE REPORTER: Thank you.

THE WITNESS: You're welcome.

MR. BRANN: You've done that a few times, huh?

THE WITNESS: Yes, I have.

BY MR. BROWN:

Q. Is [redacted] local to you?

A. She is not.

Q. How often do you talk to [redacted]

A. I try to talk to my sister approximately twice a week.

Q. Okay. Is she aware of the litigation that you're involved in?

A. No.

Q. Is she aware of the security for [redacted]

A. No.

Q. Is she aware of the child support you're receiving?

A. No.

Q. Is she aware that [redacted] won the lottery?

A. No.

Q. Does she know anything about things that [redacted] does with [redacted]
A. No.
Q. You have a brother also?
A. I have a brother.
Q. Named [redacted]?
A. Yes.
Q. And where is [redacted]?
A. [redacted].
Q. Are you close with [redacted]?
A. Since my mother passed away, I try to keep better communication with my brother, yes.
Q. How often do you speak to him?
A. I'd probably say along the lines of twice a week. He has children. I try to keep up with what the children are doing.
Q. Okay. Has he visited you in [redacted] since [redacted] won the lottery?
A. He has not.
Q. Is he aware that [redacted] won the lottery?
A. No.
Q. Is he aware that [redacted] has wealth?
A. No.
Q. Is he aware of anything that [redacted] is doing with [redacted]

A. No.
Q. Has he asked any questions of you regarding [redacted]
A. No.
Q. Who is [redacted]?
A. [redacted] is [redacted]'s sister.
Q. Oh, that's right. And is she local?
A. To me, yes.
Q. Are you close with her?
A. No.
Q. Have you ever had any discussions with her about [redacted]
A. Yes.
Q. Okay. What do you -- since January of 2023?
A. No.
Q. To your knowledge, is she aware that [redacted] won the lottery?
A. Not to my knowledge.
Q. To your knowledge, is she aware of [redacted] wealth?
A. Not to my knowledge.
Q. At some point -- when was the last time you saw her?
A. It's been years.
Q. Okay. And I don't want to ask you detailed

questions about what happened between [redacted] and [redacted]; so I'm not asking that.

Is the reason that you have not seen her because of those incidences?

A. Yes.

Q. Okay. When you -- when you cut off -- is it fair to say that you cut off your relationship with [redacted] or that she did?

A. Yes.

Q. Okay. When that happened, was there any discussion about [redacted] wealth?

A. No.

Q. Was there any discussion about security?

A. No.

MR. BRANN: If you're going to go into a whole other area, maybe we should take a short break.

MR. BROWN: I was going to go -- try to go an hour, but we can take it.

MR. BRANN: Well, I think we actually are at about an hour.

MR. BROWN: Okay.

MR. BRANN: It looks like you're about to go to something different; so I thought, Oh, well --

MR. BROWN: [redacted] and [redacted] that's basically what I've got left, so --

MR. BRANN: Okay. Then why don't we take a break then. Okay? We'll go off the record.

THE VIDEOGRAPHER: Off the record. The time is 10:55 a.m.

(A short was taken from 10:55 a.m. until 11:11 a.m.)

THE VIDEOGRAPHER: We are going back on the record. The time is 11:11 a.m.

BY MR. BROWN:

Q. Ms. [redacted] tell me about your relationship with [redacted] [redacted] How close are with you Mr. [redacted]

Hold on. Since we have two Mr. [redacted] in this case, how close are you with [redacted] [redacted]

A. I feel as though I'm close to them, not as close as I would like to be currently. Prior to this and halfway during this, I felt close.

Q. Okay. Did you -- are you closer with [redacted] or with [redacted]

A. I would probably say equally. I probably talk to [redacted] a little bit more.

Q. When was the last time you spoke to [redacted]

A. Goodness, a couple of months ago, possibly.
Q. At some point, you and [redacted] decided that [redacted] should not be in communication with them; do you recall that?
A. I recall something along the line of that.
Q. Okay. Has -- did you cut off your communication with them at that time also, or was it just [redacted]
MR. BRANN: Objection.
A. I believe [redacted] stopped talking to them. For a period of time, I didn't stay in communication with them.
BY MR. BROWN:
Q. Do you recall what period of time that was?
A. I don't recall a specific date. However, [redacted] had either called me or emailed or texted me about a concern that [redacted] had verbalized to [redacted]
(Exhibit 4, Screenshot of Blocked Calls, marked for identification.)
BY MR. BROWN:
Q. Ms. [redacted] I've handed you a document that's been marked as Smith 4. Do you recognize that?
A. Yes.

Q. And what do you recognize it to be?
A. I recognize it to be blocked calls.
Q. Okay. There are -- this is -- this is a screenshot from your phone?
A. It appears -- it appears that it is.
Q. The dates that are on this sheet, and it's Bates numbered Smith 2, they start with December 10, 2023, and conclude with June 1, 2024. And the first and last blocked calls are [redacted]
That's [redacted] father?
A. Yes.
Q. Is there -- is there more to this timeline? Did you block him after June 1 of 2024?
A. I don't recall. My best answer would be that he possibly is still blocked from my phone. I haven't looked.
Q. When was the last time you spoke with [redacted] on the phone?
A. I spoke with [redacted] -- approximately, it was a couple of months ago.
Q. Okay. And prior to that?
A. I don't know. I don't recall a specific time.
Q. Are there other blocked calls after June 1 of 2024?

A. I don't recall.

MR. BRANN: Objection, I think it was asked and answered.

BY MR. BROWN:

Q. Do you know?

A. I don't recall.

Q. On here, it shows that [redacted] was also called, I mean, was also blocked on May 30, 2024.

Do you know whether [redacted] is still blocked in your phone?

A. [redacted] is not blocked on my phone.

Q. When was the last time you spoke to her?

A. I don't recall a specific time. I believe a couple of months ago.

Q. You gave the same answer for [redacted] Did you speak to both of them at the same time?

A. They were both on the phone.

Q. Do they use a landline?

A. They do have a landline. I'm not quite sure -- I don't have their landline number.

Q. Okay. Did you -- what did you discuss on the call a couple months ago?

A. The call a couple of months ago was a three-way call. I had my lawyer on the call.

It was more of a discussion of, How are you doing, how's [redacted] what is she up to, why is [redacted] doing this to us, do you think this will end?
Q. Did -- those are questions that they asked?
A. Mm-hmm.
Q. How did you respond to the question, Why is [redacted] doing this to us?
A. I responded that, I do not know. I responded that, I don't know when this will end, and I don't know why he's doing that.
Q. And when they asked -- when you say they don't know why he's doing that, what is the "that" that they were asking you about?
A. They don't understand, despite good and bad times they've had with [redacted] why he cut off communication with them. I did not verbalize an answer. My communication with them is more for their health, to let them know that despite everything going on, that I care about them, and despite anything, it is [redacted] grandparents that she does not see.
Q. Have you reviewed the deposition transcript of [redacted]
A. I have not.

Q. Did you see the video?
A. I have not.
Q. There were a couple of messages -- I don't have them with me. I wish I did. There were a couple of messages between you and [redacted] that were marked as deposition exhibits in [redacted] deposition where you and [redacted] communicated about cutting [redacted] off from his parents.
Do you recall the reasons why -- well, first of all, do you recall that you were in agreement with cutting off [redacted] communication with them?
MR. BRANN: I'm going to object to the characterization. Go ahead.
A. I recall a conversation with [redacted] I'm not sure in the context if it was an email or text or call.
BY MR. BROWN:
Q. I think it might have been an OurFamilyWizard message.
A. Okay.
Q. I wish that I had it with me. I'm sorry, I don't.
Do you recall being in agreement that

[redacted] communication with [redacted] and [redacted] would be cut off?

MR. BRANN: Objection.

A. I did not like what [redacted] had texted [redacted] and in that moment I thought the better thing to do was to cut communication at that time from [redacted] and her. I didn't like what she said.

BY MR. BROWN:

Q. Do you recall what she said?

A. I don't recall specifically, but what I do remember is something along the line of [redacted] texting her and saying, I'm sorry I haven't been able to email or text you, I've been busy. And then I believe [redacted] said something to extent, Are you -- oh, so what, you're too busy to drop a line to [redacted] or too busy to text or --

Q. A shaming kind of thing?

MR. BRANN: Objection.

BY MR. BROWN:

Q. Is that fair?

MR. BRANN: Objection.

A. What I think is fair is that she shouldn't have used that tone, and she could have used a

different language with, at that time,
possibly a [redacted] year-old.
BY MR. BROWN:
Q. Okay. Okay. When [redacted] won the lottery, when was your first communication with [redacted] and [redacted] about that?
MR. BRANN: Objection.
A. What I do remember is that [redacted] went to visit his father and [redacted] with [redacted] and [redacted]. They stopped to their house. I called [redacted] to make sure [redacted] got there okay, and she said, She's here. That was that day. And I don't recall -- I believe shortly after, [redacted] had called me and possibly said, I know we're not supposed to discuss things, but [redacted] told us. And that's all she said.
BY MR. BROWN:
Q. Do you recall any other communications with [redacted] or [redacted] about [redacted] money?
A. I don't recall any conversations speaking directly about their money, no.
Q. Do you recall any communications with [redacted] or [redacted] about the lottery?
MR. BRANN: Objection.

A. I don't recall.
BY MR. BROWN:
Q. You don't recall any?
A. No, not that I initiated. I think there were times that [redacted] and [redacted] would call and say how excited they were that he won and that he was going to set up a trust for them. That never happened, to my knowledge. And I believe as months went on and as years went on, or a year, they became more frustrated over that.
Q. How did you come to believe that they came -- became more frustrated with it?
A. As I said, she had called and said that he was going to set up a trust, and they had said, Oh, we're waiting, we hope we get the money. And then as time went on, I think they were more disappointed that nothing was set up for them. It is my belief in just tone.
Q. Did they ask you any questions about what he was doing with his money?
A. No, not that I'm aware of.
Q. Did they ask you any questions about the child support that [redacted] paying to you?
A. I would not verbalize any child support that I

got to them. So no, they do not know.

Q. Okay. But my question was whether they asked, but you're saying, whether they did or not, you didn't tell them anything?

A. I did not tell them anything. They did not ask how much child support I was getting, and I did not verbalize that.

Q. Tell me about your communications with [redacted] or [redacted] about settlement discussions in the custody case. What did you discuss with [redacted]

A. [redacted] had called me and said, We heard that [redacted] has to return [redacted] or he's going to jail, why would you do that, why would you put [redacted] in jail, why would you do that? And I said, I have reason to believe or I feel that [redacted] could potentially kidnap our daughter. And she said, Well, I can't believe that.

And so I sent her an email -- or maybe -- I don't know how I sent it -- about what [redacted] offered me, [redacted] And I

don't know about anybody, but I can't be bought. And I love my daughter, and they were going to know that. So I did send them what [redacted] had proposed to me.

Q. What else did you talk about in that conversation?

A. There was nothing else to talk about in the conversation.

Q. Did you communicate with [redacted] any other offers that were made in the custody case?

A. No. To my knowledge, I don't believe there were any other offers.

Q. Did you communicate with [redacted] during mediations that had occurred in the custody case?

A. No, not that I'm aware of.

Q. How do you communicate with [redacted] Well, from January of 2023 to the present, how -- what are the different ways in which you've communicated with [redacted] [redacted]

A. [redacted] has sent letters to my house, which I have not sent her a letter back. Any communication has gone through my lawyers when we've set up a call.

Q. When did that start?

A. I don't recall exactly. I think -- I believe that started when I started with Brann & Isaacson. And I don't know the exact time frame.
Q. The earliest blocked call here is December 10th of 2023. I believe this lawsuit, the NDA lawsuit in which Mr. Brann represents you, was filed in November of 2023.
A. Okay.
Q. So you have not communicated with them, with [redacted] or [redacted], except through your lawyers since November, December of 2023?
A. I believe so.
Q. In your communications with [redacted] and [redacted], have they asked questions about what [redacted] doing with his money?
A. I believe they had asked, Well, you must know what he's doing, or, where does he live, you must know something. And I told them that I don't know.
(Exhibit 5, Text Messages, marked for identification.)
BY MR. BROWN:
Q. Shifting gears just briefly, this is a text message with your son, [redacted]. Do you

recognize that? It's been marked as Smith 5.
A. I mean, I don't recall the conversation, but I would assume --
MR. BRANN: Hold on. Wait for -- wait for the next --
MR. BROWN: I'm sorry.
MR. BRANN: No, no, no. Were you about to ask a question?
BY MR. BROWN:
Q. Do you know what year this was?
A. I would -- I don't recall what year it is, and it doesn't look like it has a year on it. And I would assume -- my son has had his car -- if it says, When did [redacted] buy you a car, it had to have been at least two years ago. I don't recall exactly. He might have had it more --
Q. How did you learn that [redacted] bought your son a car?
MR. BRANN: Didn't we already do this? Objection, asked and answered.
A. I believe my son had told me he bought him a car.
BY MR. BROWN:
Q. Okay.
A. Or at least he came to my house and showed me

the car. I don't know when that was.
Q. Okay. Do you -- who told you that -- the second question you asked [redacted] on Smith 5 is, When did [redacted] talk to your dad? His dad is [redacted]
A. Yes.
Q. Who told you that [redacted] talked to [redacted]
MR. BRANN: Objection.
BY MR. BROWN:
Q. Or what led you to believe that that had occurred?
A. I don't know the context of how I found out, and I don't want to say a hundred percent that it was my son, but I believe it possibly could have been my son. I just don't know a hundred percent.
(Exhibit 6, Letter to [redacted] from [redacted] marked for identification.)
BY MR. BROWN:
Q. Ms. [redacted] do you recognize this document that's been marked as Smith 6?
A. I recognize the document.
Q. What do you recognize it to be?
A. It appears it's a letter from [redacted] addressed to me.

Q. Okay. Did you receive this letter in the mail?
A. Yes.
Q. Did you ever respond to this letter?
A. No.
Q. In the first paragraph, it says, Have you given any thoughts to my suggestion I gave you about having your boyfriend sending me a few pictures of [redacted] Would [redacted] be able to know he did this. I wouldn't think so.
Did you -- have you communicated to [redacted] through other people -- sorry, I confused the names.
Have you communicated to [redacted] through other people?
A. I have not.
Q. She asked, How is your case going with [redacted] What -- how does she know about the case?
MR. BRANN: Objection.
A. [redacted] knows about the case because when we were in mediation and he sued me, it wasn't that he directly sued me, he went to the news media. That's how she knew, I believe.
BY MR. BROWN:
Q. Who went to the news media?

A. I would assume it was your team. It was all over the news that Sara Smith was being sued by John Doe. So I would assume, since she knew about [redacted] lottery winnings, that's how she knew about him suing me.
Q. We've done everything we can to keep it out of the media, and we don't -- there's nobody on [redacted] side putting stuff in the media.
A. When --
MR. BRANN: Wait. Just wait for a question.
THE WITNESS: Okay.
BY MR. BROWN:
Q. Do you know -- have you talked to her about your case with [redacted]
A. I don't believe so.
Q. Okay. That's a -- that's a qualified answer. What makes it difficult for you to just tell me no?
A. I have spoken to [redacted] regarding the stress that I've been under in working because of being sued.
Q. What did you communicate to [redacted]?
A. I believe I said, Despite his substantial winnings, he chose to sue me. And I wasn't

the one who told [redacted] or [redacted] that he won. So I told her how difficult it was to try to sustain finances in the family court and the Maine court, which I believe I'm allowed to verbalize, and then I had to work extra time or that I had to cut my hours at a certain point because when we were going through mediation or family court or this, I couldn't get 12-hour shifts covered. And then I love my job; so I cut my hours to eight so at least I could find four-hour coverage and then possibly use PTO time to get my other four hours covered. That is the stress and what I talked to her about.

Q. Did you -- did you communicate with her about the parties' positions in either of the litigations you're involved with?

A. I don't think I understand that question, I'm sorry.

Q. I'm asking if you communicated with her about the positions that the parties, that you and [redacted] have taken in the two pieces of litigation you're involved with?

A. I don't know how to answer that. I guess by just saying that she knows that I had to get a

lawyer to fight my case, and obviously they know who you are. So I don't know what else to say.
Q. Okay. Did you -- did you communicate anything about what was offered in mediation or what was discussed or decided in mediation?
A. The only thing that I discussed was what I told you I sent them, and that was the settlement --
Q. Offer?
A. Yeah.
Q. How did -- we'll ask --
A. Sure.
Q. Well, let me ask you about that settlement offer. How did you convey that to [redacted]
MR. BRANN: Do you mean physically?
MR. BROWN: Well, is digital physically? I don't know.
BY MR. BROWN:
Q. How did you -- how did you provide that settlement offer to [redacted]
A. I believe I sent it via email. I'm not sure.
Q. Did you regularly communicate with [redacted] by email?
A. Prior to all of this, yes, but mostly it was

phone calls.
Q. You have not produced in this case the email where you forwarded that settlement offer to [redacted] Why not?
A. Because I don't -- I've looked, I don't know where it is.
Q. What type of email do you use?
A. I use Yahoo email.
Q. Does Yahoo delete emails?
MR. BRANN: Objection.
A. Not to my knowledge.
BY MR. BROWN:
Q. Okay. So all of your emails with [redacted] are still in your Yahoo account?
A. Yes.
Q. Okay. Did you -- did you look for all of your communications with [redacted]
A. I looked for it and my lawyers looked for it.
Q. Are there other emails from [redacted] in your Yahoo account that you did not produce?
A. Not that I'm aware of.
Q. Are there other emails to [redacted] in your Yahoo account that you did not produce?
A. Not that I'm aware of. My lawyers took my phone. My lawyers have my passwords. They

thoroughly looked into everything. So anything they would have found, they would have.

Q. So if anything was there and not produced, your lawyers have it?

MR. BRANN: Objection. Go ahead.

A. I believe so.

BY MR. BROWN:

(Exhibit 7, Letter to [redacted] from [redacted] marked for identification.)

BY MR. BROWN:

Q. Ms. [redacted] I've handed you a document that's marked as Smith 7. Do you recognize it?

A. This would be a letter from [redacted] to [redacted]

Q. [redacted] being you?

A. Yes.

Q. Did you receive this from [redacted]

A. I received it in the mail, I would assume, yes.

Q. In the second sentence it says, I was thinking if I gave you an envelope and stamped addressed to my friend [redacted] this way if you were worried about [redacted] seeing your letter, you would write to me. But then again, maybe

you don't trust me.
Did you ever send communications to [redacted] indirectly so that [redacted] would not see them?
A. I did not. And this here should solidify that I haven't said anything and that I should do this and that I haven't because she knew that I can't talk about certain things.
Q. Which language were you pointing to specifically? The one at the first sentence, I haven't had any luck with getting any answer from you?
A. Correct.
Q. Okay. Do you know -- there's no date on this letter. Do you have any idea when it was sent?
A. I do not.
Q. All we know is it was a Thursday. Do you still have the envelopes?
A. No.
Q. How did -- how did [redacted] know that you couldn't talk about it?
MR. BRANN: Objection.
BY MR. BROWN:
Q. You just said that this should solidify that

she knows you couldn't talk about it?
A. She knows -- I would assume that I had told her that I couldn't talk to her about it.
Q. Do you recall that conversation?
A. I'm just assuming. I don't recall the conversation.
Q. Do you know whether you ever said to her, I can't talk to you about any- -- anything?
A. I believe I had told her that I was scared about the NDA and there were certain things that I couldn't talk about. She possibly wanted more answers than what I gave her.
Q. I guess she wanted you to secretly violate the NDA, but you weren't willing to do that, is kind of what I hear you saying; is that fair?
MR. BRANN: Objection, mischaracterizes the testimony.
A. To be honest, I'm not sure how I could violate an NDA when [redacted] and [redacted] already knew that he won. So the whole purpose of this was, did I disclose this to [redacted] and [redacted] his winnings? And that was no.
BY MR. BROWN:
Q. Did you disclose to [redacted] and [redacted] anything that [redacted] has been doing with his

money?
A. To be honest with you, I'm not sure I know what [redacted] does with his money. As you probably know, my communication with [redacted] is OurFamilyWizard. I have not texted him, I've never set foot in his home, and have driven by his house once. When [redacted] was going to NDA, I just wanted to see what the distance was from his house to mine, and that's the only thing.
Q. How did the NDA come up in your communications with [redacted]
MR. BRANN: Objection.
A. I'm not sure. I don't know if I recall the circumstances of that.
BY MR. BROWN:
Q. When [redacted] called you and told you that [redacted] had told her about winning the lottery, did you -- did you tell [redacted] Did you let [redacted] know that [redacted] had called you about that?
A. I don't recall.
Q. Did you -- did you ever communicate with [redacted] that you had had any of those discussions with [redacted] about his winning?

MR. BRANN: Objection.
A. I don't believe I did.
BY MR. BROWN:
Q. Have you ever communicated with [redacted] about [redacted] flying on private jets?
A. I don't believe I did.
Q. Or talking [redacted] places on a private jet?
A. I don't believe I did.
Q. Have you communicated with [redacted] about [redacted]?
A. I don't believe I did. I'm not a big fan of [redacted]; so that wouldn't be a topic of discussion for me to --
Q. [redacted] wrote in this letter, Maybe you can give us his address just to see how the rich and famous live.
Did you ever provide his address to them?
A. I don't believe I did.
Q. Do you know one way or the other?
A. I did not disclose his address.
Q. Thank you.
A. I believe if I did, he would have driven down to see his son, just so you're aware. So to answer your question, I did not give --
Q. You think [redacted] would have driven to --

A. To see his son.
Q. She writes, We aren't -- we are not sending a gift to her -- meaning [redacted] -- because it might get her in trouble if he found out about it.
Why would she think that?
MR. BRANN: Objection.
A. I do not recall, and I do not know the answer to that.
(Exhibit 8, Letter to [redacted] from [redacted] marked for identification.)
BY MR. BROWN:
Q. I just handed you a document marked as Smith 8. Do you recognize it?
A. I would -- yes. This is a letter from [redacted] to myself.
Q. Do you know what year it was sent?
A. I do not know the year it was sent. However, it says, Last week a private investigator came -- a private eye from [redacted] came to talk to us. So I would think that was sometime after his winnings, but I don't know. So I would assume -- I don't know, to be honest with you.
Q. Do you know anything about a private eye

speaking to [redacted] and [redacted] [redacted]
A. From this letter, I do.
Q. Okay. Do you know -- do you have any information from anything other than this letter?
A. I do not.
Q. Did you ever have any conversations with them about -- about that?
A. I don't believe I did.
Q. There's -- down below it says, [redacted] -- with an [redacted] -- [redacted] even told her dad the private eye was at her house.
Is -- who is [redacted] Who is that [redacted]
A. That [redacted] is [redacted] sister.
Q. [redacted]
A. No. That would be [redacted] I don't know her last name. She's married. That's [redacted] sister.
Q. Okay. How can you tell from this that that's [redacted] sister and not -- or how can you tell it's [redacted] sister?
A. Because by reading this, a private investigator wouldn't have come to, I don't believe, my son or his fiancee's home. And it was an assumption that it was [redacted] It said,

Told her dad. So if a private investigator came to [redacted] and [redacted] -- it says here, [redacted] told her dad. I would assume that was [redacted]

Q. Did private investigators come to your house?

A. Not that I'm aware of.

Q. Okay. The second page says, Does [redacted] watch your mail? I don't think it's gone that far, has it?

Do you ever -- did you tell -- well, first of all, did you have any conversations with [redacted] or [redacted] about the private eye or security or people watching the mail or anything like that?

A. No. It is my assumption, from her verbiage, that she is nervous, anxious, and probably thinking if a private investigator showed up to her house to ask her questions, what might I be going through. That is my assumption.

Q. The first time that you called [redacted] and/or [redacted] with your lawyer on the phone --

A. Yes.

Q. -- how did you -- what did you say to them to explain your lawyer being on the phone?

MR. BRANN: Objection.

A. I guess I had said that I have my lawyer on the phone and just to keep the conversation to, you know, [redacted] and what's been going on with me and things like that.
Q. Did they ask you why you needed to have your lawyer on the phone?
A. I don't believe they ever asked me.
Q. Before you called them with your lawyer, had you -- did -- were they -- did they know ahead of time that your lawyer would be on the phone?
MR. BRANN: Objection.
A. Yes.
BY MR. BROWN:
Q. How did they -- how did they know that?
A. Because my lawyer would initiate the call.
Q. Did you have any communication with them ahead of time about they would be hearing from your lawyer?
A. I don't recall.
Q. When was the first time that you called with your lawyer?
MR. BRANN: I think we already did this. Objection.
A. I don't recall.

BY MR. BROWN:
Q. Was it around the time that you hired them, do you think?
A. I believe that's what I had said.
Q. Okay. And how frequently since then have you called with your lawyer?
A. I believe I spoke to [redacted] and [redacted] probably three if not four times in a couple of years.
Q. Okay. Each time with your attorney?
A. Yes.
Q. Did you ever answer [redacted] question, Does [redacted] watch your mail?
A. I did not answer her question.
Q. She asked, How is [redacted] doing? How much does she know?
My question for you is, how much does [redacted] know?
MR. BRANN: Objection.
A. I'm not sure I understand how much does she know about -- I don't understand.
BY MR. BROWN:
Q. What's going on between you and [redacted]
MR. BRANN: Objection.
A. I believe I stated before, [redacted] and [redacted] know that [redacted] is suing me. And what I meant

earlier about the news breaking, it was all over the news stations and it was in newspapers that John Doe was suing Sara Smith and the circumstances surrounding it.

BY MR. BROWN:

Q. Did you confirm to [redacted] or [redacted] that John Doe is [redacted] and Sara Smith is you?

A. I don't believe I had to.

Q. Did they ask you that question?

A. They did not.

Q. The last time you spoke with [redacted] did she have any trouble understanding or staying with the conversation?

A. It appeared to me [redacted] was a bit more tired, kind of waxed and waned a little bit from conversations. Maybe she'd ask me how work was doing, and then I would let her know, like, good and give her something, and then maybe a few minutes later she would ask the same question.

(Exhibit 9, Envelope and Letter to [redacted] from [redacted] marked for identification.)

BY MR. BROWN:

Q. Ms. [redacted] I've just handed you a document marked as Smith 9.

A. Yes.
Q. Do you recognize it?
A. It's an envelope addressed to me from [redacted]
Q. Is this, in fact, a letter that you received from [redacted]
A. I did receive this.
Q. The envelope has the year 2023. So unlike the others, the letter says November 22.
Does it seem right to you that it was 2023?
A. It appears it's that way. It appears it says, November 22nd of 2023, the 22nd day of November in 2023.
Q. Okay. For the second paragraph on the first page of the letter, it's the second page of the document, it says, Anyway, I want you to know that we stand with you against what [redacted] said.
Who told them what [redacted] said?
MR. BRANN: Objection.
A. If I'm answering your question correctly, this is in regards to [redacted] suing me and stating that Sara Smith told John Doe's parents that he won the lottery. I believe that is what

that is referring to. I want you to know that we stand with you against what [redacted] said. We had [redacted] tell us about his winnings. That's what she's referring to. She's stating that she's standing by me because I didn't tell them about his winnings.

BY MR. BROWN:

Q. Did you have other discussions with them about things that [redacted] was doing with his money?

A. Again, I don't believe I did because I don't have that conversation with [redacted] so I don't know what he's doing with his winnings.

Q. Okay. The second page says, If you need us to be on your side, we'd be happy to come up there. And then it's signed [redacted] and [redacted]

A. Okay.

Q. Do you know whether [redacted] had any role in this letter?

A. I don't recall. It was never said to me that [redacted] knew about the letter.

Q. Do you have a reason to believe one way or the other that he knew about the letter or did not know?

A. I believe he possibly did not know about the

letter. She would write letters and sign -- most of them are from [redacted]. This one says [redacted] That appears -- her writing -- where it says, [redacted] and [redacted], that appears to me that's her writing.

Q. Did you ever receive letters from [redacted]

MR. BRANN: I'm sorry, I missed the last part of that.

BY MR. BROWN:

Q. Did you have any discussion with [redacted] and [redacted] -- well, in this letter, [redacted] says, It took forever -- it took [redacted] -- we know it took [redacted] forever to tell us, and then we had [redacted] tell us about his winning.

Had you communicated with them about [redacted] winning before he got around to telling them?

A. I did not. I would assume if [redacted] won in January and then went to see his father -- when did he go? January, February, later February into March, I'm assuming she's referencing, Why didn't he will tell us sooner, like, why didn't he tell us in January that he won? That's what I'm assuming.

Q. The line, We had him tell us, it makes it

sound as if they knew and then they didn't -- they didn't want him to know they know, and they were waiting for him to tell them so that they could talk about it.

MR. BRANN: Objection. Whoa, whoa, whoa, stop.

BY MR. BROWN:

Q. Did that happen?

MR. BRANN: Objection. Objection to the characterization. Go ahead.

A. Greg, I have never told [redacted] or [redacted] about [redacted] winnings prior to him -- to them knowing.

BY MR. BROWN:

Q. So prior to March --

A. I never spoke a word.

Q. -- you didn't have any discussions?

(Exhibit 10, Letter to [redacted] from [redacted] marked for identification.)

BY MR. BROWN:

Q. Ms. [redacted] I've just handed you Smith 10. Do you recognize that document?

MR. BRANN: This one is a little longer. Take the time you need to just make sure you know what it is.

A. This is a letter from [redacted] to myself.
BY MR. BROWN:
Q. Do you know what year it was sent?
A. I do not.
Q. Okay. Do you recall receiving it?
A. I don't recall receiving it, but I do recall that it's a -- it's a letter from [redacted] to myself. So I would have at some point. It would have came in the mail.
Q. On the second page --
A. Yep.
Q. -- it says up on -- well, at the end of the first page, it says, It must be putting a lot of pressure on you and [redacted] The second page, it says, It is on us, too, and on [redacted] too.
What is -- do you know anything about the relationship between [redacted] and [redacted]
A. Yes.
Q. What is their relationship like?
A. Prior to the winnings and despite [redacted] and I not being together, [redacted] had a very good relationship with [redacted] and [redacted] And as he was young -- [redacted] came into [redacted] and [redacted] life when he was seven. And we lived in [redacted] so we would see them

quite frequently. So he had a pretty good relationship with them.

Q. Do you know -- are you aware of any communications between -- among them regarding [redacted] money or his winnings?

MR. BRANN: Who's the "them"?

MR. BROWN: [redacted], [redacted], [redacted].

MR. BRANN: Thank you.

A. I don't recall or know of any communication that [redacted] had directly with [redacted] and [redacted]. [redacted] works at a [redacted] in [redacted]. I know [redacted] had frequented that once or twice. I don't know when [redacted] told me that he saw [redacted]. She gave him a hug, but that was all I knew.

BY MR. BROWN:

Q. Okay. But you don't have -- you don't have any information -- you have not -- let me start over.

A. Sure.

Q. You have not had any communications with them about their interactions with [redacted] and [redacted] money or anything like that?

A. I have not had any interactions with them, no.

Q. Do you -- are you aware of any communications

between [redacted], [redacted], and [redacted] about [redacted] money or the things that he's doing?
A. No.
Q. On the fourth page, it looks like maybe the fourth half, it says, You mentioned a while ago that we could use Messenger on Facebook to talk and that would be private.
Have you used Facebook Messenger to communicate with [redacted]?
A. No, I have not. And to be honest, I'm not quite sure why she would say that or if her verbiage was wrong, because nothing on social media is private; so I would not tell her that we could talk on Facebook privately.
Q. There is another instance earlier where she wanted you to send a letter to her friend, and she thought maybe [redacted] could send things to them instead of you.
Is this another attempt to communicate about things in ways that wouldn't be discoverable?
MR. BRANN: Objection.
A. I would assume by that verbiage, it was her intent, but that did not happen.

BY MR. BROWN:
Q. I'm sorry, what was your answer to the question of whether you have communicated with her on Messenger?
A. I have not communicated with her on Messenger.
Q. Okay. Thank you.
This is page 2. She wrote in the second full paragraph, This is taking a big toll on both of us down here not knowing what's going on. When you said in an old message that your world had been turned upside down, you sounded crushed. At that point, I didn't want to push you to tell me.
We have not -- you did not produce a message to [redacted] with -- and she put -- with that language she put in quotes, That your world has been turned upside down, end quote, where is that message?
MR. BRANN: Objection.
A. I believe I spoke to her directly on the phone. Despite it saying a message, I did tell her my whole world has been turned upside down, and I believe I discussed it with you as to why, the suing and finances.
///

BY MR. BROWN:
Q. And so when she says, When you said in an old message, you're saying that there was no message?
A. No. I'm saying that I believe I had spoke to her directly on the phone and talked to her about that.
Q. All right. Did you ever write in a message to her that your world had been turned upside down?
A. I don't believe I did. Again, I believe I had a conversation with her on the phone regarding this.
Q. Have you produced all of your messages to [redacted]
A. I have produced what I have to my lawyers.
Q. Do you know if your lawyers are holding other messages between you and [redacted] that they did not produce?
A. I do not know that.
Q. But they were the ones who downloaded messages from your account, not you, correct?
A. Correct.
(Exhibit 11, Email to [redacted] from [redacted] March 20, 2023, marked for identification.)

MR. BRANN: Just for the record, we did not withhold anything that was responsive that was a message, just so you know. And I think we sent -- we told you that as well.

BY MR. BROWN:

Q. Ms. [redacted] do you recognize the document I just marked as Smith 11 and handed to you?

A. I recognize that it's from [redacted] and it's to me.

Q. You have more than one email address, correct?

A. I do.

Q. And this email address to you is [redacted] What other email addresses do you have?

A. [redacted]

Q. Any others?

A. [redacted]

Q. Any others?

A. No.

Q. Which of those accounts did you give your attorneys access to?

A. All.

Q. All three?

A. Mm-hmm.

Q. When she -- when she wrote, Hi, I read it,

what was she referring to?
MR. BRANN: Objection.
A. I assume she's referring to the settlement offer that [redacted] sent me.
MR. BROWN: Okay. Peter, Request 10 was, Please produce all voicemails, email messages, text messages, and handwritten correspondence among plaintiff's father and stepmother and defendant from January 1, 2023, to the present.
A moment ago, you said you produced everything that was responsive. Did you produce everything, all of her emails that were within that date range among those three?
MR. BRANN: Yes.
BY MR. BROWN:
Q. Ms. [redacted] in the last three and a half years, how many emails have you exchanged with [redacted] or [redacted]
A. I don't email [redacted] so none. And I don't recall.
Q. Can you give me an order of magnitude? Was it 1, 10, 100?
A. No.
Q. Give me your best estimate.

A. One, possibly.
Q. From January of 2023 to now, one email?
A. Yes.
Q. Okay.
A. Like I said, my communication is through my lawyers.
Q. Did you have any follow-up communication with [redacted] after she sent you this email that's marked as Smith 11?
A. I don't believe I did.
Q. Did you talk to her on the phone about it?
A. No.
Q. The one email that you're talking -- that you just said that you sent to [redacted] in the last three and a half years, have you produced that one email?
A. I think it was the settlement offer that I was talking about.
Q. That's the only email you've sent?
A. I believe I do -- yes.
MR. BROWN: I think I'm about done. Why don't we take a five-minute break? I know you've heard that from me before.
MR. BRANN: I've heard that before.
MR. BROWN: I have about 20 more minutes,

but let's go off the record for a little bit.

THE VIDEOGRAPHER: Off the record. The time is 12:18 p.m.

(A break was taken from 12:18 p.m. until 12:25 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:25 p.m.

BY MR. BROWN:

Q. Ms. [redacted] did you ever tell [redacted] about your communications with [redacted] [redacted] regarding the money?

MR. BRANN: Objection.

A. No.

BY MR. BROWN:

Q. Have you had any contact with [redacted]

A. No.

Q. When was the last time?

A. [redacted] approximately, was two, one in -- when we lived in [redacted].

Q. Okay. Now, did you know [redacted] Did you ever know [redacted] biological mother?

A. Yes.

Q. Okay. Do you have any relationship with her?

A. No.

Q. When was the last time you -- did you ever

meet -- I can't -- I don't have -- was [redacted] still in the picture when you and [redacted] first got together?
A. Yes.
Q. When was the last time you had contact with [redacted]
A. Goodness, [redacted] was in a car seat.
Q. Okay. So years before the lottery?
A. Yes.
Q. What about [redacted] brother, [redacted]
A. I've never met [redacted]
Q. Okay. [redacted]
MR. BRANN: Objection.
BY MR. BROWN:
Q. Do you know who I'm talking about?
A. I do not.
MR. BROWN: I didn't -- we didn't bring a hard copy of this.
MS. APONTE: We just covered the answers, yes.
BY MR. BROWN:
Q. [redacted]

A. [redacted]
Q. You testified earlier that it was obvious because your name is [redacted], you live in [redacted] and [redacted] birth date?
A. It would be obvious to direct family. I would assume that's how [redacted] and [redacted] knew.
Q. [redacted]
A. [redacted]
Q. While Louise is looking for that, the -- when you were served with the summons in this NDA case, there was a woman with you. Who was that?
A. I don't recall, specifically, her name. She was a traveler --
Q. Okay.
A. -- and worked her assignment and left.
Q. Okay. Did you have any communication with her about what was going on?
A. I did not have any communications with her as to what was going on. When you served me at my work and she was standing there next to me and I was trying to figure out who you were

and what the papers were, I was assuming she was looking over my shoulder.
Q. Okay. But you didn't talk to her about it?
A. I did not.
Q. And you don't recall her name?
A. No. She has a different name, like a nice name, but a different one. If I knew it, I would be, like, Yes, that's her. But I don't know her name offhand.
Q. Okay. [redacted] do you know who -- do you know [redacted]
A. I do know [redacted]
Q. Okay. Has [redacted] communicated with you about the litigation?
A. No.
Q. Your -- your answers to interrogatories say, The following individuals may have knowledge of protected subject matter, [redacted]
What knowledge of the protected subject matter does [redacted] have?
A. I do not know.
Q. [redacted]
A. I believe that's her name, [redacted]
Q. And she was the woman that was with you the day that you were served?

A. Yes.
Q. Okay. And do you have -- do you possess her contact information?
A. I do not.
Q. Who's [redacted]
A. [redacted] is [redacted] dad.
Q. Okay. Do you have any information about what knowledge he has concerning the lottery, [redacted] money, or anything like that?
A. I do not.
Q. Have you communicated with [redacted] since the lottery?
A. I have not.
Q. When was the last time you spoke to [redacted]
A. [redacted] is [redacted] friend, a [redacted] for [redacted] And I have had no communication with [redacted] The only thing that I can tell you in regards to that is when [redacted] told me he won the lottery, he said that he tried to give the winning ticket to his friend, [redacted] and he would not take it. And that is what [redacted] had told me.
Q. How about [redacted]
A. [redacted] is his wife, and I have had no

communication with her.
Q. What about [redacted]
A. [redacted] is [redacted] friend, [redacted] sorry, [redacted] I have not talked to him. I don't know where he is. I don't know anything of him.
Q. Have you had any communications with people at [redacted] regarding [redacted] money?
A. In regards to people at [redacted] there was an instance where your security [redacted]
So when we talked to the school, myself and [redacted] there was no talk about [redacted] winnings. They just said that security was not warranted on the property.
So to answer your question, I did not disclose any winnings to anyone at NDA.
Q. Did Ms. [redacted] say anything in that meeting

about [redacted] money or his wealth?
A. She did not.
Q. You don't recall a message from [redacted] about litigation or her knowledge of your situation?
A. Not that I'm aware of.
Q. Okay.
MR. BROWN: This is the last question. I'm just -- we're going to try to find that document and just show it to her.
MR. BRANN: [redacted]
MR. BROWN: That doesn't help me ask about her communications with [redacted] But I need to show her this, and then we'll see.
MR. BRANN: Well --
MR. BROWN: That's what -- that's what I want to know about.
MR. BRANN: Okay. [redacted]

[redacted] So it's -- that doesn't move us down the -- down the road at all.

MS. APONTE: I don't recall it was our mistake, though.

MR. BROWN: Yeah, I think your firm made that mistake.

MR. BRANN: Highly unlikely.

MR. BROWN: We pulled all of the alarms at the courthouse. We tried to get you guys to fix it, and you wouldn't.

MS. APONTE: We were trying to seal everything.

MR. BROWN: We got the clerk to fix it.

MS. WURGAFT: I actually think it was completely unrelated to what you're talking about. I think it was actually a tech issue with the court.

MR. BROWN: Oh, that one?

MS. WURGAFT: Yeah.

MR. BROWN: Okay.

MS. APONTE: Thank you.

MS. WURGAFT: To be fair.

MR. BROWN: Yeah, no, there have been multiple -- we don't need to -- give us just a minute. We can go off the record while

we're --

THE VIDEOGRAPHER: Off the record. The time is the 12:38 p.m.

(A discussion was held off the record.)

THE VIDEOGRAPHER: We're going back on the record. The time is 12:42 p.m.

MR. BROWN: I have no more questions.

MR. BRANN: We have no questions. So we're done.

(The reporter asked that counsel place their orders on the record.)

MR. BROWN: Expedited, digital only. Monday's great, digital.

MR. BRANN: Mini, regular delivery.

(The proceeding ended at 12:47 p.m.)

C E R T I F I C A T E

I, [redacted], a Notary Public in and for the State of Maine, hereby certify that the within-named deponent was sworn to testify to the truth, the whole truth, and nothing but the truth, in the aforementioned cause of action.

I further certify that this deposition was stenographically reported by me and later reduced to print through Computer-Aided Transcription, and the foregoing is a full and true record of the testimony given by the deponent.

I further certify that I am a disinterested person in the event or outcome of the above-named cause of action.

IN WITNESS WHEREOF, I subscribe my hand this 4th day of September, 2026.

[redacted]

My Commission Expires: January 12, 2033

# DEPONENT SIGNATURE PAGE

CAPTION: John Doe v. Sara Smith

DEPONENT: SARA SMITH

I, , acknowledge that I have read pages through inclusive of the transcript of my deposition taken on September 3, 2026.

I further acknowledge that:

(check appropriate language)

the same is a true, correct, and complete transcription of the answers given by me to the questions recorded therein.

OR

except for the changes noted on the attached errata sheet, the same is a true, correct, and complete transcription of the answers given by me to the questions recorded therein.

SARA SMITH

Subscribed and sworn to before me

this day of , 2026.

Notary Public

ERRATA SHEET FOR THE TRANSCRIPT OF:

SARA SMITH - 09/03/2026

| Pg/Ln: | Now Reads: | Should Read: | Reasons: |
|---|---|---|---|

[redacted]

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was served on the following counsel of record on this 18th day of September, 2026:

Peter J. Brann
Hannah Wurgaft
BRANN & ISAACSON
PBrann@brannlaw.com
HWurgaft@brannlaw.com

*/s/ Louise M. Aponte*
Louise M. Aponte